**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STACY DEEMAR, | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-3466 |
| BOARD OF EDUCATION OF THE CITY OF EVANSTON/SKOKIE ("DISTRICT 65"), et al., | Judge Robert M. Dow, Jr. |
| Defendants. | |

<u>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**</u>

2934419.2

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

FACTS .................................................................................................................... 2

    A.  The District's Equity Work ............................................................................ 3

    B.  Deemar's Minimal Participation in the District's Staff Equity Work ........................... 4

    C.  Deemar's Minimal Participation in the District's Student Equity Work ...................... 5

    D.  The Alleged Impact of the District's Equity Policies on Deemar ................................. 7

ARGUMENT ......................................................................................................... 8

    I.  Deemar's Complaint Should be Dismissed Under Rule 12(b)(1) Because Deemar Lacks Standing to Bring her Claims ................................................. 8

        A. Standard of Review ................................................................................... 8

        B. Deemar Alleges No Injury in Fact Traceable to District's Equity Programs ............. 9

        C. Deemar Lacks Standing to Vindicate Rights of Students ........................................ 12

    II. Deemar's Complaint Should be Dismissed Pursuant to Federal Rule 12(b)(6) because She Fails to State an Actionable Claim Under Title VI or the Equal Protection Clause ............................................................................. 13

        A.  Standard of Review .................................................................................. 13

        B.  Plaintiff Fails to State a Claim under Title VI ........................................................ 13

               1.  Deemar's Claims Do Not Fall Within the Zone of Interests that Title VI Protects Because She is Not the Intended Beneficiary of the District's Educational Programing ........................................... 13

               2.  Deemar's Employment Claims are Barred by Section 2000d of Title VI ............................................................... 14

        C.  Deemar Does Not Allege the Existence of a Hostile Work Environment ............... 16

CONCLUSION ....................................................................................................... 18

**<u>TABLE OF AUTHORITIES</u>**

Page(s)

Cases

*Abrego v. Wilkie,*
   907 F.3d 1004 (7th Cir. 2018) .................................................................................16

*Agbefe v. Bd. of Educ. of City of Chicago,*
   2021 WL 1885964 (N.D. Ill. May 11, 2021) ............................................................15

*Ahern v. Bd. of Educ. of Chicago,*
   133 F.3d 975 (7th Cir. 1998) ....................................................................................15

*Alexander v. Rush N. Shore Med. Ctr.,*
   101 F.3d 487 (7th Cir. 1996) ....................................................................................15

*Allen v. Wright,*
   468 U.S. 737(1984) ..............................................................................................1, 10

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..................................................................................................13

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ..................................................................................................13

*Bogie v. Rosenberg,*
   705 F.3d 603 (7th Cir. 2013) ......................................................................................4

*Carroll v. Nakatani,*
   342 F.3d 934 (9th Cir. 2003) .................................................................................9, 10

*Cieslik v. Bd. of Educ. of Chi.,*
   2021 WL 1172575 (N.D. Ill. Mar. 29, 2021) ...........................................................16

*Crabtree v. Experian Info. Sols., Inc.,*
   948 F.3d 872 (7th Cir. 2020) .................................................................................8, 13

*Davis v. City and Cnty. of San Francisco,*
   1993 WL 268452 (9th Cir. Feb. 2, 1993) .................................................................12

*Doe ex rel. Doe v. St. Joseph's Hosp. of Fort Wayne,*
   788 F.2d 411 (7th Cir. 1986) ...............................................................................13, 15

*Doe v. Woodridge Elementary Sch. Dist. 68 Bd. of Educ.,*
   2005 WL 910732 (N.D. Ill. Apr. 13, 2005) .............................................................14

*Ezell v. Potter,*
   400 F.3d 1041 (7th Cir. 2005) ..................................................................................16

*Johnson v. Transp. Agency,*
   480 U.S. 616 (1987) ..................................................................................................14

*Johnson v. U.S. Off. of Personnel Mgmt.,*
   783 F.3d 655 (7th Cir. 2015) .................................................................................9, 11

*Kansas City, Missouri Sch. Dist.,*
   65 F.3d 98 (8th Cir. 1995) .........................................................................................12

*Keen v. Bluestar Energy Svcs., Inc.,*
   2012 WL 1118215 (N.D. Ill. March 30, 2012) ..........................................................8

*King v. Board of Regents of Univ. of Wisconsin System,*
   898 F.2d 533 (7th Cir. 1990) ....................................................................................16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ...................................................................................13

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...............................................................................1, 8, 9

*McReynolds v. Merrill Lynch & Co*., Inc.,
   2011 WL 1196859 (N.D. Ill. Mar. 29, 2011) ...........................................13

*Miller v. Phelan*,
   845 F. Supp. 1201 (N.D. Ill. 1993) ...........................................................14

*Milliken v. Bradley*,
   418 U.S. 717 (1974) ....................................................................................1

*Moore v. Bryant*,
   853 F.3d 245 (5th Cir. 2017) ....................................................................11

*Oncale v. Sundowner Services, Inc.*,
   523 U.S.  75 (1998) ...................................................................................17

*Parks v. Speedy Title & Appraisal Review Servs*,
   318 F.Supp.3d 1053 (N.D. Ill. 2018) ........................................................15

*Silha v. ACT, Inc.*,
   807 F.3d 169 (7th Cir.2015) ......................................................................8

*Simpson v. Reynolds Metal Co.*,
   629 F.2d 1226 (7th Cir. 1980) ..................................................................13

*Spokeo, Inc. v. Robins*,
   578 U.S. 856, 136 S.Ct. 1540 (2016) .........................................................9

*Totten v. Benedictine Univ.*,
   2021 WL 3290926 (N.D. Ill. Aug. 2, 2021) .............................................16

*Trageser v. Libbie Rehab. Ctr., Inc.*,
   590 F.2d 87 (4th Cir. 1978) ......................................................................15

*U.S. ex rel. Bidani v. Lewis*,
   1998 WL 1820753 (N.D. Ill. Dec. 29, 1998).............................................8

*U.S. v. Hays*,
   515 U.S. 737 (1995) .............................................................................10, 12

*U.S. v. Payner*,
   447 U.S. 727 (1980) ..................................................................................12

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*,
   454 U.S. 464 (1982) .............................................................................11, 12

*Veljkovic v. Bd. of Educ. of Chicago*,
   2020 WL 7626735 (N.D. Ill. Dec. 22, 2020)........................................14, 15, 18

*Warth v. Seldin*,
   422 U.S. 490 (1975) ..................................................................................12

Statutes

42 U.S.C. § 2000d-3................................................................................14, 15

2934419.2

Rules

Fed. R. Civ. P. 8(a)(2)................................................................................13
Federal Rule of Civil Procedure 12(b)(1)........................................................8
Federal Rule of Civil Procedure 12(b)(6)......................................................13

## INTRODUCTION

The Board of Education of Evanston/Skokie District 65 (the "District") serves a diverse, multi-racial community. Despite its commitments to equity and inclusion, it is also a community historically marked by significant gaps in income, access to resources, and educational outcomes between Black students and students of other races. The District is dedicated to closing these gaps and addressing other longstanding inequities by adopting policies, engaging in training and developing curriculum reflective of the needs of the community. This work has engaged District stakeholders at all stages, ensuring that the voices of educators, parents, students, and faith, community and District leaders are included. In this action, Plaintiff Stacy Deemar, a part time drama teacher in the District who is White, asks this Court to enjoin the District's diversity, equity and inclusion initiatives because she personally believes that the District's attempts to address the ongoing and pernicious effects of discrimination and racism are in themselves "divisive" and "racist."

The Supreme Court recognizes that "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process." *Milliken v. Bradley,* 418 U.S. 717, 741-42 (1974). Also, under the Constitution, the federal court system is a forum for resolving actual cases and controversies and redressing real injuries; it is not the forum for resolving disputes about educational curriculum, even when that curriculum addresses politically charged and sensitive matters such as equity, race and racism. *See Allen v. Wright*, 468 U.S. 737, 760-61 (1984) (*abrogated on other grounds by Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2015); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).

1

Deemar violates these bedrock constitutional principles by asking this Court to prohibit the District from teaching about race and racial inequity because she was "concerned" by statements in the District's diversity, equity and inclusion curriculum such as "I've encountered racism and discrimination from White adolescents and adults." Compl. ¶165. Her Complaint is long on politically charged rhetoric regarding the supposed divisiveness of "anti-racism," "social justice," "Black Lives Matter," and "critical race theory," but falls woefully short of establishing that she has personally suffered an injury that entitles her to relief in federal court, or that would otherwise justify this court's intervention in curriculum decisions best left to the discretion of educators.

For the reasons explained below, Deemar's Complaint should be dismissed pursuant to Federal Rule 12(b)(1) for lack of jurisdiction because she personally has not suffered an "injury in fact" that gives her standing to challenge the legality of the District's curriculum. Deemar's Complaint should also be dismissed pursuant to Federal Rule 12(b)(6) because Deemar, as a teacher, is not within the "zone of interests" protected by Title VI of the Civil Rights Act and her employment does not rely on and is not based on any federal funding received by the District as required for an employee of a federal funding recipient to state a claim under Title VI. Deemar also cannot state an actionable race discrimination claim under Title VI or the Equal Protection Clause because she has not been subjected to any adverse discriminatory action or subjected to an actionable hostile work environment.

## FACTS

The District is a public elementary school district serving over 8000 Pre-K through Eighth Grade students from Evanston and Skokie. Compl. ¶20. Stacy Deemar is a part time drama teacher in the District. Compl. ¶¶12, 20, 161. She has taught at Nichols Middle School for 19 years and has also taught at Dr. Martin Luther King Jr. Literary and Fine Arts School ("King Arts"), Haven Middle School, and Kingsley Elementary School. Compl. ¶¶161-62.

2

### A. The District's Equity Work

In 2015, the District released a 5-year strategic plan that was the result of input received from "thousands of members of the Evanston and Skokie Communities, including "[ ] students, families, neighbors and employees." Compl. ¶28 and Strategic Plan linked thereto at 5. The Plan identified closing achievement gaps based on race, income, disability status and language barriers as a priority. Compl. ¶25.

Achievement Reports compiled by the District for the years 2015 through 2018 identified persistent and ongoing race-based achievement gaps. Compl. ¶30 and 2015 Achievement & Accountability Report linked thereto at 19-20.

To address these longstanding gaps and inequities, in 2017 the District adopted a Racial and Educational Equity Policy. Compl. ¶33 and Racial and Educational Equity Policy linked thereto. The District also compiled a Racial Educational Equity Report which was based on feedback received during 233 focus groups consisting of more than 500 parents, teachers, support staff and administrators, and student focus groups consisting of approximately 1000 students. Compl. ¶34, Equity Report Evanston/Skokie School District 65 linked thereto at 4. The survey data collected for this report showed that the overwhelming majority of survey participants, including 68% percent of White survey participants, "strongly agree" that it is important for adults to be able to talk about race in school. *Id.*, Equity Report at 11. An equally overwhelming majority, including 70% of White survey participants, agreed that it is important for students to be able to talk about race in school. *Id.* Consistent with these findings, the Equity Report recommended that the District implement equity training for all employees and create "district wide" affinity groups as a means of increasing racial literacy. Compl. ¶36.

2934419.2

Deemar cites selectively from the District's Policy and the Report. For example, while the Policy does indeed state that the District "is committed to focusing on race as one of the first visible indicators of identity" as referenced by Deemar, the Complaint omits the remainder of this sentence which reads "while recognizing that the district's students hold multiple, intersecting identities such as mental or physical ability, sexual orientation including gender identity and/or expression, religion, economic status, national origin and any other personal characteristics." Compl. ¶33 and website citation contained therein.[1]

## B. Deemar's Minimal Participation in the District's Staff Equity Work

Of her 193 paragraph Complaint, over 105 paragraphs are devoted to describing generally race and equity-based training provided to teachers and the curriculum provided to students but indicate nothing regarding Deemar's own participation in these activities.

For example, consistent with the recommendations from the Report, the District provided a two-day seminar to staff called "Beyond Diversity" that used materials from the book Courageous Conversations. Compl. ¶¶40-46. During the 2018-2019 school year, the District also hosted voluntary racial "affinity groups." Compl. ¶59. The alleged affinity group sessions were not part of the two-day mandatory Beyond Diversity training that all staff received; rather, these were voluntary activities in which Deemar did not participate. Compl. ¶¶49-59; Decl. ¶4.

Deemar asserts that the District continues to use the Courageous Conversation materials to inform its work in the District. Compl. ¶47.[2] Deemar, however, has not been required to use these

---

[1] When the contents of an exhibit incorporated into a Complaint contradicts the allegations in the complaint, the contents of the exhibit controls, even when considering a motion to dismiss. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).
[2] The learning tools referenced in the Complaint include a compass on "thinking, acting, feeling, believing" which apply regardless of the topic, race or otherwise. The tool is used as a check in for each participant, to reflect on what they are bringing to the topic. Decl. ¶5.

4

materials or participate in any "Courageous Conversation" apart from the initial two day Beyond Diversity training. Decl. ¶5.

Deemar further alleges that the District also implemented a seminar series entitled Seeking Educational Equity and Diversity ("SEED"). Compl. ¶¶36-37.[3] The SEED seminar, however, was entirely voluntary and Ms. Deemar never attended any SEED sessions. Decl. ¶6.

Deemar identifies staff meetings at Nichols during the 2017-2018 school year as times when discussions of equity and race took place. Compl. ¶55. Deemar, however, did not typically attend these staff meetings because of her part time status. Decl. ¶7.

Deemar asserts that during the 2019-20 school year, administrators read the book "White Fragility" by Robin DiAngelo and invited teachers to take part in a monthly book study. Compl. ¶¶85-91. Administrators also announced to staff that DiAngelo would be speaking at the District. Deemar, however, was not required to read the book, did not participate in these voluntary book study groups, and Robin DiAngelo never spoke at the District. Compl. ¶89; Decl. ¶8.

## C. Deemar's Minimal Participation in the District's Student Equity Work

Deemar asserts that the District offered an affinity group for black students in the 2018-19 school year (Compl. ¶¶103-105) and in 2019 and 2020 offered racial affinity groups for students who were "Black" or "White." Compl. ¶105. Deemar, however, did not participate in or play any role in facilitating these "affinity groups." Decl. ¶9. Similarly, she asserts that the District has conducted "privilege walk" exercises with students (Compl. ¶¶ 109-110) but does not allege or assert that she participated in or was required to participate in any of these activities.

---

[3] While Deemar describes SEED, incompletely, as a seminar designed to promote change "by examining…race", in fact "SEED is a 10-month seminar that meets monthly for three hours and offers participants the opportunity to explore and build capacity to promote institutional change by examining their own education in relation to race, gender, socioeconomic status, religion, sexual identity, abilities, and age, and how these factors currently impact their school, classrooms, community, or workplace." Compl. ¶37; https://www.district65.net/Page/1519 (full citation cited in complaint provided).

Deemar goes into great detail about the Black Lives Matter Week Curriculum and makes various allegations as to what District 65 "teaches" to students or instructed teachers to teach students, but does not identify which if any, of these teachings she taught her students, and does not allege that she was disciplined, criticized or reprimanded for failing to teach this curriculum or for disagreeing with it. Compl. ¶¶112-121, 124-16. For example, Deemar asserts that in 2020-21 all teachers were instructed to read aloud the children's book, "Not My Idea;" as a drama teacher she was not required to read this book to students and, indeed, this book was not taught at Nichols Middle School at all. Compl. ¶126; Decl. ¶10.[4]

Deemar claims to have taught two BLM Week lessons, developed collectively by her department at Nichols. She asserts that she was instructed to teach a lesson in which the teacher asked students whether they would participate in a civil rights march like the Children's March of 1963, and also was instructed to teach a lesson on "intersectionality" (i.e. the identities that make up an individual, including race, gender, class, sexual orientation, ability and nationality.) Compl. ¶¶121-123, The District has no record that the Children's March history lesson was ever taught at the middle school level, as claimed, nor was intersectionality lesson taught during the 2019-2020 school year. Decl. ¶11.

Deemar asserts that during the 2018-2019 school year, Principal Adrian Harries designated half-days to programming for students at Nichols Middle School regarding race. Compl. ¶¶110-

---

[4] The Complaint contains a link to a You Tube video of a women reading the entire book, Compl. ¶126 and Video linked thereto. But the Complaint itself, selectively and misleadingly quotes only isolated and out of context excerpts from the book. Among the quotes missing from the complaint are the following:

- "Racism was not your idea. You don't need to defend it. You can bring your curiosity to learn about it and see that it is true. (link to book at 30-31).
- In the United States of America, White people have committed outrageous crimes against Black people for four hundred years. All along every step of the way, people who love justice and love each other have been fighting back (link to book at 33).
- Some White people joined the leaders of black liberation. (link to book at 36).

111.  Deemar does not indicate her role in this programming or if she was required to facilitate any of these discussions.

**D.  The Alleged Impact of the District's Equity Policies on Deemar**

With respect to her personal involvement with the District's equity based policies and their impact on her personally, Deemar makes the conclusory allegation that that she was "aware of and subjected to" segregated affinity groups, Courageous Conversation training and practices, and curriculum focused on "whiteness." Compl. ¶163. She asserts that "Defendants "treated her differently from her colleagues because of her race when they intentionally segregated staff meetings by race, offered race-based programming, promoted affinity groups, conducted privilege walks and maintained policies committed to focusing on race as one of the first visible indicators of identity." Compl. ¶179. She further asserts that when she spoke out about these practices, her colleagues "interrupted her, rolled their eyes, and said she did not know what she was talking about." Compl. ¶166.

On July 1, 2021, lead counsel from the Southeastern Legal Foundation, the firm representing Deemar in this action, appeared on the Chicago, Fox Network affiliate news and spoke about the motivation for the lawsuit. At the very beginning of the interview Deemar's counsel explained:

> "[T]he lawsuit actually is not so much about discriminating against Ms. Deemar, it is challenging the overall policies and procedures the training and curriculum that discriminates against all teachers and all students in the District.

*See* Fox 32 Chicago, *White Middle School Teacher Sues Evanston/Skokie School District for Alleged Discrimination,* YOUTUBE (Jul. 1, 2021).

Later in the interview Deemar's attorney further emphasized:

> "this is not about her; this is about the district and how it is segregating students
> and how it is treating them differently because of their race."

*See Id.*

## ARGUMENT

I. **Deemar's Complaint Should be Dismissed Under Rule 12(b)(1) Because Deemar Lacks Standing to Bring her Claims.**

### A. Standard of Review

Article III of the Constitution limits federal court subject matter jurisdiction to the resolution of cases and controversies. *Lujan,* 504 U.S. at 560. To establish Article III standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). At the pleading stage, the plaintiff must allege facts that demonstrate each element of Article III standing. *Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872, 877 (7th Cir. 2020).

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of claims where the Court lacks subject matter jurisdiction. *Keen v. Bluestar Energy Svcs., Inc.*, 2012 WL 1118215, at *1 (N.D. Ill. March 30, 2012). In evaluating a motion pursuant to Rule 12(b)(1), a court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff; however, in addition to pleadings and legal arguments, the court considers evidence extrinsic to the pleadings. *Id.* While the burden is on the plaintiff to bring evidence establishing jurisdiction, the court can resolve the dispute on the evidence submitted with the pleadings (i.e. documentary evidence, affidavits, etc.) or allow additional proceedings. *U.S. ex rel. Bidani v. Lewis*, 1998 WL 1820753, at *3 (N.D. Ill. Dec. 29, 1998).

### B. Deemar Alleges No Injury in Fact Traceable to District's Equity Programs

Deemar lacks standing to bring a constitutional Equal Protection and Title VI claims because she fails to identify a redressable injury that she personally suffered. Injury in fact—is "the '[f]irst and foremost' of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 856, 136 S.Ct. 1540, 1547 (2016). It requires a plaintiff to demonstrate that she "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).

To establish standing to bring a discrimination claim based on the Equal Protection clause or other federal anti-discrimination laws a plaintiff must "show that the challenged classification creates a barrier that makes it more difficult for members of one group to obtain a benefit, or causes non-economic injuries…" *Johnson v. U.S. Off. of Personnel Mgmt.,* 783 F.3d 655, 665 (7th Cir. 2015) (internal citations omitted).

Deemar's Complaint fails to meet this standard. She merely alleges that contents of the District's training and curriculum "concerned" her (*see e.g.* Compl. ¶165) and that the District's equity based activities treated her "differently" from her colleagues based on race. Compl. ¶179 Deemar, however, fails to allege or identify how this "different" treatment has caused her actionable harm, or how she personally was "treated differently," based on race given that all teachers regardless of race presumably were aware of or exposed to the training and curriculum at some level. Without an alleged harm, her allegations, which merely suggest the possibility of racial classifications, are insufficient to establish standing. *Carroll v. Nakatani,* 342 F.3d 934, 946 (9th Cir. 2003).

Deemar allegation that the District classified students or teachers by race through the use of "affinity groups" or "privilege walks" is not an "injury-in fact." Compl. ¶¶179, 186, 190. As an

initial matter, Deemar herself was not required to and/or did not participate in most of the equity activities of which she complains. Decl. ¶¶4-11.

Moreover, Deemar's assertions that these activities were "divisive" or racially "stigmatizing" (*see* Compl. ¶¶ 1, 17) fail to establish that she was personally harmed or injured by these activities as is necessary to meet constitutional standing requirements. The Supreme Court has noted that "race consciousness does not inevitably lead to race discrimination" and the mere classification or use of race is insufficient to establish an injury in fact. *U.S. v. Hays,* 515 U.S. 737, 745-46 (1995). While "classifications based on race carry a danger of stigmatic harm" and can "promote notions of racial inferiority and lead to a politics of racial hostility" such "stigmatic" injury "accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct[.]" *Allen* 468 U.S. at 755; *see also Carroll,* 342 F.3d at 946 (Being subjected to a racial classification differs materially from having personally been denied equal treatment, such as in education and contracting affirmative action programs.").

In *Allen v. Wright*, the Supreme Court held that parents of Black students in schools undergoing racial desegregation lacked standing to bring claims that the Internal Revenue Service failed to adopt sufficient standards and procedures to deny tax exempt status to racially discriminatory public schools. *Allen*, 468 U.S. at 755. The Court reasoned that the alleged "stigmatization" caused by racial discrimination was insufficient to confer Article III constitutional standing on the parents of Black students. *Id.* at 738. As noted by the Court, even though this type of non-economic injury is one of the most serious consequences of discriminatory treatment and may be sufficient to confer standing in some cases, such an injury accords a basis for standing only to "those persons who are personally denied equal treatment by the alleged discriminatory conduct." *Id.* at 755.

2934419.2

Similarly, in *Moore v. Bryant*, the Fifth Circuit denied standing to a Black lawyer who alleged that the Mississippi state flag, which incorporated the Confederate battle emblem in its top left-hand corner, violated the Equal Protection Clause. *Moore v. Bryant*, 853 F.3d 245, 251 (5th Cir. 2017). The plaintiff in *Moore* asserted that he had suffered an injury in fact because the presence of the flag in state courts where he routinely appeared as a lawyer created a "hostile work environment." *Id.* He also asserted that he had standing to as a parent of a public school student who was taught, pursuant to curriculum mandated by state law, to show "proper respect" to an unquestionably racist and stigmatizing symbol. *Id.* at 252. The Court found that neither contention established an "injury in fact" sufficient to give him standing on him to challenge the racist connotation of the state flag on Equal Protection grounds. *Id.*

If a Black attorney and parent lacked standing to challenge the state forcing him to view an unquestionably racist symbol in order engage in his profession and the state requiring that his child be taught give "proper respect" to that racist symbol, Deemar's allegations that she was "aware of" and "subjected to" affinity groups and other training and curriculum that "concerned" her (Compl. ¶ 163- 165) fails to establish an "injury in fact" that gives her standing in this case. *See Id.*; *see also Johnson,* 783 F.3d at 665.

As evidenced by the contents of Deemar's Complaint, as well as her own attorney's admission that this case "is not about her," this lawsuit is a blatant attempt to use the federal courts for the improper purpose of challenging curriculum that Deemar, and others, disagree with for political and/or philosophical reasons. In so doing, she asks this court to violate the Supreme Court's directive that courts should refrain from "adjudicating abstract questions of wide public significance which amount to generalized grievances." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc*., 454 U.S. 464, 474–75 (1982) (internal quotation

2934419.2

marks omitted). This rule against generalized grievances applies in Equal Protection challenges. *Hays*, 515 U.S. at 743–44; *see Davis v. City and Cnty. of San Francisco*, 1993 WL 268452, at *3 (9th Cir. Feb. 2, 1993) (holding nonminority teachers lacked standing because they demonstrated no injury resulting from a desegregation plan).

Because Deemar cannot establish that she personally has suffered "an injury in fact" as required for Article III standing, her claims should be dismissed for a lack of subject matter jurisdiction.

### C. Deemar Lacks Standing to Vindicate Rights of Students.

As noted, the vast majority of the Complaint is focused on a critique of the District's equity curriculum and activities generally, without any allegation as to how Deemar herself has been adversely impacted or injured. Even if Deemar could establish she personally suffered an injury in fact, her claims should still be dismissed for lack of standing to the extent she is attempting to challenge the impact of the District's curriculum on students.

The Supreme Court has long held that as a general matter, a party "must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley Forge Christian Coll.*, 454 U.S. at 474 (quoting *Warth v. Seldin*, 422 U.S. 490 (1975)). This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party. *See U.S. v. Payner*, 447 U.S. 727, 731–32 (1980).

In this case, Deemar has no constitutional right to dictate or object to the curriculum taught to students, and she lacks standing to assert claims on behalf of students. *Kansas City, Missouri Sch. Dist.,* 65 F.3d 98, 101 (8th Cir. 1995) (finding teacher lacked standing to oppose district's actions in complying with desegregation order affecting students. Claim had to be brought by student or a parent of student).

**II.** **Deemar's Complaint Should be Dismissed Pursuant to Federal Rule 12(b)(6) Because She Fails to State an Actionable Claim Under Title VI or the Equal Protection Clause.**

**A.** **Standard of Review**

Under Federal Rule of Civil Procedure 12(b)(6), the Court must dismiss a complaint unless it pleads facts, accepted as true, that are sufficient to "state a claim to relief that is plausible on its face." *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also McReynolds v. Merrill Lynch & Co.,* Inc., 2011 WL 1196859, at *2 (N.D. Ill. Mar. 29, 2011) ("To survive such a motion, the complaint must meet the plausibility standard."). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). The complaint's factual allegations must "allow[] the court to draw the reasonable inference" that the defendant engaged in the conduct alleged and violated the law. *Id.* at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

**B.** **Plaintiff Fails to State a Claim under Title VI**

**1.** **Deemar's Claims Do Not Fall Within the Zone of Interests that Title VI Protects Because She is Not the Intended Beneficiary of the District's Educational Programing.**

To bring a statutory claim, a plaintiff must demonstrate that his/her claims are within the zone of interests protected by a statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.* 572 U.S. 118, 129 (2014); *Crabtree v. Experian* 948 F.3d 872, 883 (7th Cir. 2020). To establish a claim within the zone of interests for a Title VI claim, "the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program." *Doe ex rel. Doe v. St. Joseph's Hosp. of Fort Wayne, 788 F.2d 411, 419 (7th Cir. 1986)* (quoting S*impson v.*

13

*Reynolds Metal Co.*, 629 F.2d 1226, 1235 (7th Cir. 1980)); *Veljkovic v. Bd. of Educ. of Chicago,* 2020 WL 7626735, at *4 (N.D. Ill. Dec. 22, 2020); *Miller v. Phelan,* 845 F. Supp. 1201, 1207 (N.D. Ill. 1993).

For a Title VI claim brought against a school district, the pertinent question is whether Title VI grants a plaintiff the right to sue as either "the intended beneficiary of" or "a participant in" the District's educational programing. *Veljkovic,* 2020 WL 7626735 at *4. A teacher in a school district that receives federal funding is not within the "zone of interests" protected by Title VI because the primary purpose of a school district's programming is the student's educational development; therefore, students, not teachers or parents, are the intended beneficiaries for purposes of a Title VI claim. *See e.g., Id.* (Title VI claim brought by White teacher dismissed because teacher was not the intended beneficiary of the school district's educational programing); *Doe v. Woodridge Elementary Sch. Dist. 68 Bd. of Educ.,* 2005 WL 910732, at *2 (N.D. Ill. Apr. 13, 2005) (holding students, not parents were the intended beneficiaries of public schooling).

Because students, not teachers are the intended beneficiaries of educational programs within the District that may receive federal funding, Deemar, as a teacher, cannot bring a claim under Title VI. *Id.*

### 2. Deemar's Employment Claims are Barred by Section 2000d of Title VI.

Deemar's Title VI claims are also barred by Section 2000d-3 of Title VI, which provides that Title VI does not "authorize action ... by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization *except where a primary objective of the Federal financial assistance is to provide employment.*" 42 U.S.C. § 2000d-3 (emphasis added). Congress enacted § 2000d-3 out of "concern that the receipt of any form of financial assistance might render an employer subject to the commands of Title VI rather than Title VII." *Johnson v. Transp. Agency*, 480 U.S. 616, 627, n.6 (1987).

14

In *Ahern v. Board of Education of Chicago*, the Seventh Circuit held that § 2000d-3 limited employment discrimination claims under Title VI to cases in which "(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Ahern v. Bd. of Educ. of Chicago*, 133 F.3d 975, 978 (7th Cir. 1998), (quoting *Trageser v. Libbie Rehab. Ctr., Inc.*, 590 F.2d 87, 89 (4th Cir. 1978)); *see Doe*, 788 F.2d 411, 419 n.12 (7th Cir. 1986) ("Although section 2000d-3 expressly addresses only agency action, courts have uniformly held that, even in private actions under Title VI, the primary objective of the federal grant must be to provide employment."), *overruled on other grounds by Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487 (7th Cir. 1996).

While Deemar generally alleges the District "receives federal funding for educational and vocational purposes" (Compl. ¶¶ 20, 185), she does not allege, and cannot allege consistent with the requirements of Federal Rule 11, that the primary purpose of such federal funding is to provide employment generally or provide employment to Deemar specifically.[5]  In fact, Deemar identifies no specific federal funding at all allegedly received by the District, and as noted above courts presume general federal funding received by school districts is directed at supporting the educational needs of students, not providing employment to teachers. *see Veljkovic*, 2020 WL 7626735 at *3.  Accordingly, she cannot satisfy either prong of the *Ahern* test, and her Title VI claim should be dismissed in its entirety. *See e.g., Agbefe v. Bd. of Educ. of City of Chicago*, 2021 WL 1885964, at *3 (N.D. Ill. May 11, 2021) (Title VI claims dismissed where Plaintiff failed to allege federal fund's primary objective and whether it related to employment); *see also Veljkovic*, 2020 WL 7626735 at *3; *Parks v. Speedy Title & Appraisal Review Servs*, 318 F.Supp.3d 1053,

---

[5] In fact, no federal funds received by the District are used to fund her position and it receives no federal funding that is any way related to Deemar's position. Decl. ¶12.

1068 (N.D. Ill. 2018); *Cieslik v. Bd. of Educ. of Chi.,* 2021 WL 1172575, at *3 (N.D. Ill. Mar. 29, 2021).

### C. Deemar Does Not Allege the Existence of a Hostile Work Environment

A plaintiff may establish a claim of intentional discrimination under the Equal Protection clause or Title VI by showing that she was subjected an adverse employment action, such as a termination, failure to hire, or demotion because of her race, or by establishing that she was subject to a racially hostile environment. *See Abrego v. Wilkie,* 907 F.3d 1004, 1012 (7th Cir. 2018).[6] Deemar does not allege that she was subjected to any "adverse action."

Her allegations also fail to support a hostile work environment claim. To establish a hostile work environment, the alleged racially offensive conduct must be sufficiently severe and pervasive to alter the terms and conditions of employment and create an abusive working environment. *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005) (citations omitted). Whether conduct arises to this level "turns on a constellation of factors that 'include the frequency of the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (citations omitted). A plaintiff must establish both that the workplace was objectively and subjectively offensive. *Id.* It is subjectively hostile when the plaintiff actually perceives it as such. *Id.* A workplace is objectively offensive when a reasonable person would find it hostile or abusive considering all of the circumstances. *Id.* Moreover, the alleged discriminatory conduct cannot be considered in a vacuum; rather, an employee's claim must be

---

[6]Title VI and Equal Protection employment claims are analyzed under the same framework as Title VII claims. *Totten v. Benedictine Univ.,* 2021 WL 3290926, at *9 (N.D. Ill. Aug. 2, 2021); King v. Board of Regents of Univ. of Wisconsin System, 898 F.2d 533, 537 (7th Cir. 1990).

2934419.2

evaluated in light of the social context in which events occurred. *Oncale v. Sundowner Services, Inc.* 523 U.S. 75, 82 (1998).

Deemar's allegations do not even permit an inference that she personally subjectively perceived the training and curriculum provided by the District to be racially hostile and abusive. Rather, she merely alleges that she was "concerned" about statements in the District's curriculum such as, "I've encountered racism and discrimination from White adolescents and adults," and "teachers should examine if objectives, expectancies, etc., may be Eurocentric or incompatible with the learning styles and everyday realities of children of color[.]" Compl. ¶165. She further alleges that "[D]efendants treated Plaintiff differently from her colleagues because of her race when they intentionally segregated staff meetings by race, offered race-based programming, promoted affinity groups, conducted privilege walks, and maintained policies committed to "focusing on race as one of the first visible indicators of identity[.]" Compl. ¶186. Deemar's alleged "concern" and allegation that she was treated "differently" fall woefully short of establishing that she was subject to a work environment that she subjectively perceived as "intolerable" or "abusive."

Similarly, her allegations fail to permit a finding that the work environment was objectively hostile. By way of example, she objects to the District's use of training materials widely used in other schools throughout the country and objects to the District encouraging teachers to read "White Fragility" which was a New York Times and Amazon best seller. Compl. ¶76. Although these materials are no doubt controversial in some circles, the overall popularity and ubiquity of these materials refutes any inference that their contents were so offensive that her minimal exposure to these materials created an objectively "abusive" working environment. The fact that a topic is challenging or controversial does not equate to "hostile" or "abusive" as is necessary to

create a hostile work environment. *See Veljkovic*, 2020 WL 762673 at *5 (court granted 12(b)(6) dismissal, holding that allegations that a white teacher was the subject of a report that "besmirched her reputation" accused her of "performance issues" and was "racially motivated" and that the school principal "stoked anger" against her and caused her colleagues to exclude her from communications failed to allege an actionable hostile work environment). Deemar's Complaint is replete with politically charged criticism of the District's equity initiatives, but these objections either as a political matter or as a matter of educational curriculum, fail to permit a finding that she was subjected to an objectively hostile and abusive working environment. Accordingly, her claims should be dismissed, with prejudice.

## CONCLUSION

Based on the foregoing, the District respectfully requests that the Court dismiss Deemar's claims pursuant to Federal Rule 12(b)(1) for lack of jurisdictional standing because she personally has not suffered an "injury in fact." In the alternative, the District respectfully requests the Court dismiss Deemar's claims pursuant to Federal Rule 12(b)(6) because she fails to state an actionable claim under the Equal Protection Clause and/or Title VI of the Civil Rights Act.

Respectfully submitted,

**BOARD OF EDUCATION OF
EVANSTON-SKOKIE COMMUNITY
CONSOLIDATED SCHOOL DISTRICT 65,
DEVON HORTON, LATARSHA GREEN
AND STACY BEARDSLEY**

By _____/s/ Nicki B. Bazer_____
One of Its Attorneys

18

2934419.2

Nicki B. Bazer *(nbb@franczek.com)*
Michael A. Warner*(maw@franczek.com)*
R. Jason Patterson *(rjp@franczek.com)*
Franczek P.C.
300 S. Wacker Drive, Suite 3400
Chicago, Illinois 60606
312-986-0300

Dated:  August 30, 2021

2934419.2

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that she caused a true and correct copy of the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS** to be filed electronically with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record on this 30th day of August, 2021.

Celia H. O'Leary (coleary@southeasternlegal.org)
Kimberly S. Hermann (khermann@southeasternlegal.org)
Branden H. Boucek (bboucek@southeasternlegal.org)
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Whitman H. Brisky(wbrisky@mauckbaker.com)
Terry S. Lu (tlu@mauckbaker.com)
Mauck & Baker, LLC
1 N. LaSalle St., Suite 600
Chicago, IL 60602

s/ Nicki B. Bazer
nbb@franczek.com

2934419.2