**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STACY DEEMAR, | ) | |
| | ) | |
|      Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-3466 |
| | ) | |
| BOARD OF EDUCATION OF THE CITY | ) | Judge Robert M. Dow, Jr. |
| OF EVANSTON/SKOKIE ("DISTRICT | ) | |
| 65"), et al., | ) | |
| | ) | |
|      Defendants. | ) | |
| | ) | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

ARGUMENT ...................................................................................................................... 5

    I.   Plaintiff has standing to assert her claims under Rule 12(b)(1). ...................................... 5

        A.  Standard of Review ................................................................................................ 5

        B.  Plaintiff has sufficiently alleged an injury in fact as to Counts One and Two that is traceable to the District's equity programs. ............................................................. 5

        C.  Plaintiff has standing as to Count Three of her Complaint. ..................................... 11

    II.  Plaintiff's claim survives Federal Rule 12(b)(6) because she was treated differently under Title VI and the Equal Protection Clause and was subject to a hostile educational environment ............................................................................................................... 14

        A.  Standard of Review ................................................................................................ 14

        B.  Plaintiff has stated a claim under Title VI (Counts Two and Three) ......................... 15

        C.  Plaintiff has sufficiently alleged the existence of a hostile educational environment (Count Three). ..................................................................................................... 16

CONCLUSION ................................................................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Rush N. Shore Medical Ctr.*, 101 F.3d 487 (7th Cir. 1996) .....................................15

*Allen v. Wright*, 468 U.S. 737 (1984).................................................................................................8

*Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014) ...............................................................................8

*Bell Atl. Corp. v. Twombley*, 550 U.S. 544 (2007) .......................................................................17

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) .............................................................................6, 7

*Bryant v. Indep. Sch. Dist. No. I-38 of Garvin County, Oklahoma*, 334 F.3d 928 (10th Cir. 2003)

........................................................................................................................................................17

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) ...........................................................16

*Doe ex rel. Doe v. St. Joseph's Hosp.*, 788 F.2d 411 (7th Cir. 1986)...........................................15

*Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014).................................................................................16

*EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773 (7th Cir. 2007)........................................14

*Evers v. Astrue*, 536 F.3d 651 (7th Cir. 2008).................................................................................5

*Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398 (5th Cir. 2015)..............................................16

*Fullilove v. Klutznick*, 448 U.S. 448 (1980) ....................................................................................6

*Geinosky v. City of Chi.*, 675 F.3d 743 (7th Cir. 2012) .................................................................14

*Hammond v. Clayton*, 83 F.3d 191 (7th Cir. 1996) .........................................................................5

*Hay v. Ind. State Bd. Of Tax Comm'rs.*, 312 F.3d 876 (7th Cir. 2002).........................................5

*Heckler v. Mathews*, 465 U.S. 728 (1984) ...............................................................................6, 8

*J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646 (7th Cir. 2014)................................5

*Johnson v. California*, 543 U.S. 499 (2005)....................................................................................6

*Johnson v. United States OPM*, 783 F.3d 655 (7th Cir. 2015)...................................................6, 9

*Kubiak v. City of Chi.*, 810 F.3d 476 (7th Cir. 2016)....................................................................14

*Lee v. City of Chicago*, 330 F.3d 456 (7th Cir. 2003)...........................................................5, 9, 15

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...........................................................5

*Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998)................passim

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508

    U.S. 656 (1993) ...........................................................6

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) .................6, 7, 9

*Qualls v. Cunningham*, 183 Fed. Appx. 564 (7th Cir. 2006) ......................................................16

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) ...........................................................6

*Ret. Chicago Police Assoc. v. City of Chicago*, 76 F.3d 856 (7th Cir. 1996) ...............................5

*Richmond v. J. A. Croson Co.*, 488 U.S. 469 (1989) ...............................................................6, 7

*Shaw v. Hunt*, 517 U.S. 899 (1996) ...........................................................7

*Shaw v. Reno*, 509 U.S. 630 (1993) ...........................................................6, 7

*Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015)...........................................................5

*Spence v. Bd. of Educ.*, 2021 U.S. Dist. LEXIS 131109 (N.D. Ill. July 14, 2021).......................17

*Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750 (7th Cir. 2002)................................14

*United States v. Hays*, 515 U.S. 737 (1995)...........................................................7

*Vinson v. Taylor*, 753 F.2d 141 (D.C. Cir. 1985) ...........................................................12

*Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir. 1982) .............................................12

*Whitfield v. Notre Dame Middle Sch.*, 412 Fed. Appx. 517 (3rd Cir. 2011);.............................16

*Wolf v. Walker*, 986 F. Supp. 2d 982 (W.D. Wis. 2014)...........................................................7

*Woodring v. Jackson Cty.*, 986 F.3d 979 (7th Cir. 2021)...........................................................5

**Statutes**

42 U.S.C. § 2000d-3...........................................................15

**Rules**

Fed. R. Civ. P. 12(b)(1)......................................................................................ii, 2, 5

Fed. R. Civ. P. 12(b)(6)....................................................................................ii, 2, 14

Fed. R. Civ. P. 12(d) ............................................................................................14

**Regulations**

59 Fed. Reg. 11448 ..............................................................................................12

## INTRODUCTION

For over six years now, Evanston/Skokie School District 65 ("District 65") has engaged in unconscionable race-based programming that threatens the moral and constitutional fibers of its community. Through its policies, curriculum, and training, the District ascribes personal characteristics to entire racial groups. Put simply, it teaches that white people are oppressors and non-white people are oppressed. It treats Plaintiff—and *all* individuals in the District—differently based solely on the color of their skin. This violates Title VI of the Civil Rights Act and the Equal Protection Clause of the United States Constitution.

The Department of Education already found as much. After Plaintiff reported the ongoing race-based discrimination occurring in District 65, the Office of Civil Rights ("OCR") conducted a nearly two-year investigation into the District's policies and programming. (Compl. ¶¶ 170, 172, Doc. 1.) It concluded that District 65 violated Title VI of the Civil Rights Act and issued a resolution order. (Id. at ¶¶ 172-73.) Following a change in presidential administration, the letter of finding was reportedly—and suddenly—suspended. (Id. at ¶ 174.)

Despite a letter of finding that was the product of a months-long investigation, District 65 claims that Plaintiff has not been harmed. (Defs.' Mem., Doc. 21 at 1.) It reasons that Plaintiff was not at *every* training, or that she did not teach *every* lesson. (Id.) But to suggest that Plaintiff has not been personally harmed by the District's practices because she did not personally attend every objectionable session, or that the District has not created an environment that is hostile to every teacher and student who sets foot on campus, is plainly wrong. Each time the District assigns moral characteristics to racial groups wholesale, it deliberately fosters a hostile environment for Plaintiff and all members of the District 65 community.

The District fails to demonstrate that Plaintiff lacks standing under Fed. R. Civ. P. 12(b)(1) because she has plausibly alleged a non-economic injury as to Counts One and Two of her Complaint. The District has treated and continues to treat Plaintiff differently than other individuals when it places Plaintiff in crude racial categories in violation of the Equal Protection Clause and Title VI of the Civil Rights Act. The District also fails to show that Plaintiff lacks standing as to Count Three of her Complaint, because even a bystander observing racial hostility may assert claims against the government. Finally, the District fails to show that Counts Two and Three should be dismissed under Fed. R. Civ. P. 12(b)(6).[1] Plaintiff is an intended beneficiary of federal funding. Moreover, she has sufficiently alleged a hostile educational environment that is severe and pervasive, such that it has deprived her of the benefits associated with teaching in a colorblind environment.

## FACTUAL BACKGROUND

One need only look at the District's website, which includes an entire portion devoted to the concept of "equity," to understand how the District perceives and categorizes racial groups.[2] The District openly admits that equity is *not* equality.[3] It proclaims its commitment to focusing on race as "one of the first visible indicators of identity."[4] To achieve so-called equity, the District is

---

[1] The District raises Plaintiff's failure to state a claim under the Equal Protection Clause, but it never actually develops its argument. (*See* Defs.' Mem., Doc. 21 at 13.) As such, the claim is waived and there is no Rule 12(b)(6) motion as to Count One, Plaintiff's equal protection claim. *Blaz v. Michael Reese Hosp. Found.*, 191 F.R.D. 570, 572 (N.D. Ill. 1999) (finding undeveloped and unsupported arguments waived).

[2] https://www.district65.net/site/Default.aspx?PageID=1411. The Court may take judicial notice of materials on government websites. *Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003).

[3] *Id*.

[4] *District 65 Racial and Educational Equity Policy*, available at https://www.district65.net/Page/1517; *see also Student Handbook 2021-2022*, Evanston/Skokie School District 65, at 7 (Aug. 2021), available at https://www.district65.net/cms/lib/IL01906289/Centricity/Domain/89/21-

2

committed to removing "barriers" like "institutional racism,"[5] which it claims "create[s] advantages for whites and oppression and disadvantage for people from groups classified as people of color."[6] It describes "whiteness" as a "key" mechanism "through which power operates" and lists several definitions for the term "white privilege."[7]

But that is not all. The District relentlessly reinforced racial stereotypes by requiring every teacher, including Plaintiff, to undergo two days of training that conditions educators to acknowledge that "[w]hite educators who actively disengage from conversations about improving the achievement of students of color and indigenous students are racist," (Compl. ¶ 45, Doc. 1) and white people are "loud, authoritative, . . . [and] controlling." (Id. at ¶ 43.) It demands that teachers "develop [their] understanding of whiteness and challenge [their] beliefs." (Id. at ¶ 43.) It has even forced teachers to participate in a privilege walk—called "White Privilege: The Color Line Exercise"—whereby participants are physically segregated by race as they respond to racially-charged prompts.[8] (Id. at ¶¶ 66-72.) Following the exercise, participants were even given different discussion questions based on the color of their skin. (Id. at ¶ 73.) Educators have been instructed to denounce "whiteness" and "white privilege" (Id. at ¶ 63) and advised to be "less racially oppressive." (Id. at ¶ 82.)

---

22%20Student%20Handbook_English.pdf. The Court may take judicial notice of materials on government websites. *Denius*, 330 F.3d at 929.

[5] *Racial and Educational Equity Policy*, *supra* n.4.

[6] *District 65 Racial Equity Tools Glossary*, available at https://sites.google.com/district65.net/district65equitytoolsglossary/home. The Court may take judicial notice of materials on government websites. *Denius*, 330 F.3d at 929.

[7] *Id.*

[8] The exercise is aptly called "The Color Line Exercise," where participants are expected to infer that where they fall in line directly corresponds to the color of their skin.

The lessons do not end there. District 65 demands that all teachers continue what they have learned in that training daily. They are constantly barraged by emails about skin color, including reminders of segregated affinity group meetings (Declaration of Stacy Deemar ("Deemar Decl.") ¶¶ 6-8, Ex. 3-6) and discussions about concepts like "white fragility." (Id. at ¶¶ 15-18, Ex. 12-15.) The District's commitment to continuing the concepts taught in Beyond Diversity training is also apparent when it instructs teachers to ask their students questions like, "What is your understanding of whiteness?" (Compl. ¶ 136, Doc. 1) or read statements like, "Many White people use color blindness to ignore the problem of racism," (Id. at ¶ 141) and "there is a system in place that rewards people of color who support white supremacy and power and coerces or punishes those who do not." (Id. at ¶ 144) Finally, the District's efforts to center skin color have become apparent in staff emails to their colleagues that include threats to wield a "metaphorical machete at white privilege" (Deemar Decl. ¶ 14, Ex. 11) and statements like "when we handle our class like champions, we watch some of our white colleagues get help handling a situation that we could have handled in 10 minutes...alone!" (Id. at ¶ 11, Ex. 8.)

The District weakly asserts that this Court should defer to the local autonomy of school boards because Plaintiff's Complaint challenges "politically charged and sensitive matters." (Defs.' Mem., Doc. 21 at 1.) The District's autonomy, however, is bound by the Constitution and Civil Rights laws. Not only does the District fail to cite any cases that actually allow it to opt out of federal law in the name of "equity," (id. (citing standing cases)), but when it comes to enforcing the constitutional and legal obligation of equality, that is precisely when the courts should intercede.

4

# ARGUMENT

## I. Plaintiff has standing to assert her claims under Rule 12(b)(1).

### A. Standard of Review

Article III standing in a constitutional challenge such as this one "requires (1) an injury in fact that is (2) caused by the defendant's conduct and (3) redressable by a favorable decision." *Woodring v. Jackson Cty.*, 986 F.3d 979, 984 (7th Cir. 2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "In ruling on a motion to dismiss for want of standing, the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor." *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) (citing *Ret. Chicago Police Assoc. v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996)). Courts may consider extraneous evidence for a Rule 12(b)(1) motion challenging subject matter jurisdiction when the defendant raises a factual, as opposed to a facial, challenge. *Hammond v. Clayton*, 83 F.3d 191, 192 (7th Cir. 1996); *Hay v. Ind. State Bd. Of Tax Comm'rs.*, 312 F.3d 876, 879 n.2 (7th Cir. 2002). By attaching the Declaration of Stacy Beardsley (Doc. 21-1) to argue that Plaintiff was not injured because she did not participate in "most" of the equity activities (Doc. 21 at 10), Defendants have raised a factual challenge. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (explaining difference between factual and facial challenge). Plaintiff may introduce additional evidence to establish injury. *See Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008).

### B. Plaintiff has sufficiently alleged an injury in fact as to Counts One and Two that is traceable to the District's equity programs.

A plaintiff must demonstrate injury, but this "showing is not meant to be a difficult one, particularly at the pleading stage." *J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646, 650 (7th Cir. 2014). To establish standing under an Equal Protection Clause challenge, a plaintiff must "show that the challenged classification creates a 'barrier that makes it more difficult for

members of one group to obtain a benefit,' or causes 'non-economic injuries' such as 'stigmatizing members of the disfavored group.'"[9] *Johnson v. United States OPM*, 783 F.3d 655, 665-666 (7th Cir. 2015) (*OPM*) (quoting *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993), *Heckler v. Mathews*, 465 U.S. 728, 739 (1984)). Plaintiff does not argue here that District 65 has erected a barrier that makes it more difficult for her to seek a benefit than members of another racial group. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (holding that a government-imposed barrier is just "one form of injury under the Equal Protection Clause"). Instead, Plaintiff's constitutional injury is non-economic because she challenges the District's stigmatizing racial classifications. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 643 (1993); *Brown v. Bd. of Educ.*, 347 U.S. 483, 492-93 (1954) (*Brown I*); *OPM*, 783 F.3d at 666.

It is well-settled that racial classifications by the government are odious and therefore "immediately suspect." *Johnson v. California*, 543 U.S. 499, 509 (2005); *accord Fullilove v. Klutznick*, 448 U.S. 448, 507 (1980) ("Under this Court's established doctrine, a racial classification is suspect and subject to strict judicial scrutiny."); *Reno*, 509 U.S. at 642-643 ("Express racial classifications are immediately suspect because, 'absent searching judicial inquiry . . . , there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'") (quoting *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 493 (1989)). For this reason, the Supreme Court recognizes a constitutional injury when the government identifies

---

[9] For purposes of this brief, Plaintiff acknowledges that Title VI is derived from the Equal Protection Clause, and thus intentional discrimination claims are subject to an equal protection analysis. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) (opinion of Powell, J.) ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment.").]

individuals by the color of their skin. *See Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (finding standing to challenge reapportionment plan when residents of a district claimed the legislature took constituents' race into account); *United States v. Hays*, 515 U.S. 737, 744 (1995) ("Any citizen able to demonstrate that he or she, personally, has been injured by [a] racial classification has standing to challenge the classification in federal court.")[10]; *Richmond*, 488 U.S. at 493 ("To whatever racial group these citizens belong, their 'personal rights' to be treated with equal dignity and respect are implicated by a rigid rule erecting race as the sole criterion in an aspect of public decisionmaking.").

Federal courts accept that racial classifications confer standing when they "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Reno*, 509 U.S. at 643 (citing *Richmond*, 488 U.S. at 493 (plurality op.)); *see also Brown I*, 347 U.S. at 493 (finding that "even though the physical facilities and other 'tangible' factors" between segregated schools may be equal, they nevertheless deprive students of equal educational opportunities because of the effects of segregation, including feelings of inferiority); *Wolf v. Walker*, 986 F. Supp. 2d 982, 1014-1015 (W.D. Wis. 2014) (assessing Equal Protection stigma cases and finding "[t]his focus on stigma and equal citizenship makes sense because one purpose of the equal protection clause is to prohibit stigmatizing members of the disfavored group as

---

[10] The District points to *Hays* for the contention that race consciousness does not inevitably lead to race discrimination. (Defs.' Mem., Doc. 21 at 10.) However, there the Court was addressing the failure to demonstrate individualized harm resulting from a legislature's awareness of various demographic factors when drawing district lines, including race, age, and economic status. *Hays*, 515 U.S. 745-46. Awareness of racial demographics is not akin to sorting or defining individuals along racial lines. *See Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring) (writing that schools may still strive for diversity through methods such as tracking student performance and enrollment because, while race conscious, those methods "do not lead to different treatment based on a classification that tells each student he or she is to be defined by race[.]")

innately inferior and therefore as less worthy participants in the political community") (internal quotation marks omitted), *aff'd sub nom. Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014).

Defendants point to *Allen v. Wright*, 468 U.S. 737 (1984), to support the claim that Plaintiff lacks standing. (Defs. Mem., Doc. 21 at 10.) Although the plaintiffs failed to establish standing in *Allen* under a theory of pure stigmatic harm, in part because their children never applied to the private schools that allegedly engaged in discrimination, the Supreme Court did not foreclose stigmatic harm as a cognizable injury under the Equal Protection Clause. The Court itself wrote: "There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing." *Id*. at 755. The parents in *Allen* lacked standing because, unlike Plaintiff, they had not *personally* been discriminated against. *Id*. The Court contrasted the parents' claim in *Allen* to *Heckler v. Mathews*, where a male federal employee challenged a law that provided more benefits to his female colleagues. 465 U.S. at 734-35. The Supreme Court held in *Heckler*, "as we have repeatedly emphasized, discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group . . . can cause serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Id*. at 739-40. Plaintiff does not allege the mere *possibility* of

racial classifications.[11] She *has* been classified, and continues to be classified, by the color of her skin.[12]

For example, District 65 vows to see race "as one of the first visible indicators of identity."[13] While it may recognize other identities, race comes first and foremost. This is apparent in training, programming, policies, and curriculum, where the District repeatedly assigns personal traits to entire racial groups. It happens when the District orders Plaintiff and her colleagues to stand in a straight line, then step forward or backward based prompts that begin with "Because of my race or color" and conclude with "What you see is White privilege and the color line." (Compl. ¶¶ 68-72, Doc. 1.)[14] It happens when the District informs Plaintiff and her colleagues that "White educators who actively disengage from conversations about improving the achievement of students

---

[11] Defendants cite to *Carroll v. Nakatani* for the contention that racial classifications "materially differ" from the denial of equal treatment. (Defs.' Mem., Doc. 21 at 9.) However, the Ninth Circuit Court of Appeals in *Carroll* appeared to treat the barrier standard as the *only* type of harm available to plaintiffs challenging an equal protection violation, essentially equating the denial of equal treatment with exclusion from a government program. *See Carroll v. Nakatani*, 342 F.3d 934, 946 (9th Cir. 2003). But the Supreme Court has said that the barrier injury is just *one* type of equal protection harm. *See Parents Involved*, 551 U.S. at 719. The Seventh Circuit agreed in *OPM*, 783 F.3d at 666, in a case to which Defendants cite. (Defs.' Mem., Doc. 21 at 9, 11.)

[12] This greatly differs from *Moore v. Bryant*, 853 F.3d 245 (5th Cir. 2017). There, the plaintiff brought a hostile environment claim under the Equal Protection Clause. *Id*. at 251-52. The Fifth Circuit Court of Appeals rejected his claim because, rather than allege any unequal treatment, he simply argued that he should not be required to look at the symbol. *Id*. at 252. Here, Plaintiff has thoroughly alleged that the District has ascribed moral characteristics to her and her colleagues on the basis of race that it then incorporates into the routine in which Plaintiff must participate.

[13] *District 65 Racial and Educational Equity Policy*, available at https://www.district65.net/Page/1517; *see also Student Handbook 2021-2022*, Evanston/Skokie School District 65, at 7 (Aug. 2021), available at https://www.district65.net/cms/lib/IL01906289/Centricity/Domain/89/21-22%20Student%20Handbook_English.pdf. The Court may take judicial notice of materials on government websites. *Denius*, 330 F.3d at 929.

[14] Defendants do not dispute any of the contentions laid out in Plaintiff's Complaint as cited in this paragraph. (*See* Defs.' Mem. at 4, Doc. 21); Declaration of Stacy Beardsley ("Beardsley Decl.") ¶¶ 4-5, Doc. 21-1.)

9

of color and indigenous students are racist, because anti-racism requires active challenges to institutionalized White racial power, presence, and privilege." (Id. at ¶ 45.) It happens when the District explains to Plaintiff and her colleagues that people of color speak in a manner that shows "silent respect . . . [and] disconnect," while white people speak in a "loud, authoritative . . . [and] controlling" manner. (Id. at ¶ 43.) It happens when the District instructs teachers to "develop [their] understanding of whiteness," (id. at ¶ 41) and accuses "White educators" of forcing non-white students and colleagues to "conform to the normalized conditions of White culture." (Id. at ¶ 44.)

And that is just one training. It is also apparent in the District's frequent invitations to join segregated affinity groups and demands to participate in segregated staff meetings. (Deemar Decl. ¶¶ 6-9, 24-25, Ex. 3-6, 21-22.) It is evident when the District sends surveys to teachers following those meetings, asking, "What is your understanding of the impact of white fragility as a result of the affinity meeting?" (Id. at ¶ 10, Ex. 7.) It appears when the District does nothing to remedy one colleague's threats to wield her "machete" at white privilege, (id. at ¶ 14, Ex. 11), or other colleagues' statement that they "watch some of our white colleagues get help handling a situation that we could have handled in 10 minutes...alone!" (Id. at ¶ 11, Ex. 8.) On a daily basis, the District reminds Plaintiff that she is white. And on a daily basis, the District assigns exclusively negative characteristics to whiteness, such as racism, oppression, and evil.

To be sure, if this Court were to replace the word "white" with any other race, in any of these statements, it would rightfully shock the conscience. The Constitution demands as much. The District even argues that because every teacher, "regardless of race," was presumably "aware of or exposed to the training and curriculum at some level," Plaintiff did not suffer a cognizable injury. (Defs.' Mem., Doc. 21 at 9.) But the District's point only furthers Plaintiff's point about how pervasively hostile the environment was—every individual in the district, including Plaintiff,

10

has encountered this programming. The District has classified *every* individual into racial groups and assigned moral characteristics because of skin color. Just because Plaintiff is but one of many individuals the District subjected to stigmatizing racial classifications, it does not mean Plaintiff's harm was not individualized. If anything, it demonstrates that the environment the District maintained was suffused with racial hostility, an injury Plaintiff herself suffered so severely that she reported it to the Office of Civil Rights, which concluded that the District was in violation of Title VI. (Compl. ¶¶ 170-72, Doc. 1.)

### C. Plaintiff has standing as to Count Three of her Complaint.

For the same reasons outlined above, the District has also subjected Plaintiff to a hostile educational environment. Plaintiff does not attempt to assert claims on behalf of students. Rather, she alleges that the environment in which she is expected to learn, work, share, and create has become excessively hostile based on race. The District's policies and programming—including but not limited to the curriculum it teaches to students—directly contribute to that hostility.

To that end, Plaintiff agrees that she has observed the District's race programming without physically participating in every activity or teaching every lesson. But Plaintiff need not participate in every hostile activity for the environment to rise to the level of being actionable. For example, she has read every communication she has received from the District. Emails inviting teachers and students to participate in segregated affinity groups. (Deemar Decl. ¶¶ 24-26, Ex. 21-23.) Emails notifying teachers they would be separated based on race to "explore the concept of equity" and "racial identification." (Id. at ¶ 7, Ex. 4.) Reminders about Black Lives Matter Week with links to the curriculum that asks students, "What does it mean to be white but not be a part of 'whiteness'?" (Id. at ¶¶ 19-20, Ex. 16-17.) Surveys sent to teachers asking how segregated meetings improved "your understanding of the impact of white fragility[.]" (Id. at ¶ 10, Ex. 7.) Emails containing

accusations that white teachers are not capable of handling difficult students and that they "direct" their non-white colleagues to handle them. (Id. ¶ 11, Ex. 8.) Emails promoting the divisive book, "White Fragility,"[15] and circulating discussion questions like "How will you ensure that when common white patterns surface (distancing, intellectualizing, rationalizing), you will work to identify and challenge them rather than ignore or avoid them?" (Id. ¶¶ 15-18, Ex. 12-15.) Requests for white volunteers to assist the District with promoting "White Racial Literacy Development." (Id. ¶ 15, Ex. 12.) Student surveys containing prompts like, "Teachers at Nichols Middle School think you are less smart than you really are because of your race/ethnicity." (Id. ¶¶ 12-13, Ex. 9-10.)

In each of those instances, Plaintiff was the intended recipient or viewer of the District's racially fixated communications. And beyond that, the mere presence of a hostile environment— even when the hostility is not always directed at a plaintiff—is sufficient to confer standing. *See* 59 Fed. Reg. 11448 ("[R]acial acts need not be targeted at the complainant in order to create a racially hostile environment. The acts may be directed at anyone."); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998) ("[R]acist attacks need not be directed at the complainant in order to create a hostile educational environment."); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359, 1982 (11th Cir. 1982) (finding offensive language and racial harassment created a hostile environment under Title VII even though most of the language was not directed at the challenger); *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C. Cir. 1985) ("Even a woman who

---

[15] Defendants suggest that because the book makes a lot of sales, concepts like "[w]hite identity is inherently racist" are widely accepted. (Defs.' Mem., Doc. 21 at 17.) Even if that were true, it is a mystery why Defendants think popular sentiment has any bearing on the legality of promulgating racially charged materials in a school setting.

was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive.").

Defendants wrongly claim that Plaintiff did not participate in "most" of the District's equity activities. To be sure, Plaintiff has attended numerous equity-oriented trainings and staff meetings over the years, including but not limited to Beyond Diversity. By their own assertion, Defendants acknowledge that Plaintiff participated in at least some of the District's race-based activities. If Defendants have a threshold for how much hostility a person must endure for it to become actionable, they never identify it. Regardless, drawing reasonable inferences in Plaintiff's favor, she has produced competent proof of injury sufficient to allow this case to proceed.

Furthermore, the District takes Plaintiff's claims that she was aware of its discriminatory programming out of context in claiming she was not injured in fact (Defs.' Mem. Doc. 21 at 11.) She was immersed in a racially hostile climate that could not escape her awareness. But even if Plaintiff were only "aware" of the programming—and was not personally denied equal treatment, as she has alleged—that is sufficient to confer standing under a Title VI hostile environment claim. *See Monteiro*, 158 F.3d at 1033.

Moreover, the District's curriculum is cumulative; courses taught in middle school build on what children learn in elementary school.[16] In this way, the intersectionality lesson Plaintiff taught included topics like identity, oppression, and race. (Deemar Decl., ¶ 23, Ex. 20.) In turn, concepts linking oppression and racism to whiteness are woven into the fabric of the District 65 learning experience from as early as Pre-K. Thus, all curriculum outlined in Plaintiff's Complaint

---

[16] Although Plaintiff was an elementary school drama teacher until recently, she did not teach the Children's March drama lesson during the 2020-2021 school year. (*Compare* Compl. ¶ 122, Doc. 1 *with* Beardsley Decl. ¶ 11, Doc. 21-1.) However, Plaintiff did teach the intersectionality lesson during the 2019-2020 school year. (Deemar Decl. ¶¶ 21-23, Ex. 18-20.) Ms. Beardsley is incorrect to say otherwise. (Beardsley Decl. ¶ 11, Doc. 21-1.)

is relevant and material to establishing the hostile educational environment Plaintiff continues to experience and has personally been forced to contribute to, particularly because it establishes the context that sets the stage for racial hostility. *Monteiro*, 158 F.3d at 1033 ("Whether a hostile educational environment exists is a question of fact, determined with reference to the totality of the circumstances.")

## II. Plaintiff's claim survives Federal Rule 12(b)(6) because she was treated differently under Title VI and the Equal Protection Clause and was subject to a hostile educational environment.

### A. Standard of Review

A motion to dismiss brought under Fed. R. Civ. P. 12(b)(6) challenges a complaint for failure to state a claim upon which relief can be granted. "To properly state a claim, a plaintiff's complaint must contain allegations that 'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]'" *Kubiak v. City of Chi.*, 810 F.3d 476, 480 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). In a Rule 12(b)(6) motion, the courts are limited to the factual allegations in the complaint and must make all reasonable inferences in favor of the plaintiff. *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). And although a movant is limited to the facts contained in the complaint, "[a] party appealing a Rule 12(b)(6) dismissal may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).[17]

---

[17] Defendants improperly resort to extraneous evidence when citing the Beardsley Declaration to argue Plaintiff's position is not federally funded. (Defs.' Mem., Doc. 21 at 15 n. 5.) This Court should exclude her statement for purposes of the Rule 12(b)(6) motion. *See* Fed. R. Civ. P. 12(d).

**B. Plaintiff has stated a claim under Title VI (Counts Two and Three).**[18]

When bringing a Title VI disparate treatment or hostile environment challenge, a plaintiff must demonstrate either that she is the intended beneficiary of a federally funded program or that a primary purpose of federal financial assistance is to fund her employment. *Doe ex rel. Doe v. St. Joseph's Hosp.*, 788 F.2d 411, 419 (7th Cir. 1986), *overruled on other grounds by Alexander v. Rush N. Shore Medical Ctr.*, 101 F.3d 487 (7th Cir. 1996); *see also* 42 U.S.C. § 2000d-3. Plaintiff does not dispute the legal standards Defendants set forth regarding Title VI funding. The only element in question is whether Plaintiff is an intended beneficiary of federal funds or whether a primary purpose of federal funding is to support her employment.

Contrary to Defendants' assertion, Plaintiff is an intended beneficiary of federal Title II funds distributed to District 65.[19] As its 2020-2021 budget demonstrates, the District received at least $216,163.00 in Title II funds during the 2020 fiscal year.[20] In turn, Title II of the "Every Student Succeeds Act" is titled "Preparing, Training, and Recruiting High-Quality Teachers, Principals, or Other School Leaders." Pub. L. No. 114–95 (Dec. 10, 2015).[21] Its stated purpose is to "improve the quality and effectiveness of teachers, principals, and other school leaders." *Id*. The Department of Education even offers pages of guidance for how schools like District 65 can

---

[18] As shown above, the District never actually develops an argument that Plaintiff failed to plead an equal protection injury. (*See* Defs.' Mem., Doc. 21 at 13.) As such, the claim is waived. *Blaz*, 191 F.R.D. at 572.

[19] www.district65.net/Page/2085. *See Denius*, 330 F.3d at 929 (Court may take judicial notice of materials on government websites).

[20] www.district65.net/cms/lib/IL01906289/Centricity/Domain/91/FY21%20Final%20Budget.pdf.

[21] www.congress.gov/114/plaws/publ95/PLAW-114publ95.pdf. In addition to being a document from a reliable government website which this Court can judicially notice, *Denius*, 330 F.3d at 929, the Court may also take judicial notice of public records when their accuracy cannot reasonably be questioned. *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017).

comply with Title II by implementing training programs to improve instruction, monitoring lesson plans, encouraging professional growth, and "[p]roviding ongoing professional development aimed at cultural competency and responsiveness and equity coaching[.]"[22] Given that District 65 appears to be using its Title II funds to do exactly that, it can hardly argue that Plaintiff is not an intended beneficiary.

### C. Plaintiff has sufficiently alleged the existence of a hostile educational environment (Count Three).

Plaintiff has been subject to racial harassment that is severe, pervasive, and objectively offensive such that it has deprived her "of access to adequate professional development, it has altered the conditions of her employment, and it has a systemic effect on education within the District as a whole." (Compl. ¶ 191, Doc. 1.) Plaintiff does not allege that the District took any adverse employment action against her because hers is not a hostile work environment claim. Rather, her claim is a hostile *educational* environment claim. *See Monteiro*, 158 F.3d at 1033; *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999); *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014); *Whitfield v. Notre Dame Middle Sch.*, 412 Fed. Appx. 517 (3rd Cir. 2011); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398 (5th Cir. 2015). Defendants have confused and conflated two distinct causes of action.

Courts in this Circuit have recognized that "[t]o establish a hostile educational environment under Title VI, [a plaintiff] must show that the alleged harassment was severe or pervasive enough to deprive him of access to educational benefits." *Qualls v. Cunningham*, 183 Fed. Appx. 564, 567 (7th Cir. 2006); *see also Spence v. Bd. of Educ.*, 2021 U.S. Dist. LEXIS 131109, at *8 (N.D. Ill. July 14, 2021) (denying motion to dismiss on hostile environment claim). Other federal courts

---

[22] www2.ed.gov/policy/elsec/leg/essa/essatitleiipartaguidance.pdf.

recognize a similar standard and often look to Title VII and Title IX cases for further support. *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin County, Oklahoma*, 334 F.3d 928, 934 (10th Cir. 2003) (remanding with instructions to apply the Title IX test from *Davis*, which requires plaintiffs to establish that harassment is severe, pervasive, and objectively offensive); *Monteiro*, 158 F.3d at 1033.

Under this standard, plaintiffs need not allege that the harassment was subjectively offensive, even though Plaintiff was obviously offended and took the extraordinary step of reporting the District to OCR. (Compl. ¶ 170, Doc. 1.) As required, and as re-stated in Section I.C of this Response, Plaintiff has sufficiently alleged that she has been subjected to severe and pervasive racial harassment centering on "whiteness." The Complaint more than adequately establishes that Plaintiff's hostile environment claim is "plausible." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007). This harassment has deprived her of access to professional development that advances Plaintiff's teaching skills and improves unity among colleagues. More importantly, it has deprived Plaintiff of a community where she can create, share, enjoy, and connect with her coworkers and students on an *individual* basis, in violation of her civil rights.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Respectfully submitted this 20th day of October, 2021.

/s/ Braden H. Boucek
BRADEN H. BOUCEK
TN BPR No. 021399
GA Bar No. 396831
KIMBERLY S. HERMANN
GA Bar No. 646473
CELIA H. O'LEARY
GA Bar No. 747472
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104

17

Roswell, GA  30075
Telephone: (770) 977-2131
bboucek@southeasternlegal.org
khermann@southeasternlegal.org
coleary@southeasternlegal.org


WHITMAN H. BRISKY
ARDC No. 297151
JOHN W. MAUCK
ARDC No. 1797328
ANDREW S. WILLIS
ARDC NO. 6333550
Mauck & Baker, LLC
1 N. LaSalle St., Suite 600
Chicago, IL 60602
Telephone: (312) 726-1243
wbrisky@mauckbaker.com
jmauck@mauckbaker.com
awillis@mauckbaker.com


*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2021, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by operation of the Court's electronic filing system to all parties

indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail

and/or facsimile. Parties may access the filing through the Court's electronic filing system.

Dated: <u>October 20, 2021</u>.

<u>/s/ Braden H. Boucek</u>
BRADEN H. BOUCEK
