IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STACY DEEMAR, <br><br> Plaintiff, <br><br> v. <br><br> BOARD OF EDUCATION OF THE CITY OF EVANSTON/SKOKIE ("DISTRICT 65"), et al., <br><br> Defendants. | Case No. 1:21-cv-3466 <br><br> Judge Robert M. Dow, Jr. |

**DEFENDANTS' REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**INTRODUCTION**

Plaintiff Stacy Deemar, a part time drama teacher at District 65, asks this court to enjoin the District from teaching about and seeking to remedy the ongoing and pernicious impact of racism on students within the District and society in general because she does not agree with the District's curriculum.

Having experienced no direct injury herself, Deemar is forced to base her claim on her belief that the District's curriculum "threatens the moral and constitutional fibers of its community." Deemar claims that as a White person, she is offended and stigmatized by discussions of concepts such as "white privilege," "intersectionality," and institutional racism because she believes that these concepts teach that "white people are oppressors and non-white people are oppressed." Putting aside her gross distortion of the District's actual training and curriculum, which teaches that all individuals, regardless of race, have inherent and equal value and worth, Deemar's status as an offended White person is insufficient as a matter of law to give her standing

2971076.2

to ask this Court to interfere in the District's curriculum decisions, no matter how "divisive" she claims them to be.

Deemar concedes that she has not been subject to actual "unequal treatment" as a result of the District's curriculum, but nevertheless contends that the "stigma" imposed by the District's curriculum is sufficient to confer standing. Deemar is wrong. The Supreme Court has never recognized that mere "stigmatic" harm is sufficient to confer standing. Moreover, Deemar's attempt to equate the District's use of voluntary "affinity groups" and other programs she claims are "divisive" with the real, lasting, tangible, and pernicious impact of government mandated school segregation, confirms the lack of any "injury in fact" suffered by her that would give her standing to ask this court to take the unprecedented step of interfering in public school curriculum decisions.

In the alternative and in addition, Deemar's claims should be dismissed pursuant to Federal Rule 12(b)(6) because her allegations regarding the District's training and curriculum, even if true, cannot support either a Title VI or Equal Protection Claim. As a teacher, she cannot assert a hostile environment Title VI claim because she is not a beneficiary of the federal funding received by the District. Moreover, the very authority she cites in her reply confirms that the contents of school curricula, even if allegedly racist or offensive, cannot support a Title VI or Equal Protection hostile environment claim. Finally, whether styled as a hostile "work" environment claim or hostile "educational" environment claim, her Title VI and Equal Protection claims fail as a matter of law because she has not alleged the sort of "severe and pervasive" conduct necessary to support such a claim.

**ARGUMENT**

**I. The District's Equity Initiatives Did Not Discriminate Against Deemar Herself, and Therefore She Cannot Claim a Stigmatic Injury.**

Deemar clarifies in her response brief that her claim of standing is based solely on an alleged racial stigmatic harm resulting from exposure to the District's equity initiatives. Dkt. No. 29 at 6. However, as set forth fully in the District's Memorandum, the alleged existence of a stigmatic harm alone is insufficient to establish standing if a plaintiff is not personally denied equal treatment by the alleged discriminatory conduct. Dkt. No. 21 at 10-11. Put simply, if Deemar was not subjected to discrimination as a result of the District's equity initiatives, any alleged stigmatic harm is merely abstract and not concrete enough to establish standing. See *Allen v. Wright*, 468 U.S. 737, 760-61 (1984) (*abrogated on other grounds by* *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2015).[1] Deemar attempts to avoid *Allen's* clear instruction by arguing that unlike the plaintiffs in *Allen,* she was personally discriminated against because "she has been classified, and continues to be classified by the color of her skin." Dkt. No. 29 at 9. However, Deemar provides no authority to support a finding that exposure to a school district's equity curriculum equates to actionable discriminatory treatment for standing purposes under the Equal Protection Clause.

Instead, Deemar places the proverbial cart in front of the horse by relying on cases in which courts discussed stigmatic harms, but only after plaintiffs demonstrated the challenged practice actually discriminated against them because of their class membership. *See e.g. Heckler v. Mathews,* 465 U.S. 728 (1984) (statute provided greater benefits to female employees); *Brown v.*

---

[1] As *Allen* warns, granting standing to plaintiffs challenging government conduct that does not discriminate against them would transfer the Court from adjudicating cognizable injuries to adjudicating "value interests." *Id.* at 756. See also *Johnson v. U.S. Off. of Pers. Mgmt.,* 783 F.3d 655, 660 (7th Cir. 2015) ("Neither psychological harm 'produced by observation of conduct with which one disagrees' nor offense at the behavior of government and a desire to have public officials comply with one's view of the law constitutes a cognizable injury.").

*Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 492-93 (1954) (addressing public school segregation) (*Brown I*); *Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (standing conferred to those who lived in a voting district that was racially gerrymandered); *Wolf v. Walker,* 986 F. Supp. 2d 982, 1014 (W.D. Wis. 2014) (statute prohibited same-sex marriage). In these cases, individuals alleged a cognizable injury in fact, not solely because they were classified based on class, but because they were subjected to unequal treatment that could result in stigmatic injury.[2]

Here, merely talking about race and attempting to implement a curriculum in which teachers and students candidly and honestly discuss the history of racism in this country and the ongoing impact of structural inequities that remain as a result of historical discrimination, even if it arguably "stigmatizes" members of the White majority race, in and of itself, does not equate to discrimination for constitutional standing purposes. The fact that staff split temporarily and voluntarily into groups based on race to discuss issues of race is a far cry from government sponsored programing such as race based hiring preferences, racial gerrymandering, government contracting, or miscegenation laws that subject individuals to unequal treatment, and also result in undeniable stigmatic harm.[3] As noted by *Carrol,* being denied equal treatment in issues such as

---

[2] Deemar's cites no authority supporting her contention that the Supreme Court, "recognizes a constitutional injury when the government identifies individuals by the color of their skin," without a showing that the individuals was allegedly subjected to race based unequal treatment.

[3] Deemar's reliance on *Heckler v. Mathews* is misplaced. *Heckler* involved a statute which granted more favorable benefits to female federal employees. *Heckler,* 465 U.S. at 740. Even though the statute contained a severability clause that made males' claims unredressable, the Court found that the <u>unequal treatment (i.e., the granting of more favorable benefits to women)</u> in this case could result in a stigmatic injury to males even if they could not recover an economic benefit. *Id.* at 740. However, *Heckler* did not eliminate the requirement that a plaintiff must demonstrate that he or she was denied equal treatment. See *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 50 (2d Cir. 2017), as amended (Aug. 2, 2017). Thus, *Heckler* is inapposite to the extent plaintiff in that case was subject to unequal treatment whereas Deemar was not.

education and affirmative action programs differs materially from simply being classified by race. *Carrol v. Nakatani*, 342 F.3d 934, 946 (9th Cir. 2003).[4]

In sum, Deemar has failed to establish that the District's equity initiatives subjected her to unequal treatment in a way recognized by courts under the Equal Protection Clause. Instead, Deemar's claim of "unequal treatment" is based on her subjective concerns about the contents of the curriculum, much of which was optional and which was open to and attended by all teachers. Deemar fails to allege that she was denied equal treatment under the Equal Protection Clause. Therefore, her claim of standing fails.

## II. Deemar Fails to Allege a Cognizable Concrete Racial Stigmatic Harm

Deemar's standing claim fails because not only has she failed to allege or demonstrate that she was denied equal treatment, but she also fails to demonstrate a concrete racial stigmatic harm.

Deemar alleges the District's equity initiatives are "stigmatizing racial classifications" and unlawfully discriminate against her as a white person. Such a strained interpretation undermines the very purpose of the Equal Protection clause and raises serious First Amendment concerns by threatening to chill discussion and debate about the ongoing role that race plays in our society generally and within education specifically. *Monteiro v. Tempe Union High Sch. Dist.,* 158 F. 3d 1022, 1032 (9th Cir. 1998) (holding that First Amendment concerns prohibited a claim that a school's curriculum, even if allegedly racist, created a hostile educational environment that violated Title VI or the Equal Protection clause).

Further, Deemar's attempt to equate the alleged "stigma" resulting from voluntary race based "affinity groups" offered by the District with the impact of government mandated forced

---

[4] Indeed, the Supreme Court has long accepted the idea that race conscious programing, which may classify by race, is permitted as is eradicates the lingering effects of discrimination. *See e.g. Fullilove v. Klutznick,* 448 U.S. 448 (1980); *Bakke,* 438 U.S. at 373; *United Jewish Org. v. Carey,* 430 U.S. 144 (1977).

segregation in *Brown v. Board of Education*, ignores history and confirms the lack of any factual or legal basis for finding that alleged "stigmatic harm" is sufficient to confer standing in this case. In *Brown*, the Court found that maintaining separate educational facilities for Black children constitutes a denial of equal protection, overturning decades of law upholding the "separate but equal doctrine." *Brown*, 347 U.S. at 492-93. In addressing harm, the Court focused on the stigmatic injuries that were inflicted on Black children because of segregation, which "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Id.* at 494. The *Brown* Court relied upon scientific evidence to conclude that Black children suffer irreparable psychological harm as the result of being forced to attend schools only for other Black children. *Id. Brown* made clear that the need to recognize racial stigmatic injuries was in response to our country's pervasive history of de jure segregation, racism and hostility towards racial minorities. *See e.g., Freeman v. Pitts*, 503 U.S. 467, 485-86 (1992) (noting that stigmatic injury is the principal wrong of de jure segregation).

Deemar provides no authority that would recognize, or even compare the real, pervasive and unquestionable economic, physical and psychological harm resulting from historical discrimination, segregation, and intentional racism against minorities in this country to any alleged discomfort or stigma she allegedly feels as a member of the historically advantaged majority race as a result of participating in what is at most, a few hours of equity training in which teachers and students discuss the pernicious effects of racism and discrimination that remain with us to this day. While not a "standing" case per se, in *Regents of University of California v. Bakke*, the Supreme Court upheld the use of racial preference in medical school admissions, and in so doing specifically rejected the idea that a White medical student who was denied admission to medical school due to a racial preference that favored Black students had suffered a stigmatic or actual harm that was in

any way comparable to the harm inflicted upon Black students as a result of the intentional segregation that was declared unconstitutional in *Brown*. *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 373 (1978). The Court specifically noted:

> Unlike discrimination against racial minorities, the use of racial preferences for remedial purposes does not inflict a pervasive injury upon individual whites in the sense that wherever they go or whatever they do there is a significant likelihood that they will be treated as second-class citizens because of their color.

*Id.* at 373 (opinion of Brennan, J., with White, Marshall and Blackmun, JJ.); *see also Britton v. South Bend Cmty. Sch. Corp.,* 775 F.2d 794, 812 n.20 (7th Cir. 1985) (finding no stigmatic implication of inferiority in preference against members of "dominant white majority group"), *vacated on other grounds by* 783 F.2d 105 (7th Cir. 1986). Deemar does not cite a single case in which a court held that "stigmatic harm" was sufficient to confer standing on behalf of an individual who did not also allege that she was personally denied equal treatment as a result of alleged government conduct, much less a case holding that a member of the historically advantaged majority race is sufficiently "stigmatized" by racial classifications and discussions about race so as to confer standing.

In sum, Deemar fails to allege a cognizable stigmatic harm. Instead, she seeks to claim a constitutional injury because she disagrees with the District's equity initiatives. However, as the Seventh Circuit notes, "Neither psychological harm 'produced by observation of conduct with which one disagrees' nor offense at the behavior of government and a desire to have public officials comply with one's view of the law constitutes a cognizable injury." *Johnson v. U.S. Off. of Pers. Mgmt.,* 783 F.3d 655, 660 (7th Cir. 2015). Accordingly, this Court should not extend longstanding principles of standing to allow Deemar to seek vindication of her values as opposed to a cognizable constitutional injury.

### III. Deemar Was Not Subjected to the Alleged Unlawful Practices and Therefore, Lacks Standing to Challenge Them.

In her Complaint, Deemar purports to challenge the entirety of the District's equity based training and curriculum, regardless of whether she personally participated in any of the activities. At a minimum, Deemar lacks standing to challenge those aspects of the District's practices to which she was not exposed or compelled to participate in. In response to the District's Motion to Dismiss, Deemar submitted a Declaration purportedly supporting her exposure to the District's equity programming and curriculum. However, Deemar's affidavit only confirms what her own attorney has already admitted—this case is not about her. *See* Fox 32 Chicago, *White Middle School Teacher Sues Evanston/Skokie School District for Alleged Discrimination,* YOUTUBE (Jul. 1, 2021).

In her complaint, Deemar sets forth lengthy allegations regarding trainings and curriculum, but her Declaration confirms that the only activities described in her Complaint that she participated in was a two-day Beyond Diversity training in 2018[5] and one lesson on intersectionality during the 2019-2020 school year. Dkt. No. 29-1, at ¶¶ 4-26; Dkt. No. 29 at p.13. Her argument on the Beyond Diversity training centers on one activity during the two-day training called "the Color Line Exercise," the purpose of which she describes in her Response to this motion incompletely and without citation. Dkt. No. 29 at p. 3 n.8. Further, the fact that race was discussed and identified in this exercise does not support her claim that she suffered an injury in fact by participating in the exercise. Indeed, throughout her complaint and response to this motion,

---

[5] In Exhibit 2, Deemar sets forth all of the trainings she attended in the District from 2011 through 2021. It is unclear what relevant information this provides, as many of these trainings relate to things such as remote learning and drama department curriculum work. Perhaps Deemar believes that by attaching a long list of irrelevant trainings, none of which have been cited in her Complaint, she will bolster her weak claim on standing.

Deemar, without any legal or evidentiary support, equates teaching about race with a constitutional injury.

Other than the two-day training, she confirms only having received emails describing trainings and meetings and having received a survey. Dkt. No. 29-1, ¶¶ 4-26. Notably, in her Declaration she does not assert that she attended or was required to attend any of the events or complete the surveys identified in the e-mails. Nothing in these materials support a finding that the mere receipt of this information resulted in a constitutionally cognizable injury to her.

Likewise, after acknowledging that she only taught one lesson on intersectionality, Deemar makes a non-sensical argument that because the District's curriculum is cumulative, somehow the previous lessons, *which she did not teach*, created a hostile work environment for her. Moreover, neither her Complaint nor her Declaration describes how teaching "intersectionality" resulted in a cognizable constitutional injury to her. Similarly, neither her Complaint nor her Declaration allege or describe what specifically occurred during the two-day Beyond Diversity training in 2018 that constituted a cognizable constitutional injury to her personally.

Deemar's reliance on *Monteiro v. Tempe Union High School District*, is misplaced and actually supports the District. *Montiero,* 158 F. 3d 1022 (9th Cir. 1998). In *Montiero*, the court held that the parents could not maintain claims that allegedly racist school curriculum created a racially hostile environment for their children, but also held that the defendant school district could potentially be held liable for allowing the students to be subjected to racial slurs and offensive racist graffiti by other students. *Id.* at 1032. The court, in finding a racially hostile environment, noted the use of "the most noxious racial epithet in the contemporary American lexicon," the victim's young age and the impact such verbal harassment would have on an impressionable adolescent, and the failure of the district to intervene. *Id.* at 1034. In *Walker v. Ford Motor Co.,*

the court found that the pervasive use of racial slurs and epithets, even though only some were aimed at the plaintiff, that were repeated, continuous and prolonged and, despite Walker's objections, were sufficient to establish a violation of Title VII. *Walker v. Ford Motor Co,* 684 F.2d 1355, 1359 (11th Cir. 1982). The context and facts in both cases are a far cry from Deemar receiving emails about meetings of adults in which the attendees were to discuss and interrogate issues of race and equity. Finally, in *Vinson v. Taylor*, the plaintiff was subject to extensive harassing behavior by the defendant, her supervisor, including sexual assault and rape–the court's conjecture that a woman who herself was not subject to harassment "might" have a claim was dicta, at best. *Vinson v. Taylor,* 753 F.2d 141, 146 (D.C. Cir. 1985).

### IV. Deemar's Complaint Should be Dismissed Because She Fails to Allege an Actionable Title VI or Equal Protection Claim.

#### A. Deemar's Claims Do Not Fall Within the Zone of Interests that Title VI Protects Because She is Not the Intended Beneficiary of the District's Educational Programming

Deemar does not dispute that to bring a statutory claim she must demonstrate that her claims are within the zone of interests protected by Title VI. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014); *Crabtree v. Experian*, 948 F.3d 872, 883 (7th Cir. 2020). To sufficiently state a claim under Title VI, "the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program." *Doe ex rel. Doe v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411, 419 (7th Cir. 1986) (quoting *Simpson v. Reynolds Metal Co.*, 629 F.2d 1226, 1235 (7th Cir. 1980)); *Veljkovic v. Bd. of Educ. of Chicago*, 2020 WL 7626735, at *4 (N.D. Ill. Dec. 22, 2020); *Miller v. Phelan*, 845 F. Supp. 1201, 1207 (N.D. Ill. 1993). However, contrary to Deemar's assertions, she is not the intended beneficiary of federal Title II funds allocated to the District and, therefore, fails to state a claim under Title VI.

Although "improv[ing] the quality and effectiveness of teachers" is stated as part of the purpose of Title II funds, this goal is *for the benefit of students,* not teachers. 20 U.S.C. § 6601. The stated purpose of Title II funding is "(1) increase[ing] student achievement consistent with the challenging State academic standards; (2) improv[ing] the quality and effectiveness of teachers, principals, and other school leaders; (3) increas[ing] the number of teachers, principals, and other school leaders who are effective in improving student academic achievement; and (4) provid[ing] low-income and minority students greater access to effective teachers, principals, and other school leaders." 20 U.S.C. § 6601. All of these purposes are aimed at benefiting students by improving teaching quality. Students, not teachers, are the intended beneficiaries of Title II funds.

Further, Congress did not intend for Title VI to be the actionable statute for employment discrimination unless the *primary objective* of the Federal financial assistance is to provide employment. *Afogho v. Illinois Cent. Sch. Dist. 104 Bd. of Educ.*, 421 F. Supp. 3d 585, 593 (S.D. Ill. 2019); *Spence v. Bd. of Educ.*, 2021 WL 2948904, at *8 (N.D. Ill. July 14, 2021). The Seventh Circuit has held that "Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless (1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Ahern v. Bd. of Educ. of City of Chi.*, 133 F.3d 975, 978 (7th Cir. 1998). Improving the quality and effectiveness of teachers is *one* of the purposes of Title II funds; as set forth above, this improvement is clearly for the benefit of students and not the teachers. Even if it could be argued that teachers get benefit from training, Plaintiff fails to allege that it is the *primary* objective of the federal assistance. Because Plaintiff fails to allege that the primary purpose of Title II funds is to provide employment and because, as stated above, the

primary purpose is to provide students with quality and effective instruction, Plaintiff cannot bring a claim under Title VI. *Afogho*, 421 F. Supp. 3d at 593.

### B. Deemar Does Not Allege the Existence of an Actionable Hostile Environment Claim Under Title VI or the Equal Protection Clause.

Deemar concedes that as an employee of the District, she was not subjected to a "hostile work environment" sufficient to establish liability under either the Equal Protection Clause or Title VI by asserting that she is really alleging that she was subjected to a hostile "educational" environment.[6] However, in arguing that she is asserting a claim based on the "educational" environment, Deemar ignores the fact that she is an employee of the District, not a student. Claims of hostile educational environment are reserved for students. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) (reasoning a hostile educational environment is created by conduct "so severe, pervasive, and objectively offensive…that the victim-*students* are effectively denied equal access to an institution's resources and opportunities") (emphasis added); *Gabrielle M. v. Park Forest-Chicago Heights, Ill., Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) (stating the harassment must have a concrete, negative effect on the victim's education). In fact, the cases Deemar cites in support of her argument for a hostile educational environment are all distinguishable from the case at hand because, among other factors, they only concern student complaints of harassment. *See Montiero*, 158 F.3d at 1022 (concerning a parent bringing suit on behalf of a student); *Davis*, 526 U.S. at 629 (suing a school board on behalf of a fifth-grade student); *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) (involving a claim brought by a student against a school district); *Whitfield v. Notre Dame Middle Sch.*, 412 Fed. Appx. 517 (3rd Cir. 2011)

---

[6] Contrary to Deemar's assertion that the District failed to argue that she failed to plead an equal protection injury (Pl. Resp. at 15), the District specifically argued that Deemar has failed to allege an actionable hostile environment under either Title VI or the Equal Protection clause, which are analyzed under the exact same framework. *Totten v. Benedictine Univ.*, 2021 WL 3290926, at *9 (N.D. Ill. Aug. 2, 2021); *King v. Bd. of Regents of Univ. of Wis. Sys.*, 898 F.2d 533, 537 (7th Cir. 1990).

(alleging racial discrimination in violation of Title VI on behalf of an African American student, among other claims); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398 (5th Cir. 2015) (concerning an allegation that the school district and two of its employees discriminated against three students and created a racially hostile educational environment); *Qualls v. Cunningham*, 183 Fed. Appx. 564, 567 (7th Cir. 2006) (involving a student suing the university and several officers under Title VI); *Spence*, 2021 WL 2948904, at *8 (concerning allegations of racist acts by classmates and school officials against a student).

Moreover, the distinction between a "hostile educational environment" claim and a hostile work environment claim is a distinction without any substantive difference. Indeed, the standard for establishing a severe and pervasive hostile educational environment is derived directly from the "hostile work environment" standard applied to employment claims under Title VII. *Hendrichsen v. Ball State Univ.*, 107 Fed. Appx. 680, 684 (7th Cir. 2004); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1023 (7th Cir.1997).

Whether styled as a hostile "educational" environment or hostile "work" environment claim, Deemar fails to allege that she was subjected to severe and pervasive conduct sufficient to support a claim. *Cf. Qualls,* 183 Fed. Appx. at 567, *with Galster,* 768 F.3d at 618 (finding violent physical attacks of pushing plaintiff, punching her in the face, repeatedly hitting her with metal track spikes, and ambushing her on the playground, causing her to leave the district sufficiently severe and pervasive to deny access to educational benefits), *Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655, 659-62, 667 (2d Cir. 2012) (finding severity requirement satisfied where victim endured blatant racial slurs and physical attacks including being punched and choked and causing plaintiff to graduate early rather than complete coursework for full diploma), *Vance v. Spencer Cnty. Pub. Sch. Dist.,* 231 F.3d 253, 259 (6th Cir. 2000) (finding sufficiently severe harassment

13

where harassers sexually positioned a female student, yanked off her shirt, and stabbed her, causing the student to finish school at home), and *Murell v. Sch. Dist. No. 1,* 186 F.3d 1238, 1248 (10th Cir. 1999) (finding severe harassment when the victim was sexually assaulted for a month, hospitalized, and rendered homebound by the abuse). Deemar's allegations that "defendants treated Plaintiff differently from her colleagues because of her race when they intentionally segregated staff meetings by race, offered race-based programming, promoted affinity groups, conducted privilege walks, and maintained policies committed to focusing on race as one of the "first visible indicators of identity" hardly rise to the level of severity sufficient to establish a claim of a racially hostile environment, regardless of whether it is an "educational" or "work" environment. Dkt. 1, ¶186.

*Monteiro*, cited by Deemar, actually confirms her inability to state a hostile environment claim based on her exposure to the District's educational curriculum. In *Montiero,* the Court held that Black students who objected to the mandatory use of books in the defendant school district's curriculum that contained racially hostile terms and themes, including the repeated use of the "n-word," could not state a hostile environment claim based on the content of the school's curriculum. *Montiero*, 158 F. 3d at 1026. The court reasoned that to recognize an Equal Protection or Title VI claim based on a school's curriculum content impermissibly impinges on the First Amendment rights of students to have access to such reading materials and "significantly interferes with the District's discretion to determine the composition of its curriculum." *Id*. at 1026-1029. Indeed, even in the context of the vulnerability of young minority students to books that are allegedly racist, the court goes on to describe the damage that would result in "allowing the judicial system to process complaints that seek to enjoin or attach civil liability to a school district's assignment of a book" concluding this would lead both to the self-censorship of districts that will avoid the

use of books or materials that could be argued to cause harm and to waring lawsuits between those who want access to the materials and those that do not. *Id.* at 1029-1031.

Here, Deemar, under the guise of a "hostile environment" claim is improperly asking this court to interfere with the District's curriculum decisions and the resulting educational opportunities it affords to students, and has significantly less justification for doing so than the parents in *Monteiro* who were attempting to protect vulnerable and impressionable children. Deemar is an experienced teacher and member of a historically advantaged race. If a young Black child's exposure to allegedly racist curriculum does not state an actionable claim, Deemar's exposure to curricula she personally finds "offensive" or "racist" cannot possibly state an actionable claim.[7]

Whether styled as a claim based on the "educational" environment or "work" environment, Deemar cannot establish that she was exposed to conduct that rendered the environment at the District so racially hostile to her that it amounted to a violation of Title VI or the Equal Protection clause. Accordingly, her Complaint should be dismissed, in its entirety pursuant to Federal Rule 12(b)(6).

---

[7] Deemar's citation to the portion of the *Montiero* decision which held that the plaintiffs in that case stated an actionable hostile environment claim based on white students repeatedly calling them the "n-word" and other racial slurs and being exposed to racist graffiti is inapposite because Deemar does not allege that she was subjected to similarly severe or pervasive conduct by other employees or students. *See Montiero*, 158 F.3d at 1033. Indeed, the only co-worker comments cited by Deemar that she claims were offensive were made in the context of curriculum-based discussions, and as such cannot support her hostile environment claim.

Respectfully submitted,

**BOARD OF EDUCATION OF EVANSTON-SKOKIE COMMUNITY CONSOLIDATED SCHOOL DISTRICT 65, DEVON HORTON, LATARSHA GREEN AND STACY BEARDSLEY**

By  */s/ Nicki B. Bazer*
         One of Its Attorneys

Nicki B. Bazer *(nbb@franczek.com)*
Michael A. Warner*(maw@franczek.com)*
R. Jason Patterson *(rjp@franczek.com)*
Franczek P.C.
300 S. Wacker Drive, Suite 3400
Chicago, Illinois 60606
312-986-0300

Dated: November 24, 2021

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that she caused a true and correct copy of the foregoing **Defendants' Reply in Support of Its Motion to Dismiss Plaintiff's Complaint** to be filed electronically with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record on this 24th day of November, 2021.

Celia H. O'Leary (*coleary@southeasternlegal.org*)
Kimberly S. Hermann (*khermann@southeasternlegal.org*)
Branden H. Boucek (*bboucek@southeasternlegal.org*)
Southeastern Legal Foundation
560 W. Crossville Rd., Suite 104
Roswell, GA 30075

Whitman H. Brisky(*wbrisky@mauckbaker.com*)
Terry S. Lu (*tlu@mauckbaker.com*)
Mauck & Baker, LLC
1 N. LaSalle St., Suite 600
Chicago, IL 60602

*s/ Nicki B. Bazer*
*nbb@franczek.com*

2971076.2