**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STACY DEEMAR, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:21-cv-3466 |
| | ) |
| BOARD OF EDUCATION OF THE CITY OF EVANSTON/SKOKIE ("DISTRICT 65"), et al., | ) Judge John J. Tharp, Jr. |
| | ) |
|     Defendants. | ) |

**PLAINTIFF'S RESPONSE TO ORDER REQUESTING SUPPLEMENTAL BRIEFING**

## INTRODUCTION

Plaintiff responds to the Court's questions regarding her Title VI hostile educational environment claim.

I. **Is either party aware of any case other than *Monteiro* in which the court addressed the viability of an equal protection hostile environment claim[1] challenging a school's curriculum?**

A federal court recently heard a hostile environment challenge to curriculum. *See Doe v. Herman*, No. 3:20-cv-00947, 2021 U.S. Dist. LEXIS 93317, at *3 (M.D. Tenn. May 17, 2021). As part of a two-day lesson about slavery, a student teacher instructed students to read aloud a plantation owner's speech called "Let's Make a Slave," where the slave owner compared slaves to horses, urged other owners to "break" their slaves, provided graphic examples of torture, and recommended making slaves "mentally dependent . . . but physically strong." *Id.* at *3-4. She then instructed students to pretend that they were slaves running from their owners. *Id.* In a different lesson, another teacher presented a book which included sale prices from the slave trade. Students joked about the "Let's Make a Slave" lesson during recess and said to an autistic classmate, "you are my slave." *Id.* at *6. The classmate's parents sued, alleging a hostile environment based on the slavery lesson, the book, and the playground comments. *Id.* at *10.

The court held that although the lesson on slavery was "ill-advised," "developmentally inappropriate," and "extremely traumatic," it only occurred once and was not pervasive enough on its own to establish a hostile environment. *Id.* at *18. Turning to the other facts, the court held that

---

[1] Ms. Deemar's hostile learning environment claim (Count Three) is brought under Title VI of the Civil Rights Act, rather than the Equal Protection Clause. (*Compare* Compl. (Doc. 1) ¶ 193 *with* id. ¶ 179 (equal protection disparate treatment claim) *and* id. ¶ 188 (Title VI disparate treatment claim).) Although courts treat *disparate treatment* claims the same way under Title VI and the Equal Protection Clause (*see* Pls.' Resp., Doc. 29, at 6 n.9), courts have not said that *hostile environment* claims can and should be analyzed the same way. Because Defendants failed to address Ms. Deemar's equal protection disparate treatment claim in their Motion to Dismiss (*see* Defs.' Mem., Doc. 21 at 13), the defense is waived. *Blaz v. Michael Reese Hosp. Found.*, 191 F.R.D. 570, 572 (N.D. Ill. 1999).

the plaintiffs failed to provide enough context about the playground comments to show that they were severe and pervasive. *Id.* at *16-17. The plaintiffs also could not show that talking about slave prices in a book was objectively offensive because it only appeared to affect their autistic child, who was "prone to . . . taking things literally." *Id.* at *17-18. Had the slavery lesson occurred more than once, or had the plaintiffs sufficiently demonstrated that other instances of harassment occurred on school grounds, a hostile environment likely would have existed.[2]

Unlike in *Herman*, Ms. Deemar has sufficiently alleged a hostile environment that is severe, pervasive, and objectively offensive. As explained more fully below, Ms. Deemar does not simply point to one misguided lesson or one stray comment but alleges a series of practices through which District 65 reinforces race-based essentialism.

**II. *Monteiro v. Tempe Union High School District*, 158 F.3d (9th Cir. 1998).**

    **A. Is *Monteiro* consistent with the law of this circuit?**

*Monteiro* fits the law of this circuit. There, a student claimed that her school subjected her to a hostile environment when it assigned two books containing racial slurs. 158 F.3d at 1024. The Ninth Circuit considered whether the student's interest in avoiding injury outweighed the school board's interest in assigning curriculum and other students' First Amendment rights to access the reading. *Id.* at 1028. Although it acknowledged that school boards typically may set curriculum, the Ninth Circuit made clear that its decision would not "preclude the prosecution of actions alleging that schools have pursued policies that serve to promote racist attitudes among their

---

[2] Similarly, an elementary school teacher in New York conducted a mock slave auction, where students shouted "bids" at their classmates and were told that in a real auction, "they would be shackled, . . . naked, and . . . their legs would be broken if they tried to escape." *Dayes v. Watertown City Sch. Dist.*, No. 5:20-cv-964 (GLS/ML), 2021 U.S. Dist. LEXIS 183933, at *4 (N.D.N.Y. Sep. 27, 2021). The court held that because the lesson "was one instance," and because the school district did not know or approve of the teacher's plans, a hostile environment did not exist. *Id.* at *17.

2

students, or have sought to indoctrinate their young charges with racist concepts." *Id*. at 1028, 1032. The concurring opinion emphasized that the complaint did not allege that teachers even discussed the books or that the school board assigned books "with overt messages of racial hatred." *Id*. at 1035 (Boochever, J., concurring). Such a complaint "may well present different issues." *Id*.

Like the Ninth Circuit, the Seventh Circuit has held that school boards' authority to assign curriculum "is not completely unfettered by constitutional considerations." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1305 (7th Cir. 1980). School boards must refrain "from imposing 'a pall of orthodoxy'" in the classroom. *Id*. (collecting cases). Once "local authorities begin to substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute," courts must intervene. *Id*. at 1306.

**B. Does *Monteiro* draw an appropriate dividing line between conduct that is protected by the First Amendment and conduct that may violate equal protection?**

The Ninth Circuit cast an appropriate line between the First Amendment and equal protection in *Monteiro*. There, the court distinguished books containing racial slurs from books advocating for racial hatred and policies urging disparate treatment. *Monteiro*, 158 F.3d at 1032, 1035. Although racial slurs are certainly offensive, the court examined the context of the books and determined that only one racial slur appeared consistently, that it was widely used during the time when those books were written and thus depicted the era accurately, and that the books were not discussed in an injurious way. *Id*. at 1031. Because "[i]t is the literary works, and *only* the literary works, that Monteiro seeks to put on trial," her claim could not stand. *Id*. (emphasis added).

Ms. Deemar is not asking this Court to remove books from District 65's bookshelves.[3] She does not oppose access to ideas about race and racism. Instead, she opposes the "pall of orthodoxy"

---

[3] Contrary to Defendants' suggestion, a school board cannot assert a First Amendment right to assign curriculum or avoid self-censorship (*see* Defs.' Reply, Doc. 36 at 14-15), but students generally have a broad First Amendment right to access ideas. *See Monteiro*, 158 F.3d at 1028.

3

District 65 casts through its consistent reinforcement that white and non-white individuals should be categorized and treated differently based on race. As described below, District 65 does not merely grant students access to those concepts; it makes them standard operating procedure.

**C. If the Court concludes that Defendant's mere act of assigning reading materials that Plaintiff finds offensive . . . does not violate equal protection, what factual support remains for Plaintiff's equal protection hostile environment claim?**

District 65 is not merely assigning reading materials but endorsing and reinforcing racial stigma. It has adopted a position on race: "If you're not antiracist, we can't have you in front of our students." (Doc. 1 ¶ 2.) According to the District, race is "a political construction created to concentrate power with white people and legitimize dominance over non-white people," and "racism" is "created for groups historically or currently defined as white being advantaged, and groups historically defined as non-white . . . as disadvantaged." (Id. ¶ 14.) The District has vowed to remedy such disadvantages by "focusing on race as one of the first visible indicators of identity[.]" (Id. ¶ 33.) It praises equity as the means to antiracism while acknowledging that it must abandon equality because the two cannot coexist. (Id. ¶¶ 5-7, 34.) The District thus reinforces through its policies that white and non-white individuals are different, that they are either oppressors or oppressed based on skin color, and that equal treatment is a fiction.

Beyond those policies, District 65 uses every opportunity to stigmatize "whiteness." When the District urged staff to read *White Fragility*, it told them that the book was "the antidote to white fragility and a road map for developing white racial stamina and humility" and that the District was "centering White Racial Literacy Development" as a districtwide goal. (Id. ¶¶ 85, 88.) Whether staff signed up to read the book or not, they received frequent email reminders containing *White Fragility* discussion questions like, "How will you ensure that when common white patterns surface (distancing, intellectualizing, rationalizing), you will work to identify and challenge them

4

rather than ignore or avoid them?"; and "How can we make generalizations about what it means to be white when we don't know each person's individual story?" (Id. ¶¶ 90-95.) Moreover, whoever participated in the book study would "plan action steps" for their schools. (Id. ¶ 101.) In other words, it was never just about inviting staff to read *White Fragility*, but about taking steps to implement its teachings by erasing colorblindness while challenging "whiteness."

And in its lesson plans, the District instructs teachers to engage students in discussions about "whiteness" and "white culture," inform students that "treating everybody equally" is a form of colorblindness that counts as racism, tell students that white people use colorblindness to ignore racism, and reinforce that our country's systems and government are controlled by white people, resulting in racism. (Id. ¶¶ 135, 142, 141, 147, 160.) Unlike in *Herman*, the District has taught not just one offensive lesson but dozens. And unlike in *Monteiro*, it does not just invite students and teachers to read materials but insists on discussing skin color each time. And each time, the District associates whiteness with negative stereotypes.

District 65 also knew, and was deliberately indifferent to, racial hostility by staff members. For example, one staff member sent a district-wide email saying, "Not one person checked you on your entitled and condescending email . . . Consequently, I will wield my metaphorical machete at white privilege at every single opportunity." (Id. ¶ 169.) A group of staff members read aloud *and* emailed their colleagues a letter stating, "We've noticed that we are often 'directed' by some of our white colleagues to handle the 'difficult' students, which are often students of color. And when we handle our class like champions, we watch some of our white colleagues get help handling a situation that we could have handled in 10 minutes...alone!" (Id. ¶ 59.)

The District bolstered this hostility when it urged—and even required—staff to attend meetings by race. From mandatory, segregated meetings at Nichols Middle School, to virtual

5

affinity sessions during COVID, to affinity groups for students, District 65 constantly barraged staff with reminders that white people and non-white people are different and should be treated as such. (Id. ¶¶ 48-55, 59, 61-62, 103-107.) Before the segregated meetings at Nichols Middle School, District 65 emailed agendas to staff explaining that they would learn about "racial awakening" and that they would be asked to share stories about "how racism has affected your life" and what it means to "belong to a certain racial group." (Id. ¶ 56.) Following the meetings, District 65 sent surveys to every staff member with questions like, "What is your understanding of the impact of white fragility as a result of the affinity meeting?" (Id. ¶¶ 57-58.)

The District also circulated student surveys to staff members, where it asked countless questions about students' skin color. (Id. ¶ 111.) It held meetings and sent staff directives for the Black Lives Matter Week curriculum, including emails with links to lesson plans and reminders that students could not opt out of those lessons. (Id. ¶¶ 113, 118-120.) And finally, District 65 required both students and teachers to participate in various privilege walks, including the Colorism Privilege Walk and the Color Line Exercise, where they had to step forward and backward based on skin color. (Id. ¶¶ 66-73, 108-110.) In these ways, District 65 did not just assign materials to *read* and reflect upon; it *implemented* race-based policies and procedures designed to stereotype and stigmatize, and it relied on reading and training materials to reinforce those policies. By assigning characteristics to racial groups, District 65 is not simply offering students access to ideas about race; it is establishing an orthodoxy that stigmatizes racial groups.

**III. Does [*Sherman v. Community Consolidated School District 21,* 980 F.2d 437, 439 (7th Cir. 1992)] place any limits on the Court's authority to order the injunctive relief Plaintiff requests or otherwise limit Plaintiff's action?**

In *Sherman*, a student claimed that a school district violated the First Amendment when it included the Pledge of Allegiance in its curriculum. 980 F.2d at 439-40. Like the Ninth Circuit in

6

*Monteiro*, the Seventh Circuit considered the competing interests that are present on school grounds. Although it recognized that school boards have some authority to set curriculum, the court held that they are still "bounded by" the Constitution. *Id.* at 445 (quoting *Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058, 1069 (6th Cir. 1987) (Boggs, J., concurring)). School boards cannot insulate themselves from liability simply by asserting their authority to make curriculum; they still must satisfy the Constitution. *See Mozert*, 827 F.2d at 1069 ("[P]upils may indeed be expelled if they will not read from the King James Bible, so long as it is only used as literature, and not taught as religious truth."); *Sherman,* 980 F.2d at 445 ("Everything would be different if [the Pledge] were a prayer or other sign of religious devotion."); *Zykan,* 631 F.2d at 1305.

Once a constitutional violation is established, "the scope of a district court's equitable powers to remedy past wrongs is broad[.]" *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). Because a remedy must be tailored to address a violation, the precise language in any injunction requires further factual development. *See Milliken v. Bradley*, 418 U.S. 717, 739 (1974). But the burden is "on a school board . . . to come forward with a plan that promises realistically to work," and school boards must engage in "good faith implementation of the governing constitutional principles." *Swann,* 402 U.S. at 12-13. District 65 can formulate a plan; it presumably already had one in mind when the Office of Civil Rights reportedly issued a letter of finding to the District in January 2021. (Doc. 1 ¶ 15.) Whatever steps the District planned to take to comply with the OCR findings, it can at the very least take those steps here.

This Court can issue appropriate injunctive relief once the scope of District 65's wrongdoing is established. Although the court in *Sherman* recognized that school boards have some discretion to create curriculum, that discretion only goes so far. When a school board

7

infringes on constitutional and civil rights, as District 65 did here, courts not only have the authority but the duty to intervene.

IV. **Is either party aware of any case (from any circuit) considering the viability of a hostile educational environment claim brought by a teacher under either Title VI or the Equal Protection Clause?**

This is a case of first impression. Although no court has directly addressed whether teachers can bring Title VI hostile educational environment claims, Seventh Circuit case law shows that they can. In *T.S. v. Heart of Cardon, LLC,* the child of an employee at an assisted living facility sued the facility, alleging discrimination because the facility's employee health plan did not cover the child's autism care. 43 F.4th 737 (7th Cir. 2022). The facility argued that although it received federal funding for patient services under the Patient Protection and Affordable Care Act (ACA), the child was not a facility patient within the statute's zone of interests. *Id*. at 740.

Like Title VI and other nondiscrimination statutes, the ACA bans "any health program or activity . . . receiving federal financial assistance" from discriminating against an individual. *Id*. at 739. The Seventh Circuit held that "the right to sue under [the ACA] is not limited to plaintiffs who are intended to benefit from that assistance" because the ACA was broadly intended to prevent discrimination by healthcare facilities receiving federal funding. *Id*. at 741-42, 744 ("By linking the prohibition to federal funding, the provision seeks to prevent federal resources from supporting discriminatory conduct; and by authorizing a private right of action, it seeks to provide individuals a means of protecting themselves from such conduct."). Even though the employee's child was not a patient, he had standing because the nondiscrimination statute "forbids discrimination against, and provides a private right of action to, 'an *individual*[.]'" *Id*. at 742 (emphasis added). Congress could have narrowed the scope of the law by inserting the word "patient" or "beneficiary," but it chose not to. *Id*. Because the plaintiff's interests and the ACA's goals

8

"squarely align," and "[b]ecause [the ACA's] prohibition on discrimination is not, by its own terms, limited to the discrete portion of a covered entity that receives federal financial assistance," the Seventh Circuit held that any individual could bring a claim under the ACA. *Id.* at 742, 744.

The court also addressed the facility's argument that the plaintiff was not within the statute's zone of interests under *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226 (7th Cir. 1980), where the Seventh Circuit held that a plaintiff must be an intended beneficiary of a program or activity receiving federal funding to bring a claim under Section 504 of the Rehabilitation Act. *Heart of Cardon*, 43 F.4th at 744. It held that through the Civil Rights Restoration Act of 1987 (CRRA), Congress "dismantled the foundation" of *Simpson* and authorized *anyone* to bring a claim under Section 504. *Id.* at 745-46. "By expanding the class of plaintiffs that could sue an entity under section 504, the CRRA overturned *Simpson*'s zone-of-interests interpretation." *Id.* at 746. Thus, the Seventh Circuit no longer requires that an individual be an intended beneficiary or otherwise fall within the zone of interests under either the ACA or Section 504.

Given that both the ACA and Section 504 were modeled after Title VI, and that their language is nearly identical, any individual may *also* bring a Title VI hostile educational environment claim.[4] Federal resources are funding discriminatory practices at District 65. The plain language and purpose of Title VI make clear that Ms. Deemar may sue to hold it accountable.

Before *Heart of Cardon*, this Court addressed a teacher's Title IX hostile work environment claim, where she alleged that a school district failed to investigate her complaints of sexual harassment. *Agbefe v. Bd. of Educ.*, 538 F. Supp. 3d 833, 836-37 (N.D. Ill. 2021). She also alleged that the school district treated her differently based on race in violation of Title VI. *Id.* at

---

[4] One statutory exception remains: a plaintiff may not bring an *employment* discrimination claim under Title VI "except where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3. Ms. Deemar is not asserting an adverse employment action. *See* 34 CFR 100.3(c)(1). Her claims relate directly to the *educational* environment at District 65.

9

837. The court dismissed her Title VI claim, reasoning that even though the district received Title I funding, its purpose was "to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." *Id*. at 838-39. Thus, she could not bring an employment discrimination claim because she could not show that the primary objective of Title I funding was to provide employment. *Id*. And even though "race discrimination in teacher employment can sometimes cause discrimination against students, the primary beneficiaries of Title I funds[,]" the teacher also failed to show a nexus between *her* disparate treatment and any disparate treatment of her *students*. *Id*. at 839.

*Agbefe* no longer appears to be good law following *Heart of Cardon*, but it was always distinguishable. Unlike the plaintiff's Title IX hostile *work* environment claim, Ms. Deemar alleges a hostile *educational* environment under Title VI. District 65 has subjected Ms. Deemar to a hostile learning environment through its policies, procedures, emails, programming, lesson plans, and surveys, all of which focus on reinforcing racial differences to students.[5] And as to her disparate treatment claim, Ms. Deemar only relies on facts and incidents to which *she* was personally subjected, including racial segregation, privilege walks, professional development programming, and policies committed to focusing on racial differences. This is different from *Agbefe*, where the plaintiff lacked standing to allege that the school board subjected her *students* to different treatment. Additionally, whereas students are the intended beneficiaries of Title I funds, teachers are the intended beneficiaries of Title II funds. (Pls.' Resp., Doc. 29 at 15-16.) Ms. Deemar may therefore allege a hostile learning environment.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

---

[5] Even if the District did not direct its actions at her every time, she may still bring a hostile educational environment claim. *See Monteiro*, 158 F.3d at 1033.

10

Respectfully submitted this 19th day of October, 2022.

/s/ Braden H. Boucek
KIMBERLY S. HERMANN
GA Bar No. 646473
BRADEN H. BOUCEK
TN BPR No. 021399
GA Bar No. 396831
CELIA H. O'LEARY
GA Bar No. 747472
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Telephone: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org


WHITMAN H. BRISKY
ARDC No. 297151
Of Counsel
Mauck & Baker, LLC
1 N. LaSalle St., Suite 600
Chicago, IL 60602
Telephone: (312) 726-1243
wbrisky@mauckbaker.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

    I hereby certify that on October 19, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail and/or facsimile. Parties may access the filing through the Court's electronic filing system.

                                            /s/ Braden H. Boucek
                                            BRADEN H. BOUCEK