**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STACY DEEMAR, <br><br> Plaintiff, <br><br> v. <br><br> BOARD OF EDUCATION OF THE CITY OF EVANSTON/SKOKIE DISTRICT 65, *et al*. <br><br> Defendants | Case No. 1:21-cv-03466 <br><br> Judge Robert M. Dow, Jr. |

**DEFENDANTS' RESPONSE TO ORDER REQUESTING SUPPLEMENTAL BRIEFING**

Defendants, Evanston-Skokie Community Consolidated School District 65, Devon Horton, LaTarsha Green and Stacy Beardsley (collectively the "District"), by and through their attorneys, Franczek P.C., respond to the Court's September 27, 2022 Order requesting supplemental briefing as follows:

**I.    Is either party aware of any case other than *Montiero* in which the court addressed the viability of an equal protection hostile environment claim challenging a school's curriculum?**

Other courts have consistently applied the reasoning of *Montiero* to reject constitutional equal protection claims based on student curriculum. *See e.g. California Parents for Equalization of Educational Materials v. Torlakson*, 267 F.Supp. 3d. 1218, 1232 (N.D. Cal. 2017) ("[T]he Equal Protection Clause is not a means for challenging curriculum content decisions in public schools").

*Doe v. Herman*, Case No. 3:20-cv-00947, 2021 WL 1967558 (M.D. Tenn. May 17, 2021) cited by Deemar, fully supports the District and compels dismissal. The court in that case dismissed a hostile environment claim brought on behalf of a Black and developmentally disabled student who was allegedly exposed to offensive race-based curriculum about slavery. *Id.* at *6.

Deemar's allegations are even weaker than those that the court rejected in *Doe*. In *Doe*, the plaintiff was an autistic child, who was particularly sensitive and vulnerable to harm resulting from the alleged conduct and was subjected to taunts by other students who were prompted by the lessons to tell the plaintiff "you are my slave." *Id.* In contrast, Deemar is a highly educated adult professional. Although she alleges that she has been subjected to comments from co-workers that she finds offensive, *Doe* confirms that such isolated comments, standing alone, do not create an actionable hostile work environment and the alleged comments themselves are significantly less offensive and traumatizing than calling a young child someone's "slave." *See Id.* Only three comments are alleged by Deemer in the Complaint. Two of them were not directed to her or demean her personally, and they were arguably protected expressions by other teachers as to how they have been unfairly stigmatized by race in the course of their careers.[1] The only conduct that Deemar alleges was directed towards her was when Deemar expressed concerns about statements in a book that "[I]'ve encountered racism and discrimination from White adolescents and adults," and "teachers should examine if objectives, expectancies, etc., may be Eurocentric or incompatible with the learning styles and everyday realities of children of color[.]" Deemar alleges that in response to "her concerns," her colleagues allegedly "interrupted her, rolled their eyes and said she did not know what she was talking about." Compl. ¶ 166. Deemar may very well disagree with the perspectives of her colleagues, and they with hers, but their disagreement with her

---

[1] Specifically, she alleges that a representative of a Black affinity group read an open letter during a staff meeting that stated in part that "[W]e've noticed that we are often 'directed' by some of our white colleagues to handle the 'difficult' students, which are often students of color. And when we handle our class like champions, we watch some of our white colleagues get help handling a situation that we could have handled in 10 minutes...alone!" Compl. ¶ 59. She also asserts that a teacher's union official sent an e-mail to another colleague which Deemar and other teachers were copied on stating "[n]ot one person checked you on your entitled and condescending email . . . Consequently, I will wield my metaphorical machete at white privilege at every single opportunity." Compl. ¶ 169.

viewpoint and expression of their personal experiences related to race is not so inherently offensive so as to create an actionable hostile environment.

Similarly, Deemar's effort to distinguish *Doe* on the ground that she does not point to only one misguided lesson or one stray comment but alleges a "series of practices" does not support her claim because she does not allege that she was personally subjected to most of those practices or required to participate in them. As set forth in the District's originally briefing on this motion, Deemar did not attend any affinity group meetings, did not teach the curriculum about which she complains nor did she attend monthly book studies. Doc.#21 at 5-6. Moreover, even if she did participate and was personally subjected to all the practices alleged in her Complaint, the allegations in the Complaint confirm that the "practices" are all curriculum related discussions and/or reading materials that cannot support a hostile environment claim for all the reasons held by the court in *Montieiro* and discussed in further detail in Part II, below. Thus, her Complaint, on its face, does not support her assertions of being subject to a hostile environment.

II. *Montiero v. Tempe Union High School District*, 158 F.3d 1022, (9th Cir).

    A. **Is *Montiero* consistent with the law in this Circuit.**

The District agrees with Deemar that *Montiero* is consistent with the law in this Circuit, but does not agree that she has a viable Equal Protection or Title VI hostile environment claim under the reasoning of *Montiero*, Supreme Court, and Seventh Circuit precedent.

*Montiero* followed a long line of Supreme Court precedent holding that "school boards generally retain a broad discretion in managing school affairs" and discretion in determining educational matters. 158 F.3rd at 1027 (*citing Hazelwood Sch. Dist. V. Kuhlmeier*, 484 U.S. 260, and *Board of Educ., Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853). In *Montiero*, the 9th Circuit was balancing this expansive discretion and the First Amendment rights of students

against any interest of students asserting injury from the curriculum assignments at issue in the case. The court held that it could not ban curricular items on the basis of their content. *Id.* at 1028. To hold otherwise would not only severely restrict students' First Amendment rights to receive material a school board deems to be of educational value, it would open school districts up to endless litigation, and civil liability, for the use of books in the classroom resulting in an overall "significant chilling effect on a school district's willingness to assign books … that might offend the sensibilities of any number of persons or groups." *Id.* at 1030. In this holding, the 9th Circuit confirmed decades of Supreme Court precedent empowering school boards to guide the educational programming for students. Deemar's claims, which seek to silence the District's educational programming because she disagrees with its content and message, are directly contrary to these longstanding precedents, and she cites no authority that supports her position.

Although the court in *Montiero* noted that its decision would not "preclude the prosecution of actions alleging that schools have pursued policies that serve to promote racist attitudes among their students or have sought to indoctrinate their young charges with racist concepts," this *dicta* does not support Deemar's hostile environment claim. Deemar is a teacher, not a student or parent suing on behalf of her child. She lacks standing to object to the curriculum on the ground that it threatens to "indoctrinate" students. Moreover, Deemar, obviously is not at risk of being "indoctrinated" herself, as evidenced by her strong objections to the District's curriculum. As the court held in *Montiero*, judicial intervention in the school's curriculum decisions has severe and untenable consequences on the First Amendment rights of those students, and judicial intervention into curriculum decisions on equal protection grounds would be warranted only under the most extreme circumstances, none of which are present here. *Id.* at 1030.

The *dicta* in *Zykan v. Warsaw Comm. Sch. Corp.,* 631 F.2d 1300, 1305 (7th Cir. 1980) cited by Deemar, is directly in accord with the principles discussed by the 9th Circuit in *Montiero* and provides no support for her claims. In *Zykan*, the 7th Circuit rejected a First Amendment constitutional challenge to a school's curriculum decision brought on behalf of a student, noting the broad discretion that schools have in setting curriculum, and the countervailing First Amendment "freedom to hear" rights of other students recognized by the court in *Montiero*. *Id.* Like the 9th Circuit in *Montiero*, the 7th Circuit noted in *dicta* that in an extreme case that discretion could be limited by First Amendment principles that barred schools from "insisting upon instruction in a religiously-inspired dogma to the exclusion of other points of view," or "placing a flat prohibition on the mention of certain topics in the classroom." *Id.* This *dicta*, however, does not support Deemar's claims in this case. As noted above, as a teacher, Deemar lacks standing to raise First Amendment concerns on behalf of students. Also, she does not allege that the District has violated her First Amendment rights. As explained in further detail below, nor could she assert a viable First Amendment claim. Finally, nothing she has alleged rises to the level of the extreme case contemplated by the *Zykan* court – rather, what she has cited makes clear that the District is seeking to provide robust educational programming and training opportunities to allow for dialogue and debate, not create the "pall of orthodoxy" the court warned against.

> **B. Does *Montiero* draw an appropriate dividing line between conduct that is protected by the First Amendment and conduct that may violate equal protection.**

*Montiero* does draw an appropriate line, and Deemars' allegations do not cross the line from protected First Amendment curriculum decisions into an actionable hostile environment.

Deemar acknowledges that the books and concepts with which she disagrees have a legitimate pedagogical purpose in that she acknowledges that they should not be removed from "District 65's bookshelves." Rather in her own words she "opposes the 'pall of orthodoxy'"

allegedly created by the District's curriculum. However, once again, as a teacher, she has no standing to object to the District's curriculum on this ground. "School teachers have no First Amendment right to influence curriculum as they so choose." *Downs v. Los Angeles Unified. Sch. Dist.* 228 F.3d 1003, 1016 (9th Cir. 2000). *See also e.g., Edwards v. California Univ. of Pennsylvania,* 156 F.3d 488, 491–92 (holding that professor has no First Amendment right to compel university to allow him to teach class from religious perspective); *Boring v. Buncombe County Bd. of Educ.,* 136 F.3d 364, 370–71 (4th Cir.1998) (en banc) (teacher's choice of play not constitutionally-protected speech); *Bradley v. Pittsburgh Bd. of Educ.,* 910 F.2d 1172, 1176 (3d Cir.1990) (holding that teacher has no First Amendment right to employ classroom teaching methodology of choice); *Kirkland v. Northside Indep. Sch. Dist.,* 890 F.2d 794, 795 (5th Cir.1989) (teacher's choice of supplemental reading list not constitutionally-protected speech); *see also Monteiro,* 158 F.3d at 1030 n. 13 ("Although the complaint does not refer to the involvement of teachers in the teaching of the literary works at issue or in the formation of the curriculum, it is likely that claims such as these, and their outcomes, could have significant effect on the First Amendment rights of teachers.").

A school board is elected by the public, and until its current members are voted out of office, they "speak" for the school district through the policies they adopt. *Downs,* 228 F.3d at 1016. In *Downs*, the Ninth Circuit held that a teacher did not have a right to post anti-LGBTQ messages on a school bulletin board which provided an opposing viewpoint to the school district's explicit support for LGBTQ diversity and inclusion, noting " [w]ere we to invoke the Constitution to protect Downs's ability to make his voice a part of the voice of the government entity he served, Downs would be able to do to the government what the government could not do to Downs: compel it to embrace a viewpoint." *Id.* Similarly, invoking the Constitution to allow Deemar's Complaint

to proceed would impermissibly allow federal courts to serve as a means for prohibiting a public school from expressing views with which a single teacher personally opposes, in violation of well settled precedent.

C. **If the Court concludes that Defendant's mere act of assigning reading materials that Plaintiff finds offensive . . . does not violate equal protection, what factual support remains for Plaintiff's equal protection hostile environment claim?**

Under *Montiero* and other precedent discussed above, the mere act of assigning reading materials alleged in the Complaint in this case cannot support Deemar's claims, and there are no other facts alleged in the Complaint that can support her claims.

In her Supplemental Response, Deemar cites only to excerpts and principles discussed in the curricula itself and points to no conduct beyond reading material provided to teachers, and the curriculum and lesson plans themselves that she finds offensive. Moreover, the conclusions she draws, for example, that the District "uses every opportunity to stigmatize 'whiteness'" are not supported by the quotation she cites from the District's mission statement, curricula or books. Rather, she quotes from sources discussing the existence of race and racism and the impact on individuals of these forces. Such content simply does not rise to the level of creating a hostile environment for her personally as a teacher. Contrary to Deemar's assertion, the discussion of skin color with students or other staff is not legally violative of her right to equal protection.

As discussed at length in the District's motion, Deemar did not participate in most of the activities of which she complains. For example, she cites at length in her current submission to the Court from the book *White Fragility* and the Defendants' emails about the book but she herself never alleges that she read the book, let alone that she was forced to attend any meetings at which the book was discussed. As noted prior, *White Fragility* was a New York Times bestseller and everything Deemar cites makes clear that this book was being used by the District to promote

discussion, *amongst teachers and other educational professionals*, about race in this country. She also cites to one email where staff members, apparently on their own accord, shared their personal experiences where their race impacted how they were perceived or treated. The remainder of her allegations center on affinity sessions she did not attend, surveys she did not fill out, and curriculum she did not teach. Even if she was required to read the identified materials or participate in meetings where concepts of race were discussed with which she disagreed, none of the alleged conduct was so inherently offensive and pervasive so as to justify judicial intervention in the District's curriculum decisions. If the Court concludes that the District's mere act of assigning these readings materials does not violate Deemar's equal protection rights, there is no remaining factual support for her equal protection hostile environment claim.

**III.   Does *Sherman* place any limits on the Court's authority to order the injunctive relief Plaintiff requests or otherwise limit Plaintiff's action.**

The Seventh Circuit's decision in *Sherman v. Comm. Consol. School Dist. 21*, 980 F.2d 437 (7th Cir. 1992) does limit the court's authority to grant the injunctive relief the Plaintiff requests and forecloses Plaintiff's action. In *Sherman*, the Court rejected the plaintiff student/parent's First Amendment challenge to the recitation of the Pledge of Allegiance in class and held that the recitation of the Pledge did not violate the First Amendment Free Speech or Establishment clauses as long as students were not personally compelled to recite the pledge. *Id.* at 447.

Deemar's claims, which rest on the Equal Protection Clause and Title VI, are even less viable than the First Amendment claims rejected by the court in *Sherman*. As noted in *Montiero*, established First Amendment precedent does in some cases allow and/or require limited judicial intrusion into religious based curriculum decisions that may violate the Establishment Clause. 158 F.3d at 1028, n. 6. Here, Deemar makes no First Amendment or religious objection to the District's curriculum, and her attempt to use the courts to limit or silence the type of curriculum made

available to students under the guise of "equal protection" impermissibly impinges on the First Amendment rights of students. *See Montiero.* 158 F.3rd at 1027-28. With no violation alleged, no injunctive relief is appropriate.

IV. **Is either party aware of any case (from any circuit) considering the viability of a hostile educational environment claim brough by a teacher under either Title VI or the Equal Protection Clause.**

The District agrees that this appears to be a case of first impression and that there is no other published decision addressing whether teachers can bring Title VI hostile educational environment claims. This is because teachers have no such cause of action.

Contrary to Deemar's assertion, *T.S. v. Heart of Cardon,* 2021 WL 2946447 (S.D. Ind. July 14, 2021) is inapposite and does not support the viability of a Title VI claim in this case. *Heart of Cardon* concerned whether the non-discrimination provision in the Affordable Care Act ("ACA") allowed a cause of action on behalf of a child of an employee of a facility who received federal funding under the ACA. The Court held that the non-discrimination provisions in the ACA and other federal funding non-discrimination statutes was not limited to preventing discrimination in the specific program that was subject to federal funding and that prior 7th Circuit and Supreme Court precedent to the contrary had been abrogated by the Civil Rights Restoration Act. *Id. at *2*.

The reasoning of *Heart of Cardon* is distinguishable because Title VI, unlike the ACA, explicitly excludes from its scope claims relating to employment. As an employee of the District, Deemar's claim, despite her unsupported protestations to the contrary, is an employment related claim. Title VI, § 604, specifically provides that Title VI does not authorize action "by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance

is to provide employment." 42 U.S.C. § 2000d–3; *See Ahern v. Board of Educ.of City of Chicago,* 133 F.3d 975, 977 (7th Cir. 1998).

Deemar's conclusory assertion that she is alleging a hostile "educational environment" claim and not a hostile "work environment" is unavailing because her status *vis a vis* the District is that of an employee, not a student. As an employee asserting that she has been subjected to a "hostile environment," her claim inherently is based on the employment practices of the District, which is plainly barred by the statutory exclusion for claims based on employment practices in § 604.

While *Heart of Cardon* may hold that the CRRA eliminated the "zone of interests" analysis previously used by courts to limit the reach of anti-discrimination provisions in federal funding statutes to the particular program at issue, *Heart of Cardon* and the CRRA did not amend or modify Section 604's explicit exclusion of employment related actions from the scope of Title VI. *See* 42 U.S.C. § 2000d–3. Accordingly, Deemar's Title VI claim fails as a matter of law and must be dismissed.

Dated: November 9, 2022  Respectfully submitted,

**BOARD OF EDUCATION OF EVANSTON-SKOKIE COMMUNITY CONSOLIDATED SCHOOL DISTRICT 65, DEVON HORTON, LATARSHA GREEN AND STACY BEARDSLEY**

By  */s/ Nicki B. Bazer*
       One of Its Attorneys

Nicki B. Bazer *(nbb@franczek.com)*
Michael A. Warner, Jr. *(maw@franczek.com)*
Franczek P.C.
300 S. Wacker Drive, Suite 3400
Chicago, Illinois 60606
312-986-0300

3077259.1

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that she caused a true and correct copy of the foregoing **DEFENDANTS' RESPONSE TO ORDER REQUESTING SUPPLEMENTAL BRIEFING** to be filed electronically with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record on this 9th day of November, 2022.

>Celia H. O'Leary (coleary@southeasternlegal.org)
>Kimberly S. Hermann (khermann@southeasternlegal.org)
>Branden H. Boucek (bboucek@southeasternlegal.org)
>Southeastern Legal Foundation
>560 W. Crossville Rd., Suite 104
>Roswell, GA 30075
>
>John W. Mauck (jmauck@mauckbaker.com)
>Whitman H. Brisky (wbrisky@mauckbaker.com)
>Terry S. Lu (tlu@mauckbaker.com)
>Andrew S. Willis (awillis@mauckbaker.com)
>Mauck & Baker, LLC
>1 N. LaSalle St., Suite 600
>Chicago, IL 60602
>
>*/s/ Nicki B. Bazer*

3077259.1