**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STACY DEEMAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-cv-3466 |
| | ) | |
| BOARD OF EDUCATION OF THE | ) | Judge John J. Tharp, Jr. |
| CITY OF EVANSTON/SKOKIE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Stacy Deemar is a drama teacher at Nichols Middle School in Evanston, Illinois. Nichols is part of Evanston-Skokie School District 65, which is governed by the elected, seven-member Board of Education of the City of Evanston/Skokie ("District 65" or the "District"). Deemar has brought the present lawsuit against District 65 and three of its administrators, Devon Horton in his official capacity as the District's superintendent, LaTarsha Green in her official capacity as District's deputy superintendent, and Stacy Beardsley in her official capacity as District's assistant superintendent of curriculum and instruction. [1] Deemar, who identifies as white, contends that District 65 has repeatedly discriminated against her through its implementation of several racial-equity-focused policies at her workplace by causing her to suffer from stigmatic harms in addition to a racially hostile educational environment. The District has moved to dismiss Deemar's complaint on jurisdictional grounds as well as for failure to state a claim upon which

---

[1] For the sake of simplicity, the Court will use "District 65" or the "District" when referring to Evanston-Skokie School District 65, defendant Board of Education of the City of Evanston/Skokie, or all the defendants collectively.

relief can be granted. For the reasons that follow, the District's motion is granted, and Deemar's complaint is dismissed without prejudice.

## <u>BACKGROUND</u>

Ms. Deemar claims that the District repeatedly discriminated against her on the basis of her race and subjected her to a racially hostile work environment through its implementation of certain "racial equity" policies. Her complaint identifies several examples of "race-based programming" to which, she asserts, the District subjected students, teachers, and other staff to promote its ideal of racial equity. These programs included, for example, mandatory antiracist training for teachers, racial affinity groups for students and teachers, a "Black Lives Matter at School Week of Action," and "antiracist," "racial equity" focused student lesson plans about "whiteness," and more, as described below. Rather than promote equality and reconciliation among the races, Deemar contends, these programs promoted and reinforced racial classifications, discriminated against her as a white person, and produced a racially hostile educational environment.

More concretely, Deemar's complaint asserts the following categories of race-based actions by the District:

- **Racial-Equity-Focused Statements, Policies, and Initiatives.** According to Deemar, District 65's public statements and policies reveal a preference for "racial equity" rather than "racial equality."[2] As some examples, she alleges:

    - Compl. ¶ 28: In 2015, District 65 released a five-year Strategic Plan developed by its Research, Accountability, and Data Department. As part of its Plan,

---

[2] According to Deemar, the District explained the distinction as:

Equity is about fairness, justice and individuals getting what they need and deserve in order to reach their full potential as opposed to equality, which is about sameness and treating everyone in exactly an identical manner regardless of their differences or unique situations. Compl. ¶ 34.

District 65 publicly expressed its desire that by the year 2020, " . . . our schools and classrooms [will] be spaces marked by . . . equity."

- o Compl. ¶ 32: In 2017 and 2018, District 65 began its Achievement Reports with a "Racial and Educational Equity Statement" that proclaimed the District's "commitment to equity" and vowed to identify and address barriers such as "institutional racism," which it claimed "create[s] advantages for whites and oppression and disadvantage for people from groups classified as people of color."

- **Race-Conscious Messaging in Employee Training and Professional Learning.** Deemar offers several examples of allegedly problematic assertions that the District "asserts" through various training programs for District 65 teachers. For example:

  - o Compl. ¶¶ 43-44: Through [the] Courageous Conversation [training program], District 65 asserts, "White people tend to dominate conversation by setting the tone for how everyone must talk and which words should be used." It uses the terms "white talk" and "color commentary" to describe how individuals of different races interact. It describes "white talk" as "loud, authoritative . . . [and] controlling," and "color commentary" as "silent respect . . . [and] disconnect." Through Courageous Conversation training, District 65 accuses "White educators" of forcing non-white students and colleagues to "conform to the normalized conditions of White culture."

- **Racial Affinity Groups for Staff.** Deemar also alleges that **"**District 65 mandated that all staff undergo Beyond Diversity training by 2019, using Courageous Conversation materials that employ race-based affinity groups." Compl. ¶ 49. "For example, in the exercise called Engaging Multiple Racial Points of View, Beyond Diversity facilitators segregate educators into racial affinity groups to read and discuss a poem." Compl. ¶ 50.

- **Racial Affinity Groups for Students.** Deemar also alleges that District 65 offered affinity groups for students based on their race and gender. Compl. ¶¶ 102-107.

- **Privilege Walks for Staff.** During some trainings, District 65 required teachers to rate the applicability of a number of scenarios to their lives on a scale of 0-5, *e.g.*, "Because of my race or color, if I should need to move, I can be pretty sure of renting or purchasing housing in an area which I can afford and in which I want to live." Compl. ¶ 69. Participants are then told to form a line, with the highest scores on the left and the lowest scores on the right. The Courageous Conversation facilitator then reads a series of prompts. For each prompt, individuals to whom it applies are instructed to take a step forward. Near the end of the exercise, the facilitator asks all white people standing in line to step forward. The facilitator concludes, "What you see is White privilege and the color line." Compl. ¶¶ 70-71.

- **Privilege Walks for Students.** Deemar alleges that the District also conducted privilege walk activities, to the effect described above, for students. Compl. ¶¶ 108-111.

- **Professional Learning for Administrators: *White Fragility*.** Deemar alleges, "District 65 administrators read the book *White Fragility* by Robin DiAngelo. For the book discussions, District 65 separated administrators into different affinity groups based on their race. Specifically, District 65 excluded white administrators from the rest of their colleagues by placing them in a separate discussion group." Compl. ¶ 76. She then excerpts several quotes from the book, copies of which she also alleges were offered to teachers, including, for example, "[w]hite identity is inherently racist; white people do not exist outside the system of white supremacy," Compl. ¶ 80, and, "white people raised in Western society are conditioned into a white supremacist worldview because it is the bedrock of our society and its institutions," Compl. ¶ 81.

- **Student Curriculum/Black Lives Matter Week.** Deemar also alleges that during the 2019-20 and 2020-21 school years, the District held "Black Lives Matter at School Weeks of Action," during which teachers and students worked through lesson plans about racism, which Deemar alleges were themselves racially discriminatory. According to Deemar, she was instructed to teach a lesson about intersectionality during one of these weeks. Compl. ¶ 123. During one of these weeks, students were instructed to read aloud a book that teaches things such as: "Racism is a white person's problem and we are all caught up in it," Compl. ¶ 128, "In the United States of America, white people have committed outrageous crimes against Black people for four hundred years," Compl. ¶ 129, and "Whiteness is a bad deal. It always was," Compl. ¶ 133. Deemar also alleges that, following this reading, teachers ask students, "What does it mean to be white but not be a part of 'whiteness'?". Compl. ¶ 135.

The complaint also includes a section entitled, "Plaintiff's Experience at District 65." Compl. ¶ 161-175. It alleges that she was "aware of and subjected to" the racially segregated affinity groups, training, curriculum about whiteness, and racial equity policies. Compl. ¶ 163. She alleges that she spoke out about the practices at a drama department meeting, but her colleagues "interrupted her, rolled their eyes, and told [her] she did not know what she was talking about." Compl. ¶ 166. Deemar concluded that her colleagues would further marginalize her if she pressed her concerns, so she didn't speak out against them again.

In 2019, Deemar filed a complaint with the Department of Education Office for Civil Rights ("OCR"). According to Deemar, OCR notified District 65 through a letter of finding that the District was violating Title VI of the Civil Rights Act of 1964. OCR gave the District 90 days

4

to reach a resolution with the Office. Following a change in presidential administrations, however, Deemar states that OCR suspended its letter of finding.

Now, turning to the federal courts, Deemar asserts that she is entitled to relief under Title VI and the Equal Protection Clause of the U.S. Constitution. She asserts her discrimination and differential treatment claim under both Title VI and the Equal Protection Clause (Counts I and II) and her racially hostile educational environment claim under Title VI only (Count III). Deemar seeks relief in the form of a declaratory judgment, a permanent injunction, and nominal damages of $1.00. According to Deemar, District 65 has not ceased the sort of programming about which she complains. There is no indication that Deemar has stopped working for the District or otherwise had any changes to her employment circumstances.

## ANALYSIS

District 65 filed a motion to dismiss Deemar's complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, to dismiss under Rule 12(b)(6) for failure to state a claim. With respect to the Rule 12(b)(1) motion, the District argues that Deemar has failed to establish that she has standing to bring her claims, which in turn means that this Court lacks subject matter jurisdiction over her claims. As for its Rule 12(b)(6) challenge, the District argues that Deemar has not stated a plausible claim because (i) she is not in the zone of interests protected by Title VI of the Civil Rights Act, and thus lacks statutory standing to seek relief under the statute, and (ii) her complaint fails to adequately allege that she faced an adverse action or was subjected to an actionably hostile environment, as needed to state a claim under Title VI or the

Equal Protection Clause. The District also filed a declaration by Stacy Beardsley in support of its motion to dismiss, and Deemar has moved to strike it.[3]

For the reasons that follow, District 65's motion to dismiss for lack of subject matter jurisdiction is granted as to Deemar's discrimination claim and denied as to Deemar's hostile educational environment claim, and District 65's motion to dismiss for failure to state a claim is granted as to Deemar's hostile educational environment claim.

## I.      Subject Matter Jurisdiction

District 65 asserts that Deemar has not invoked this Court's subject matter jurisdiction because her complaint fails to establish her standing. "Under Article III of the Constitution, the judicial power of the United States extends only to cases and controversies." *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 488 (7th Cir. 2004). "The core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Thus, standing is a key justiciability doctrine that "assure[s] that cases will be litigated by those having an actual stake in the outcome and that decisions will be made in an arena of real and substantial problems to be redressed by specific solutions." *Jorman v. Veterans Admin.*, 830 F.2d 1420, 1424 (7th Cir. 1987).

---

[3] This case was originally assigned to Judge Dow. In 2022, Judge Dow ordered supplemental briefing on various issues, ECF No. 41. The case was reassigned to this Court before Judge Dow entered a ruling.

That "core component of standing," *i.e.*, the "irreducible constitutional minimum," comprises three elements: First, the plaintiff must have suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (1992) (cleaned up). "Second, there must be a causal connection between the injury and the" complained-of conduct, so that the injury is fairly traceable to the defendant's actions. *Id.* Third, it must be likely—not merely speculative— that a ruling in favor of the Plaintiffs will redress the injury. *Id.* at 561.

"As the party invoking federal jurisdiction, a plaintiff bears the burden of establishing the elements of Article III standing." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). "When reviewing a dismissal for lack of subject matter jurisdiction . . . a district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). And the Court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993) (per curiam)).

The District argues that Deemar lacks standing to challenge the District's policies and practices because she has not shown that she has personally suffered an injury-in-fact that is traceable to the District's conduct. Specifically, District 65 posits that Deemar's alleged stigmatic injuries based on the District's race-conscious programming are too abstract to serve as the basis for a claim before a federal court, and she has not shown that she has been treated differently from others. Next, it contends that Deemar's complaint should not be allowed to proceed as a vehicle for grievances about the curriculum's impact on students.

The Court evaluates whether Deemar has satisfied her burden of establishing standing to pursue her discrimination and hostile educational environment claims separately. "[A] plaintiff must demonstrate standing for each claim he seeks to press." *Davis v. FEC*, 554 U.S. 724, 734 (2008). "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, e.g., *Flast v. Cohen*, 392 U.S. 83, 99 (1968), it often turns on the nature and source of the claim asserted." *Warth*, 422 U.S. at 500.

Moreover, Deemar's complaint contains allegations about several different types of conduct. "The fact that a plaintiff has suffered an injury that is traceable to one kind of conduct does not grant that plaintiff standing to challenge other, even related, conduct . . ." *Johnson*, 783 F.3d at 662. Thus, the Court's claim-by-claim analysis will take care to identify which particular conduct, if any, gives rise to Deemar's claim of injury.

### A. Standing to Pursue Discrimination Claim under the Equal Protection Clause and Title VI

Deemar invokes both the Equal Protection Clause of the U.S. Constitution and Title VI of the Civil Rights Act as the vehicles for her discrimination claim. The parties agree, however, that they are subject to the same standing analysis. But they offer slightly different characterizations of the legal framework for conducting that analysis. Deemar proposes that:

> To establish standing under an Equal Protection Clause challenge, a plaintiff must "show that the challenged classification creates a 'barrier that makes it more difficult for members of one group to obtain a benefit,' or causes 'non-economic injuries' such as 'stigmatizing members of the disfavored group.'"

Pl.'s Resp. at 5-6 (quoting *Johnson v. U.S. Off. of Pers. Mgmt*, 783 F.3d 655, 665-66 (7th Cir. 2015)). She concedes that she "does not argue here that District 65 has erected a barrier that makes it more difficult for her to seek a benefit than members of another racial group." *Id.* at 6. Rather, she contends that her complaint satisfies the standing test because it establishes that (1) the District

8

employs racial classifications throughout its programming and (2) these classifications have caused her to suffer stigmatic harm. *Id.*

Deemar's proposed equal protection standing argument misses its mark. To be sure, the Supreme Court has ruled time and again that stigmatizing racial classifications can be harmful: "There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing." *Allen v. Wright*, 468 U.S. 737, 755 (1984). But the Supreme Court's "cases make clear, however, that such injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Id.* (cleaned up); *see also Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 822 (7th Cir. 2014) ("[T]he mere fact that discrimination is occurring is not enough to establish standing, absent being 'personally denied equal treatment.'" (quoting *Allen*, 468 U.S. at 755)). "If the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the Government was alleged to be discriminating . . . ." *Allen*, 468 U.S. at 755-56. "Recognition of standing in such circumstances would transform the federal courts into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *Id.* at 756 (quoting *U.S. v. Students Challenging Reg. Agency Procedures (SCRAP)*, 412 U.S. 669, 687 (1973)). Thus, racial stigmatic harm can show why differential treatment is injurious even in the absence of some tangible harm (or denial of a benefit) stemming from that treatment. But the fact that a plaintiff suffered a stigmatic harm from a state action is not in itself sufficient to show differential treatment.

To illustrate, if the District declared that white teachers were not allowed to earn extra pay by teaching summer school classes, then a white teacher would be able to show that there is a

barrier that makes it more difficult for white teachers to seek a certain benefit. In that case, a white teacher would establish injury/standing based on unequal treatment without reference to racial stigma. But imagine if the District forced white teachers to teach in classrooms on the southwest side of the school and allowed non-white teachers to teach anywhere, and assume that there is no tangible benefit to teaching in any particular area of the school. A white teacher could still demonstrate that they suffered a cognizable injury by alleging that there is a harmful stigma associated with being relegated to one side of the building while teachers of other races can teach anywhere. *See, e.g.*, *Freeman v. Pitts*, 503 U.S. 467, 485-86 (1992) (noting that stigmatic injury is the principal wrong of *de jure* segregation). That is, where the state treats people of different races differently, but it is not obvious from a tangible or economic perspective why that instance of different treatment is actually unequal treatment—the core evil targeted by the Equal Protection Clause—the notion of stigmatic harm steps in to demonstrate the injurious nature of the state's conduct.

To have suffered a cognizable injury under the Equal Protection Clause, then, Deemar must allege that the District treated her differently on the basis of her race and ***thus*** caused her stigmatic injuries, not merely that the District's messages concerning race and racism upset, offended, or stigmatized her.

> ### 1. Injuries Stemming from Deemar's Exposure to Allegedly Discriminatory Lesson Plans and Staff Training

Deemar's complaint outlines an array of lesson plans concerning race that were directed at students, teachers, and administrators. It is, at times, unclear from the complaint to which particular lesson plans Deemar was actually exposed, or required to teach, at the time. Putting that problem aside, the Court considers whether Deemar can establish that she suffered a cognizable injury as a result of being treated differently because white teachers like her were allegedly exposed to

training, lesson plans, and other programs that, in her view, stigmatized white people as oppressors, while non-white teachers in District 65 were not exposed to programs that made their respective races out to be oppressors?

The answer is no. The school's messaging itself, which Deemar alleges differentiates among races, cannot itself be considered unequal treatment, nor can Deemar's feelings of stigmatic injury stemming from her exposure to those statements furnish her with a basis for Article III standing. ". . . *Allen* and its progeny make clear that those same types of injuries are not a basis for standing under the Equal Protection Clause—that is, exposure to a discriminatory message, without a corresponding denial of equal treatment, is insufficient to plead injury in an equal protection case." *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017); *see also Carroll v. Nakatani*, 342 F.3d 934, 946 (9th Cir. 2003) ("Being subjected to a racial classification differs materially from having personally been denied equal treatment. . . . . [Plaintiff] does not cite, and we do not find, any authority supporting the proposition that racial classification alone amounts to a showing of individualized harm."); *Johnson*, 783 at 660 ("Neither psychological harm 'produced by observation of conduct with which one disagrees' nor offense at the behavior of government and a desire to have public officials comply with one's view of the law constitutes a cognizable injury." (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.,* 454 U.S. 464, 485 (1982))).

In *Moore v. Bryant*, the Fifth Circuit confronted a complaint where a Black prosecutor sought to challenge the constitutionality of Mississippi's state flag, which depicted the Confederate battle flag in its corner.[4] The plaintiff characterized his injury for Article III standing purposes as follows:

---

[4] Mississippi has since changed its flag. https://www.mdah.ms.gov/taxonomy/term/131.

> [H]e is unavoidably exposed to the state flag and that the flag's message is "painful, threatening, and offensive" to him, makes him "feel like a second-class citizen," and causes him both physical and emotional injuries." At its core, Plaintiff's injury theory is that the Mississippi state flag stigmatizes him.

*Moore*, 853 F.3d at 249. Thus, there was: A state message (the flag) that the plaintiff alleged expressed a discriminatory message (essentially: "We revere our state's history of fighting to preserve the institution of slavery of African Americans.") to which the state directly subjected him on a constant basis (by virtue of his employment in courthouses where the state flag is flown). The Fifth Circuit held that this injury was not cognizable in an equal protection case, and it explained the nature of the Equal Protection Clause in part by contrasting it with the sorts of injuries toward which the Establishment Clause is directed. "In an Establishment Clause case, a plaintiff adequately alleges standing by alleging direct and unwelcome exposure to a religious display." *Id.* It continued:

> The reason that Equal Protection and Establishment Clause cases call for different injury-in-fact analyses is that the injuries protected against under the Clauses are different. The Establishment Clause prohibits the Government from endorsing a religion, and thus directly regulates Government speech if that speech endorses religion. . . . The same is not true under the Equal Protection Clause: the gravamen of an equal protection claim is differential governmental treatment, not differential governmental messaging.

*Id.* at 250.

The Court finds *Moore*'s reasoning regarding the application of *Allen* persuasive and consistent with the law of the Seventh Circuit. *See Johnson*, 783 at 660-64. Applying it here, it is apparent that Deemar's allegations regarding her exposure to the District's race-conscious programming do not, either individually or cumulatively,[5] give rise to a cognizable injury-in-fact

---

[5] The Fifth Circuit went on to explain why the presence of this message throughout his place of work—courthouses, since he was a prosecutor—could not furnish the plaintiff with standing even if he analogized it to a hostile workplace injury. *Id.* at 251-52 ("[S]tigmatic injury

under the equal protection clause any more than did the Black prosecutor's allegations regarding his exposure to the racist Mississippi flag in *Moore*. Just as the Black prosecutor was subjected to the same treatment as every other prosecutor vis-à-vis the state flag (*i.e.*, exposed to it in courtrooms), Deemar was treated the same way as every other District teacher with respect to the majority of the conduct about which she complains. The Court finds that Deemar's alleged required participation in certain those messages does not move the ball forward for her; the outcome of *Moore* did not depend on, for example, whether Mississippi required its prosecutors to wear Mississippi flag pins when representing the State.

Deemar attempts to distinguish *Moore* by arguing that she "has thoroughly alleged that the District has ascribed moral characteristics to her and her colleagues on the basis of race that it then incorporates into the routine in which Plaintiff must participate." Pl.'s Resp. at 9, n.12. That distinction is not persuasive because it again relies on an injury stemming from differential messaging, which *Allen* established was not within the purview of equal protection, as opposed to differential treatment. If Deemar's argument were accepted, the distinction between messaging and treatment—the types of conduct that the Establishment Clause and the Equal Protection Clause respectively target—would collapse.

One can imagine several ways that racialized government messaging can turn into differential treatment and thus give rise to a cognizable injury in an equal protection case. It can be based on **who** must disseminate the messaging or listen to it, *e.g.*, a rule that only white teachers must listen to or teach certain messages. Here, Deemar does not allege that she was personally forced to share or listen to a particular message because of her race. Another way that government

---

does not transform into injury in fact just because the source of the stigmatic injury is frequently confronted or the stigmatic harm is strongly, sincerely, and severely felt.").

messaging can turn into differential treatment is if the plaintiff alleges that the government messaging *instructed* other individuals to treat the plaintiff differently or deprive them of some benefit, and then those individuals followed those instructions. Of course, the normal rules of traceability would apply. But, again, no such allegations are present here. Until abstract, allegedly discriminatory messaging becomes discriminatory individual treatment, it can only be used as extremely strong evidence of racialized intent when actual discrimination causes a cognizable injury.

It also bears noting that Deemar's lack of an injury-in-fact with respect to the lesson plans, both curricular and extracurricular, reflects a broader problem with the justiciability of her discrimination claim stemming from the student curriculum and staff racial sensitivity trainings. Much of her complaint identifies sociological propositions about the nature, history, and manifestation of racism as the "racial classifications" that have caused her to suffer stigmatic harm. For example, she cites a lesson plan that allegedly states: "Because of the overt and subliminal messages about Black people being bad, ugly, and inferior to White people, Black people feel pressure to assimilate, or throw away their culture in order to become more like White people in the hopes to be more accepted by society." Compl. ¶ 11.k. Another example is her allegation that:

> District 65 defines "racism" as "created for groups historically or currently defined as white being advantaged, and groups historically defined as non-white . . . as disadvantaged." District 65 further explains that racism is not mere "racial prejudice," but rather prejudice "and power." Finally, District 65 describes "whiteness" as a "key" mechanism "through which power operates."

Compl. ¶ 14. And, as a final example, Deemar alleges that a book that District 65 administrators read made propositions such as: "white people raised in Western society are conditioned into a white supremacist worldview because it is the bedrock of our society and its institutions," and

14

white people "infuse their racial prejudice into the laws, policies, practices, and norms of society[.]" Compl. ¶ 81.

But the Court is not the appropriate arbiter of the validity and propriety of these controversial contentions. That is the role of the duly elected District Board. The assertions that District 65 includes in its curriculum may be true. They may be false. They may be warranted or unwarranted. They may enlighten or infuriate. But except for the most extreme circumstances it is not the province of the federal courts to evaluate their legitimacy or balance their pedagogical value against their offensiveness. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) ("[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges."); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1032 (9th Cir. 1998) ("It is simply not the role of courts to serve as literary censors or to make judgments as to whether reading particular books does students more harm than good.").

A Ninth Circuit case to which both parties cite, *Montiero*, explains:

> [W]e conclude that the assignment of a literary work determined to have intrinsic educational value by the duly authorized school authorities cannot constitute the type of discriminatory conduct prohibited by the Fourteenth Amendment and Title VI, regardless of the fact that the work may be deemed to contain racist ideas or language. We do not, of course, suggest that racist actions on the part of teachers implementing a curriculum could not comprise discriminatory conduct for the purposes of Title VI or the Fourteenth Amendment. Nor do we preclude the prosecution of actions alleging that schools have pursued policies that serve to promote racist attitudes among their students, or have sought to indoctrinate their young charges with racist concepts.

158 F.3d at 1032. Deemar latches on to the latter language: the Ninth Circuit's disclaimer that it would not preclude actions based on indoctrination and policies that serve to promote racist

attitudes. But again, that door is only open to plaintiffs who are able to allege that they were meaningfully injured by such policies.

The Equal Protection Clause requires the states to treat each person as an individual and not a mere by-product of the social categories to which he or she belongs. *Students for Fair Admissions, Inc. v. Pres. and Fellows of Harvard College*, 600 U.S. 181, 220-21 (2023). And cases stemming from governmental failures to abide by that requirement are appropriate for federal judicial resolution; courts are well suited to identify and remedy injuries where people are treated differently because of their immutable characteristics, *i.e.*, discriminated against. But Deemar has not persuaded the Court that the Equal Protection Clause enables federal courts to exercise jurisdiction over grievances about whether and how states can acknowledge the existence of social categories—or stake out claims about the origins and nature of discrimination pertaining to those social categories—without ever actually acting on those ideas by subjecting any individuals to some sort of differential, harmful treatment.

### 2. Discrimination at Affinity Groups and Segregated Meetings

Next, Deemar alleges that "Defendants treated Plaintiff differently from her colleagues because of her race when they intentionally segregated staff meetings by race, offered race-based programming, promoted affinity groups, conducted privilege walks, and maintained policies committed to 'focusing on race as one of the first visible indicators of identity[.]'" Compl. ¶ 179. The Court has already addressed the "race-based programming" and "policies committed to focusing on race as one of the first visible indicators of identity" aspects of Deemar's assertion,[6]

---

[6] Deemar also fails to allege a cognizable injury stemming from the "privilege walks" for the same reasons as the race-based programming.

but the allegations concerning segregated staff meetings and affinity groups merit separate consideration.

In some circumstances, a state entity's use of racially segregated affinity groups or trainings for staff can give rise to a cognizable injury for Article III standing purposes. Injuries stemming from the separation of individuals based on race are certainly within the purview of the Equal Protection Clause. *See Students for Fair Admissions, Inc.*, 660 U.S. at 203 ("Separate cannot be equal.").

But, as always, a plaintiff in any discrimination case must allege that they were "personally subject to the challenged discrimination." *Allen*, 468 U.S. at 755. Deemar can show that she was personally subject to the discriminatory meetings/groups by either actually having attended them or, if she elected not to attend them, alleging that she was "able and ready" to attend the meetings and would have but for their segregated nature. *Carney v. Adams*, 592 U.S. 53, 60 (2020). For example, the plaintiff in *Diemert v. City of Seattle* "allege[d] that he tried to 'sign up for a training reserved only for people of color,'" that the City of Seattle had set up or promoted, "but he was harassed and advised that he should not sign up." No. 2:22-CV-1640, 2023 WL 5530009, at *5 (W.D. Wash. Aug. 28, 2023). The court in *Diemert* did not discuss any standing issues, but it did find that the plaintiff had stated a plausible equal protection claim based on the City's race-based and voluntary affinity group practices. *Id.* at *5-6.

The question is, then, was Deemar "personally subject to" any racially segregated meetings, training programs, or affinity groups? She never alleges that she attended any racially segregated meetings or training, or that she otherwise would have sought the benefits associated with attending the meetings and racial sensitivity training if not for their segregated nature. Nor does she allege that they were mandatory, in the sense that her failure to attend caused her to suffer

any sort of adverse consequences. Her allegations concerning how she was "personally subject" to the meetings and training amount to no more than exposure or awareness; she was no more personally subject to these incidents than, for instance, a student who receives a letter inviting them to apply to a university that offered preferential admissions based on race but who otherwise does not intend to apply. *Cf. Gratz* v. *Bollinger*, 539 U.S. 244, 262 (2003) (holding that plaintiff had standing to challenge university's affirmative action admissions policy because he had applied for admission and been rejected in the past, intended to apply in the near future if the policy were stricken, and the university was taking applications for transfers on a rolling basis). And to the extent that Deemar seeks prospective relief, she must also plausibly allege her intentions with respect to future segregated meetings.

District 65 has submitted a declaration by assistant superintendent of curriculum and instruction Stacy Beardsley wherein Ms. Beardsley attests that Deemar did not personally attend any affinity group meetings or other meetings where staff members were segregated by race. Beardsley Decl., ECF No. 21-1. Deemar's complaint does not allege that she ever personally participated in any such activities either. Deemar seeks to strike the Beardsley declaration on the basis that many of the assertions constitute inadmissible hearsay. Mot. to Strike, ECF No. 30. It is unnecessary to reach that issue or rule on the motion because Deemar does not allege that she did so.

### 3. Discrimination at Drama Department Meeting

Deemar's complaint chronicles an episode where she spoke out during a drama department meeting in February 2016. (Deemar does not specifically identify it in resisting the motion to dismiss her discrimination claim for lack of standing, but the Court considers it regardless.) According to Deemar, she "was concerned by statements in the book such as, 'I've encountered racism and discrimination from White adolescents and adults,' and 'teachers should examine if

18

objectives, expectancies, etc., may be Eurocentric or incompatible with the learning styles and everyday realities of children of color[.]'" Compl. ¶ 165. "When Plaintiff expressed these concerns [about the student curriculum at a Drama Department meeting], her colleagues interrupted her, rolled their eyes, and told Plaintiff she did not know what she was talking about." Compl. ¶ 166. Deemar "concluded that if she voiced her concerns further, she would be marginalized and face further humiliation from her colleagues. That was the one and only time Plaintiff spoke out to District 65 against the District's materials or policies." Compl. ¶ 167. The complaint does not identify any state action relating to this episode, nor does Deemar explain how her treatment is traceable to the District's actions or on the basis of her race, as opposed to her speech. Therefore, these allegations do not suffice to establish Deemar's standing to pursue her discrimination claim.

### 4. Discrimination Stemming from Student Affinity Groups

Deemar does not have standing to pursue a discrimination claim based on the existence of student affinity groups. She was not personally affected by them and cannot assert the rights of third parties through her complaint.

In short, Deemar fails to identify any discriminatory conduct that caused her to personally suffer a concrete and particularized injury sufficient to invoke this Court's subject matter jurisdiction. Accordingly, her discrimination claim is dismissed without prejudice for lack of subject matter jurisdiction.

### B. Article III Standing to Pursue Hostile Educational Environment Claim

Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d). The parties agree, courts have uniformly held, and the Department of Education has long recognized, that Title VI provides for a cause of action against educational institutions (among

other entities) receiving federal funds that inculcate or fail to adequately address racially hostile educational environments. "To establish a hostile educational environment under Title VI, [a plaintiff] must show that the alleged harassment was severe or pervasive enough to deprive him of access to educational benefits." *Qualls v. Cunningham*, 183 Fed. Appx. 564, 567 (7th Cir. 2006) (unpublished). Courts have analogized hostile educational environment claims under Title VI to hostile work environments under Title VII. *See, e.g.*, *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (collecting cases in the Title VII context suggesting that "racist attacks need not be directed at the complainant in order to create a hostile educational environment.").

Specifically with respect to Count III, her hostile educational environment claim pursuant to Title VI,[7] Deemar alleges:

> Defendants have subjected Plaintiff to severe, pervasive, and objectively offensive racial harassment through mandatory race-based training, race-conscious student curriculum, segregated staff meetings and affinity groups, privilege walks, and frequent and repeated affirmation by Defendants about the District's commitment to making racial distinctions among students and staff.

> The harassment has deprived and continues to deprive Plaintiff of access to adequate professional development, it has altered the conditions of her employment, and it has a systemic effect on education within the District as a whole.

Compl. ¶¶ 190-191.

In her briefing, she characterizes her injury as follows:

> This harassment has deprived her of access to professional development that advances Plaintiff's teaching skills and improves unity among colleagues. More importantly, it has deprived Plaintiff of a community where she can create, share, enjoy, and connect with

---

[7] Deemar disavows that she is asserting a hostile ***work*** environment but rather insists that "her claim is a hostile *educational* environment claim." Pl.'s Resp. to Mot. to Dismiss at 16, ECF No. 29 (emphasis in original).

> her coworkers and students on an *individual* basis, in violation of
> her civil rights.

Pl.'s Resp. to Mot. to Dismiss at 16, ECF No. 29 (emphasis in original).

It is possible for a plaintiff to simultaneously lack Article III standing to bring a traditional discrimination claim under Title VI or the Equal Protection Clause and have standing to bring a hostile environment claim under Title VI based on the same factual allegations about the defendant's conduct. As discussed above, the Equal Protection Clause's prohibition against racial discrimination does not transform stigmatic harms stemming from, for example, a public institution's offensive racialized messaging or racial classifications about which a plaintiff was merely aware but to which they were never personally subjected, into cognizable injuries. But Civil Rights Act provisions such as Title VI "evince[d] a congressional intent to strike at" a broader "spectrum" of injuries, including one's subjection to certain environments that are "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (discussing Title VII's prohibition against requiring employees to work in discriminatorily hostile or abusive environments on the basis of their race, sex, etc.). Thus, Congress sought to carve a "middle path," without "making actionable any conduct that is merely offensive," or going so far as to "requir[e] the conduct to cause a tangible psychological injury," *id.* "Congress has the power to define intangible harms as legal injuries for which a plaintiff can seek relief . . . ." *Casillas v. Madison Ave. Assocs.*, 926 F.3d 329, 333 (7th Cir. 2019); *see also Warth*, 422 U.S. at 501 ("Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute.").

The Fifth Circuit in *Moore* acknowledged that subjection to a hostile environment is a distinct injury from the set of injuries that are cognizable under the Equal Protection Clause.

21

*Moore*, 853 F.3d at 251-52. "[A]nalogizing Plaintiff's equal protection claim to a hostile work environment claim fails for the same reason that the Establishment Clause analogy fails: under Title VII, 42 U.S.C. § 2000e *et seq.*, exposure to a hostile work environment alone is the injury; under the Equal Protection Clause it is not." *Id.* at 252.

Whereas Deemar lacked standing to pursue her discrimination claim because she was not personally subject to racial staff affinity groups, not treated differently from others in terms of her exposure to the school's race-conscious lesson plans for students and teachers, and otherwise not denied any tangible benefits or targeted for negative treatment on account of her race, each of those things can contribute to an overall racially hostile environment that injures her in a cognizable way. That is the sort of indirect injury that Congress has authorized the federal courts to adjudicate. She argues that it has affected her personally and directly. She seeks monetary damages as a form of remedy. Therefore, the Court has subject matter jurisdiction over Deemar's Title VI hostile educational environment claim.

## II. Plausibility of Deemar's Hostile Educational Environment Claim.

The District has also moved to dismiss Deemar's hostile educational environment claim for failure to state a claim upon which relief can be granted. It argues:

> While Deemar generally alleges the District "receives federal funding for educational and vocational purposes" (Compl. ¶¶ 20, 185), she does not allege, and cannot allege consistent with the requirements of Federal Rule 11, that the primary purpose of such federal funding is to provide employment generally or provide employment to Deemar specifically. In fact, Deemar identifies no specific federal funding at all allegedly received by the District, and . . . courts presume general federal funding received by school districts is directed at supporting the educational needs of students, not providing employment to teachers.

Defs.' Memo. at 15. The District also contends that, "in arguing that she is asserting a claim based on the 'educational' environment, Deemar ignores the fact that she is an employee of the District,

not a student. Claims of hostile educational environment are reserved for students." Defs.' Reply at 12.

Deemar, acknowledging that this is a case of first impression as to this issue, does not cite any case suggesting that a teacher can state a claim for hostile educational environment under Title VI. *See* Pl.'s Supp. Briefing at 8, ECF No. 44. Instead, in defending her claim, Deemar relies heavily on the Seventh Circuit's recent analysis in *T.S. by and through T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737 (7th Cir. 2022). In *T.S. v. Heart of Cardon, LLC*, the child of an employee at an assisted living facility sued the facility, alleging discrimination because the facility's employee health plan did not cover the child's autism care. 43 F.4th 737 (7th Cir. 2022). The facility argued that although it received federal funding for patient services under the Patient Protection and Affordable Care Act (ACA), the child was not a facility patient within the statute's zone of interests. *Id*. at 740. The Seventh Circuit rejected that argument, holding that the ACA's enforcement provision was not limited to the discrete portion of a covered entity that receives federal funding but rather was broadly intended to prevent discrimination by healthcare facilities receiving federal funding. *Id*. at 744.The Court also noted that Congress could have narrowed the scope of the law by limiting the parties who could enforce the ACA antidiscrimination provision (which incorporated Title VI's provisions) to "patients" or "beneficiaries," but it chose not to do so. *Id*.

Given that the ACA was modeled after Title VI, and that their language is nearly identical, Ms. Deemar contends that "any individual" may also bring a Title VI hostile educational environment claim. But the plaintiff's reliance on *Heart of Cardon* is misplaced in the context of a Title VI claim. Although the Seventh Circuit's zone-of-interests analysis in *Heart of Cardon* may suggest that a teacher can bring *some* types of claims under Title VI, it does not confer upon a

teacher the right to bring ***any*** sort of cause of action under the statute in their capacity as a teacher, particularly a so-called "hostile educational environment claim." That is because—unlike in the ACA—Congress expressly excluded from the class of potential plaintiffs under Title VI those asserting claims of employment discrimination. Title VI may not be construed "to authorize action ... by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization *except where a primary objective of the Federal financial assistance is to provide employment.*" 42 U.S.C. § 2000d-3. The Seventh Circuit has held that "Title VI authorizes remedial action if employment practices tend to exclude from participation, deny benefits to, or otherwise subject the primary beneficiaries of a federal program to discrimination in violation of 42 U.S.C. § 2000d." *Ahern v. Bd. of Educ. of City of Chicago*, 133 F.3d 975, 977 (7th Cir. 1998). "Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless (1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Id.* at 978 (quoting *Trageser v. Libbie Rehab. Ctr., Inc.*, 590 F.2d 87 (4th Cir. 1978), *abrogated on other grounds by Consol. Rail Corp. v. Darrone*, 465 U.S. 624 (1984)).

Undoubtedly for this reason, Deemar specifically disavows making a hostile ***work*** environment claim and insists throughout her briefing that she is asserting a hostile ***educational*** environment claim through Title VI. But she does not plausibly allege that the primary purpose of the federal funding received by the District is to provide employment generally or provide employment to Deemar specifically. Nor does she allege that the hostile environment to which she was subject resulted in a denial of any educational benefits to which she may have been entitled. No matter how severe or abusive her environment was, it could not have plausibly denied her

access to educational benefits because she does not allege that she was a student at the school. The Court agrees that Deemar fails to state a claim under Title VI for a hostile educational environment because she has not plausibly alleged that she suffered from a hostile environment such that it denied **_her_** from receiving **_educational_** benefits.

Accordingly, Deemar's hostile educational environment claim is dismissed.

\*       \*       \*

For the foregoing reasons, Deemar's discrimination claim is dismissed for lack of subject matter jurisdiction, and her hostile educational environment claim under Title VI is dismissed pursuant to Rule 12(b)(6). Because it is not inconceivable that Deemar may be able to supplement her pleadings as to (1) her standing and (2) the nature and purpose of federal funding received by the District, the court cannot say that any amendment would be futile, and these dismissals are therefore without prejudice.

Dated: August 9, 2024

John J. Tharp, Jr.
United States District Judge