**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STACY DEEMAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-3466 |
| | ) | |
| BOARD OF EDUCATION OF THE CITY | ) | Judge John J. Tharp, Jr. |
| OF EVANSTON/SKOKIE ("DISTRICT | ) | |
| 65"), ANGEL TURNER in her official | ) | |
| capacity as Superintendent of District 65, | ) | |
| LATARSHA GREEN in her official capacity | ) | |
| as Deputy Superintendent of District 65, and | ) | |
| STACY BEARDSLEY in her official | ) | |
| capacity as Assistant Superintendent of | ) | |
| Performance Management and Accountability | ) | |
| of District 65, | ) | |
| | ) | |
| Defendants. | ) | |

---

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

## <u>INTRODUCTION</u>

1.      This is an action by Plaintiff Stacy Deemar ("Plaintiff") brought under the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964 to prohibit Evanston/Skokie School District 65 ("District 65") from treating individuals differently because of their race.

2.      District 65 visibly proclaims a commitment to so-called "equity" on its website, a doctrine that it believes requires it to treat individuals differently based on their race.

3.      "Classifications of citizens solely on the basis of race are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. They threaten to

stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (citations and quotations omitted).

4.    District 65 didn't just *threaten* to stigmatize individuals and incite racial hostility; it succeeded.

5.    Plaintiff is one of many victims of District 65's practice of promoting divisive racial ideologies that foster animus in the name of "equity."

6.    Equity is very different than equality, although the two are sometimes confused. As District 65 itself has recognized, *equality* is about sameness and treating everyone in an identical manner regardless of their race. *Equity* is about so-called justice and individuals getting what they "need and deserve." Said another way, equality strives for equal opportunity while equity strives for equal outcomes.

7.    In its so-called equity programming, District 65 requires its teachers:

    a.    To accept that white individuals are "loud, authoritative . . . [and] controlling."

    b.    To understand, "To be less white is to be less racially oppressive."

    c.    To acknowledge that "White identity is inherently racist[.]"

    d.    To denounce "white privilege."

    e.    To participate in exercises with individuals of only the same color called "affinity groups"—that is, to racially segregate themselves.

    f.    To participate in so-called "privilege walks," a group exercise whereby teachers standing in a line separate from each other in response to the prompt, "[b]ecause of my race or color . . . ."

8.    District 65 also mandates that teachers impose these divisive, race-obsessed teachings on their students.

2

9.    For example, District 65's curriculum for Pre-K through eighth grade students teaches:

    a.  "Racism is a white person's problem and we are all caught up in it."

    b.  Students should consider what it means "to be white but not be a part of 'whiteness[.]'"

    c.  "White people have a very, very serious problem and they should start thinking about what they should do about it."

    d.  "In the same way that the systems and the government are controlled by White people and racism being a result of it, so is it with men controlling systems and government and messages about women being dumb, weak, and inferior being a result."

    e.  "It [is] important to disrupt the Western nuclear family dynamics as the best/proper way to have a family[.]"

    f.  "Racial injustice" means "an act/occurrence motivated by anti-blackness or racism."

    g.  To "treat everybody equally" is a colorblind message that "helps racism."

    h.  "[B]urying the truth . . . is something many White people do to ignore racism."

    i.  "Because of the overt and subliminal messages about Black people being bad, ugly, and inferior to White people, Black people feel pressure to assimilate, or throw away their culture in order to become more like White people in the hopes to be more accepted by society."

    j.  Students should sign a pledge to be anti-racist.

    k.  Students should gather in affinity groups segregated by skin color.

3

l.  Students should participate in privilege walks.

m.  White students should understand "white privilege, internalized dominance, [and] microaggressions."

10.   Throughout its curriculum and programming, District 65 promotes and reinforces a view of race essentialism that divides Americans into oppressor and oppressed based solely on their skin color.  In furtherance of this ideology, District 65 employs "affinity groups," whereby it segregates faculty members and students into groups based on race.

11.   District 65 assigns negative ideas to being white. For instance, through a cartoon depicting an offer of "whiteness" being given by the devil in return for someone's soul—teaching students both that everything white people own is stolen and that they sold their souls for it:



12.   District 65's use of language is designed to promote a view of race essentialism and to treat teachers and students differently because of their race. For example, District 65 defines "race" as "a political construction created to concentrate power with white people and legitimize dominance over non-white people." District 65 defines "racism" as "created for groups historically or currently defined as white being advantaged, and groups historically defined as non-white . . . as

4

disadvantaged." District 65 further explains that racism is not mere "racial prejudice," but rather prejudice "and power." Finally, District 65 describes "whiteness" as a "key" mechanism "through which power operates."

13.     Fostering racial identities, promoting the idea that they are in conflict, and perpetuating divisive stereotypes pits teachers and children against one another based on the color of their skin. District 65's practices divide students and teachers into two worlds: the oppressors and the oppressed. They teach them that their whole identity comes from the color of their skin.

14.     District 65 intentionally discriminated against Plaintiff based on her race in violation of the Equal Protection clause through its intense stigmatization of white people like her. That stigmatization seeps into every aspect of her work in District 65; it has prevented her from achieving her career goals, denied her opportunities, limited the ways in which she can interact with her coworkers and students, and resulted in her being repeatedly harassed.

15.     District 65 violated Title VI by creating a hostile environment through this constant stream of racial animus in which Plaintiff has been forced to work and learn.

16.     District 65's practices, policies, and procedures are not permitted under the Constitution or federal law. Equality cannot, and need not, be the price of equity. Equal protection is a principle "[p]urchased at the price of immeasurable human suffering." *Adarand Constr., Inc. v. Peña*, 515 U.S. 200, 240 (1995) (Thomas, J., concurring in part and concurring in judgment). Plaintiff asks this Honorable Court to reinforce this principle firmly etched into our nation.

## PARTIES

17.     Plaintiff Stacy Deemar is a drama teacher in District 65. She has been a teacher in District 65 since 2002. She is white. On June 17, 2019, Plaintiff filed a complaint with the United States Department of Education Office of Civil Rights ("OCR"). In the complaint, she notified

OCR that District 65 was segregating teacher meetings by race, imposing hiring quotas based on race, hosting racial affinity groups for staff, forcing teachers and students to undergo frequent race-based programming, and maintaining general policies and practices that classified individuals based on race. Based on information and belief, OCR determined that District 65 violated Title VI regulations but has taken no further action since then.

18.     Defendant Board of Education of the City of Evanston/Skokie ("District 65") is an Illinois school district created under the laws of the State of Illinois, with the capacity to sue and be sued in this Court. District 65 is governed by seven locally-elected school board members. It manages eighteen public schools serving approximately 6,000 Pre-K through eighth grade students, and it is responsible for creating educational policies and goals for those schools. District 65 receives federal funding and thus is subject to Title VI of the Civil Rights Act of 1964.

19.     Defendant Angel Turner is an adult resident of Illinois. Defendant Turner serves as Superintendent of District 65. Defendant Turner was hired by District 65 in March of 2024 to replace the former Superintendent, Devon Horton. At all times relevant to this Complaint, Defendant Turner acted under color of state law and within the scope of her employment; prior to her tenure, former Superintendent Devon Horton always acted under color of state law and within the scope of his employment at all times relevant to this Complaint.

20.     Defendant LaTarsha Green is an adult resident of Illinois. Defendant Green serves as Deputy Superintendent of District 65. Defendant Green's responsibilities include directing District 65's professional learning and equity initiatives. At all times relevant to this Complaint, Defendant Green acted under color of state law and within the scope of her employment.

21.     Defendant Stacy Beardsley is an adult resident of Illinois. Defendant Beardsley served as interim Superintendent during the 2019-2020 school year. She currently serves as

Assistant Superintendent of Performance Management and Accountability. At all times relevant to this Complaint, Defendant Beardsley acted under color of state law and within the scope of her employment.

## JURISDICTION AND VENUE

22.     This case arises directly under the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. §§ 1983 and 2000d *et seq*.

23.     The Court has jurisdiction over the complaint under 28 U.S.C. §§ 1331 and 1343.

24.     This Court has authority to issue a declaratory judgment, to order injunctive relief, attorneys' fees and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §§ 1983 and 1988.

25.     Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1). A substantial part of the events giving rise to this claim occurred in this district, Defendants maintain one or more offices and employees in this district, and a substantial part of the property subject to this action is situated in this district.

## FEDERAL FUNDING

26.     District 65 receives federal funding from grants under Title II.

27.     Because District 65 receives this federal funding, it must comply with Title VI. 42 U.S.C. § 2000d.

28.     Two of the four purposes for which Title II grants are available are to "improve the quality and effectiveness of teachers, principals, and other school leaders" and to "increase the number of teachers, principals, and other school leaders who are effective in improving student academic achievement in schools." 20 U.S.C. § 6601.

29.     District 65 received Title II grants for these purposes, as noted in yearly budgets.

30.     For fiscal year 2020, District 65 received $216,163 marked "Title II – Teacher quality." Evanston/Skokie School District 65, Final Budget, Fiscal Year 2021-2022, at 192, https://perma.cc/9B7E-T4NT.

31.     For fiscal year 2021, District 65 received $206,698 in the same category. *Id.* at 92.

32.     For fiscal year 2022, District 65 received $239,314 in the same category. Evanston/Skokie School District 65, Final Budget, Fiscal Year 2022-2023, at 90, https://perma.cc/PSE8-P69F.

33.     The fiscal year 2023 budget expected a further $289,314 in the same category. *Id.*

## FACTS

### Background

34.     In 2015, District 65 released a five-year Strategic Plan developed by its Research, Accountability, and Data Department. As part of its Plan, District 65 publicly expressed its desire that by the year 2020, "our schools and classrooms [will] be spaces marked by . . . equity."

35.     Specifically, District 65 indicated it was concerned about closing achievement gaps. Race was just one of four reported achievement gaps along with income, disability status, and language barriers.

36.     Also beginning in 2015, District 65 released an annual Achievement & Accountability Report to implement its Strategic Plan.

37.     By 2017—two short years later—District 65's policies, procedures, training, and curriculum began revealing that by committing itself to the goal of equity, District 65 was really stating that nothing is more important than skin color.

38.     In 2017 and 2018, District 65 began its Achievement Reports with a "Racial and Educational Equity Statement" that proclaimed its "commitment to equity" and vowed to identify

and address barriers like so-called "institutional racism," which it claimed "create[s] advantages for whites and oppression and disadvantage for people from groups classified as people of color."

39.     In 2017, District 65 began maintaining a Racial and Educational Equity Policy, which is featured prominently on its website and appears in the Student Handbook. In the policy, District 65 states that it "is committed to focusing on race as one of the first visible indicators of identity[.]"

40.     Also in 2017, District 65 released a Racial and Educational Equity Report where it distinguished equity and equality: "Equity is about fairness, justice and individuals getting what they need and deserve in order to reach their full potential as opposed to equality, which is about sameness and treating everyone in exactly an identical manner regardless of their differences or unique situations." District 65 went on to explain that its number one priority was creating "racial equity," not "racial equality."

41.     The Equity Report was produced by Corrie Wallace, an "equity consultant" who District 65 paid to conduct several race-based trainings and programs since at least 2018.

42.     The Equity Report contained several recommendations. As a means of increasing "the level of Racial Literacy," the Report recommended requiring "[e]quity training for all employees, starting with Beyond Diversity and Seeking Educational Equity & Diversity ('SEED')." The Report also recommended creating "district-wide employee Affinity Groups." The Equity Report also recommended a pilot program for family SEED sessions and the development of district-wide racially segregated affinity groups for parents.

43.     Affinity groups are groups segregated based on race or other characteristics.

9

44.    SEED is a monthly seminar designed "to promote institutional change by examining . . . race[.]" Corrie Wallace, who drafted the 2017 Racial and Educational Equity Report, is a SEED facilitator for District 65.

45.    In the 2018-2019 school year, District 65 paid Corrie Wallace at least $104,011.

46.    Beyond Diversity is a two-day seminar developed by Pacific Educational Group to train teachers to avoid what it refers to as "predictable pitfalls" in their understanding of race. Beyond Diversity uses materials from Courageous Conversation—also developed by Pacific Educational Group—to train District 65 teachers.

47.    The Courageous Conversation training program focuses almost entirely on race. It demands that educators "develop [their] understanding of *whiteness* and challenge [their] beliefs about [their] own association with and relationship to racial privilege and power."

48.    There are four agreements and six conditions in the Courageous Conversation program. Educators in District 65 are expected to comply with all of them. According to the program, the four agreements "serve as the bridge to discuss race" because "educators quickly become silent, defiant, angry, or judgmental" on the topic. The six conditions are the topics educators must discuss, including "Let's Talk About Whiteness" and "Keeping the Spotlight on Race."

49.    Through Courageous Conversation, District 65 asserts, "White people tend to dominate conversation by setting the tone for how everyone must talk and which words should be used." It uses the terms "white talk" and "color commentary" to describe how individuals of different races interact. It describes "white talk" as "loud, authoritative . . . [and] controlling," and "color commentary" as "silent respect . . . [and] disconnect."

10

50.     Through Courageous Conversation training, District 65 claimed that "White educators" forced non-white students and colleagues to "conform to the normalized conditions of White culture."

51.     Through Courageous Conversation, District 65 asserts that, "White educators who actively disengage from conversations about improving the achievement of students of color and indigenous students are racist, because anti-racism requires active challenges to institutionalized White racial power, presence, and privilege."

52.     District 65 required all staff to complete Beyond Diversity training using Courageous Conversation methods by 2019.

53.     Additionally, since 2019, District 65 frequently invokes Courageous Conversation during mandatory staff meetings. For example, on August 20, 2020, District 65 instructed teachers, including Plaintiff, to engage with Courageous Conversation materials during a district-wide meeting. During a drama department meeting on August 24, 2020, Plaintiff and her colleagues were again instructed to "check in" using Courageous Conversation learning tools.

**Racially Exclusive Affinity Groups: Staff**

54.     The 2017 Racial and Educational Equity Report included a recommendation to "create district-wide employee Affinity Groups" separated based on race.

55.     As a result, District 65 mandated that all staff undergo Beyond Diversity training by 2019, using Courageous Conversation materials that employ race-based affinity groups.

56.     For example, in the exercise called Engaging Multiple Racial Points of View, Beyond Diversity facilitators segregate educators into racial affinity groups to read and discuss a poem.

11

57.     In addition to Beyond Diversity training, District 65 offered more programming for teachers where they were segregated by race.

58.     During the 2017-2018 school year, then-Principal Adrian Harries notified Nichols Middle School staff that staff meetings throughout the year would "explore the concept of equity" through affinity groups "based around racial identification," with one group for "individuals of color" and the other group for those who identify as "White." In other words, the school segregated staff into two groups based solely on the color of their skin.

59.     During the 2017-2018 school year, District 65 regularly held development days on Wednesdays, where students were given a half day and staff met for various purposes, such as professional development or to hold curriculum discussions.

60.     These Wednesday afternoon events were led by then-Principal Harries.

61.     Plaintiff consistently attended these Wednesday afternoon events during the 2017-2018 school year.

62.     Many of these events were focused on "equity," and Plaintiff was subjected to District 65's racially discriminatory views during them.

63.     At one of the Wednesday afternoon meetings Plaintiff attended, then-Principal Harries directed all white staff to one room and all non-white staff to a different room for that afternoon's meeting.

64.     Plaintiff's segregated meeting that afternoon was led by Josh Seldess, a white staff member.

65.     The meeting focused on District 65's discriminatory "equity" ideology that equates white racial identity with being an inherently racist oppressor.

66. In an email on November 14, 2017, Principal Harries emailed Nichols staff that they would be doing mandatory staff meetings on Thursdays through affinity groups that would be "based around racial identification," with groups separated based on whether they "identify" as "individuals of color" or "White."

67. In this same email, Harries directed Nichols staff who "identifie[d] as individuals of color," to one room and white staff to another room.

68. Plaintiff is aware of racially segregated staff meetings that occurred on at least four Thursdays: November 16, 2017; January 25, 2018; April 5, 2018; and April 19, 2018.

69. Plaintiff would have been required to attend these four meetings, but she did not work during the times they took place.

70. During the meetings, Nichols staff participated in Courageous Conversation exercises. They were introduced to the concept of "racial awakening"; they were asked to share stories about "how racism has affected your life"; and they were asked what it means to "belong to a certain racial group."

71. Staff were given surveys about the racial affinity groups following each meeting.

72. In one survey, staff were asked, "What is your understanding of the impact of white fragility as a result of the affinity meeting?"

73. In March of 2018, Commissioner Peter Kirsanow of the United States Commission on Civil Rights wrote a letter to Principal Harries. He was alarmed about reports that District 65 was segregating faculty meetings through affinity groups. He warned Harries that segregated affinity groups were unlawful and asked him to respond.

74.     In response to public attention on District 65's racial segregation of teachers, then-Superintendent Paul Goren himself even acknowledged that the racially exclusive affinity groups existed by acknowledging that "separating by racial identity feels uncomfortable[.]"

75.     However, Goren explained that District 65 had "renewed [its] focus on racial and educational equity," and that "this work is critical" for the success of non-white students "and to prepare our White students for success in a multiracial world that is far from race neutral." He added that staff and family had used "self-identified affinity groups" for years.

76.     But this public discussion changed nothing for District 65's ongoing practice of racial segregation.

77.     During the 2018-2019 school year, District 65 hosted at least seven affinity group sessions in its main office, each time segregated with one meeting for white staff and a separate meeting for non-white staff.

78.     District 65 also hosted racially exclusive affinity groups for administrators during the 2018-2019 school year while reading the book *White Fragility* by Robin DiAngelo. The contents of the book are described more fully below.

79.     During the 2019-2020 school year, District 65 conducted professional development training for administrators that used racially segregated affinity groups.

80.     For instance, during the 2019-2020 school year, District 65 offered sessions called "Racial Affinity Groups: Asian and LatinX Courageous Self Care" and "Racial Affinity Groups: Indigenous and Black." Both sessions used Courageous Conversation materials and facilitators.

81.     Plaintiff would have attended workshops about self-care and other non-racial topics useful to her professional development had they been available to her, but she was excluded from

14

many of them based on her race, including the "Courageous Self Care" session exclusive to "Asian and LatinX" staff.

82.     Because she was excluded from them based on her race, she lost out on valuable opportunities to connect with colleagues and to engage in professional development.

83.     District 65 also endorses racial exclusion among staff through voluntary affinity groups.

84.     District 65 then permits those voluntary affinity groups to foster racial animus.

85.     For example, in January 2019, the Black Affinity Group of King Arts read an open letter to their "Non-Black colleagues" at a staff meeting. The group said, "We've noticed that we are often 'directed' by some of our white colleagues to handle the 'difficult' students, which are often students of color. And when we handle our class like champions, we watch some of our white colleagues get help handling a situation that we could have handled in 10 minutes...alone!" The letter was then circulated by email to all King Arts staff.

**Privilege Walks: Staff**

86.     During mandatory Beyond Diversity training, District 65 inculcated through the Courageous Conversation program the idea that privilege means "the amount of melanin in a person's skin, hair, and eyes." District 65 taught educators that "White privilege . . . refers to the advantages that White people receive simply by virtue of their appearance."

87.     Similarly, District 65 sets out definitions of terms that are key to understanding its use of Courageous Conversation in both teacher training and curriculum development. According to District 65,

        a.      "Privilege" is "[u]nearned social power" accorded by institutions of society to members of a "dominant group (e.g. white privilege, male privilege, etc.),"

15

b.      "White Privilege" is "the unquestioned and unearned set of advantages, entitlements, benefits and choices bestowed on people solely because they are white,"

c.      "Structural White Privilege" is "[a] system of white domination that creates and maintains belief systems that make current racial advantages and disadvantages seem normal,"

d.      "Interpersonal White Privilege" is "[b]ehavior between people that consciously or unconsciously reflects white superiority or entitlement," and

e.      "Cultural White Privilege" is "[a] set of dominant cultural assumptions about what is good, normal or appropriate that reflects Western European white world views and dismisses or demonizes other world views."

88.     Through Courageous Conversation, District 65 urges educators to "acknowledge white skin privilege" in the name of "fully examin[ing] the cultural implications of Whiteness in schools."

> Educators must acknowledge White skin privilege and work to develop a deeper understanding of this reality in order to fully examine the cultural implications of Whiteness in schools.

89.     During mandatory Beyond Diversity trainings in 2018-2019 and 2019-2020, District 65 required educators to participate in a Courageous Conversation exercise entitled, "White Privilege: The Color Line Exercise." The stated purpose of the exercise was to develop a clearer understanding of the ways in which "Whiteness" impacts their daily experiences.

90.     In the exercise, participants are provided a list of scenarios. They must answer each scenario, giving themselves a score of 5 if the statement is mostly true, a score of 3 if the statement is sometimes true, and a score of 0 if the statement is never true.

91.     The scenarios begin with the statement "Because of my race or color . . . ."

92.     Scenarios include "Because of my race or color, I can speak in public to a powerful male group without putting my race on trial"; "Because of my race or color, if I should need to move, I can be pretty sure of renting or purchasing housing in an area which I can afford and in which I would want to live"; and "Because of my race or color, I can be sure that my children will be given curricular materials that testify to the existence of their race."

93.     Participants are then told to form a line, with the highest scores on the left and the lowest scores on the right. The Courageous Conversation facilitator then reads a series of prompts. For each prompt, individuals to whom it applies are instructed to take a step forward.

94.     Near the end of the exercise, the facilitator asks all white people standing in line to step forward.

95.     The facilitator concludes, "What you see is White privilege and the color line."

96.     Participants are asked different reflection questions based on their race. Participants who are white are asked to reflect upon whether the exercise "challenge[]s your self-identification in society." Participants who are non-white are asked, "how do you cope with the daily injustices triggered by White privilege?"

97.     Privilege walks have continued. For example, during the 2019-2020 and 2020-2021 school years, District 65 encouraged staff to attend SEED programming.

17

98.     During at least one SEED session, staff were instructed to line up and step forward in response to certain statements, much like the Color Line Exercise. Through the SEED exercise, District 65 instructed staff to step forward if "you're male" or "you're white."

### Professional Learning: *White Fragility*

99.     During the 2018-2019 school year, District 65 administrators read the book *White Fragility* by Robin DiAngelo. For the book discussions, District 65 separated administrators into different affinity groups based on their race. Specifically, District 65 excluded white administrators from the rest of their colleagues by placing them in a separate discussion group.

100.     During the 2019-2020 school year, Defendant Beardsley notified all District 65 staff that they "will hear Robin DiAngelo speak" about *White Fragility*.

101.     District 65 also provided teachers with a copy of her book.

102.     In the book, DiAngelo writes that "social forces" like "individualism and meritocracy" operate to uphold racism, and that "[t]alking about race and racism in general terms such as *white people* is constructive for whites because it interrupts individualism."

103.     DiAngelo asserts that "[w]hite identity is inherently racist; white people do not exist outside the system of white supremacy."

104.     DiAngelo writes that "white people raised in Western society are conditioned into a white supremacist worldview because it is the bedrock of our society and its institutions." She teaches that white people "infuse their racial prejudice into the laws, policies, practices, and norms of society[.]"

105.     DiAngelo states, "To be less white is to be less racially oppressive."

106.     DiAngelo attributes many of her ideas in *White Fragility* to "critical race scholars" such as Cheryl Harris, Zeus Leonardo, and Eduardo Bonilla-Silva.

18

107. "Critical Race Theory," according to District 65, questions "the very foundations of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism and principles of constitutional law."

108. District 65 described DiAngelo's book as "the antidote to white fragility and a road map for developing white racial stamina and humility."

109. District 65 invited teachers to attend a monthly book study on *White Fragility* leading up to the speaking engagement. It informed teachers that the study "will focus in on Condition 6 - Examine the Presence and Role of 'Whiteness' to support us all in continuing to build our racial literacy toolbox."

110. District 65 invited teachers to apply to facilitate the book studies.

111. District 65 instructed schools to select "at least one facilitator who identifies as White as we are centering White Racial Literacy Development."

112. Plaintiff declined to participate in the *White Fragility* book studies because she refuses, on principle, to participate in racially segregated activities.

113. The facilitator at Nichols Middle School sent frequent reminders about book study meetings to all staff, even those who declined to participate.

114. In the email reminders, the Nichols facilitator included discussion questions corresponding with each chapter of *White Fragility*.

115. For example, Chapter 1 is titled "The Challenges of Talking to White People about Racism." A discussion question following Chapter 1 says, "If you are working through these questions as part of a white discussion group, how will you keep the discussion on track (focused on *ourselves* and our *own* participation)?"

116.     The same question then asks, "How will you ensure that when common white patterns surface (distancing, intellectualizing, rationalizing), you will work to identify and challenge them rather than ignore or avoid them?"

117.     Another discussion question asks, "How do so many white people feel so confident in their opinions on racism, even as they live their lives in segregation?"

118.     The next question asks, "How can we make generalizations about what it means to be white when we don't know each person's individual story?"

119.     Chapter 7 of *White Fragility* is called "Racial Triggers for White People."

120.     One Chapter 7 discussion question instructs readers to list the racial triggers for white people and describe how they emerge in daily life.

121.     Another discussion question states that "white people have limited information about what racism is and how it works, while at the same time they have very strong opinions about racism[,]" and it invites readers to discuss this idea.

122.     A discussion question following Chapter 8 of *White Fragility* asks readers to "[s]hare a time that you experienced your own white fragility or witnessed another white person's."

123.     Another question asks, "How does white fragility function as racial control?"

124.     The Nichols Middle School facilitator stated that following the six-part book study, participants would "plan action steps for the Nichols community" based on the book.

**Racial Affinity Groups: Students**

125.     After carrying out the above-referenced policies and practices among staff, District 65 began its race-based programming among students.

126.    For example, beginning in the 2018-2019 school year, District 65 offered an affinity group for students from kindergarten through eighth grade to "provide an intentional space for students of the same race."

127.    The affinity group was only offered to students who "identify as black."

128.    During the 2019-2020 school year, at least one elementary school in District 65 offered racial affinity group meetings twice a month for students who were "Black" or "White."

129.    Through the white student affinity group, District 65 drilled into white students the concepts of "white privilege, internalized dominance, [and] microaggressions," and it taught the white student affinity group "how to act as an ally for students of color."

130.    Likewise, in the 2020-2021 school year, Nichols Middle School offered affinity groups for "black and brown students that identify as she/her/hers."

131.    District 65 continues and encourages this practice of formally segregating student groups to the present day.

132.    In August of 2024, Foundation 65, an independent non-profit that provides grants to aid student development in District 65, announced its funding recipients, all of which are official student organizations in District 65.

133.    That list includes segregated academic student groups that are exclusive to: (1) "female students of color," (2) "Middle Eastern, East Asian, and South Asian" students; (3) "Black male students," (4) "Latino/a students."

134.    It also includes "a free summer program for Black boys and girls."

135.    These affinity groups stereotype based on race and foster an "us vs. them" culture that negatively impacts Plaintiff by biasing her students against her based on her race, making it more difficult for her to do her job and to connect with students.

21

**Privilege Walks: Students**

136.    Since at least 2018, District 65 has also conducted "privilege walk" activities with students. In one activity, teachers instruct students to stand in a straight line, much like the Courageous Conversation Color Line Exercise staff endured in their own training. The teacher then reads a list of prompts, such as, "If you studied the history and culture of your ethnic ancestors in elementary and middle school, take one step forward"; "If you or your ancestors have ever learned that because of your race, skin color, or ethnicity, you are ugly, inferior, or a threat to others, take one step back"; "If you have ever been profiled by someone else using stereotypes, take one step back."

137.    During the 2018-2019 school year, King Arts hosted a Student Equity Summit during which students participated in a "Colorism Privilege Walk." In that activity, teachers read a list of prompts including "[i]f you are white, take two steps forward. If you are a person of color with light skin, take one step back. If you are a person of color with dark skin, take one step back. If you're Black, take two steps back."

138.    During the 2018-2019 school year, then-Principal Adrian Harries designated monthly half-days to Courageous Conversation programming for students at Nichols Middle School. This included the very same Courageous Conversation materials and exercises provided to staff in Beyond Diversity training which teach participants to "develop [their] understanding of *whiteness*." Teachers were expected to lead the programming based on the Beyond Diversity training they received.

139.    During one of the half-days, students were given a survey to complete, where responses could range from "always" to "never." Survey questions for the middle schoolers included, "Teachers at Nichols Middle School call on you less often than they call on other students

22

because of your race/ethnicity"; "Teachers at Nichols Middle School discipline you more harshly than other kids because of your race/ethnicity"; "Teachers grade you harder than they grade other kids because of your race/ethnicity"; "Teachers at Nichols Middle School think you are less smart than you really are because of your race/ethnicity"; "Teachers or counselors at Nichols Middle School discourage you from taking certain classes because of your race/ethnicity"; "Teachers at Nichols Middle School are fair to students of all races/ethnicities"; "Teachers and principals at Nichols Middle school believe negative stereotypes about your racial or ethnic group"; "Nichols Middle School encourages you to ignore racial and ethnic differences"; and "People at Nichols Middle School think it's better not to pay attention to race/ethnicity[.]"

### Student Curriculum: Black Lives Matter Week

140.     During the 2019-2020 and 2020-2021 school years, District 65 held a week of learning called Black Lives Matter at School Week of Action ("BLM Week"), and pointed to it as a "concrete example of how our equity work and trainings are being translated into change in the classroom."

141.     District 65 stated, "All educators are expected to participate by leading or supporting instruction throughout the week. The School Board and Administration do not support allowing students to opt out of this or any units of study that seeks to include a more complete account of the role of historically marginalized people in our society."

23

142.    On its BLM Week 2020 webpage, District 65 states, "Your 5 year old is already racially biased."

**Your 5 year old is already racially biased.**

Your 5-year-old is already racially biased. Here's what you can do about it.
By Andrew Grant-Thomas, May 1, 2017

143.    The webpage states, "White kids remain strongly biased in favor of whiteness."

144.    The webpage also states, "In the United States, a lot of us believe that children, especially White children, are racial innocents — completely naive, curiously fragile with respect to the realities of race, or both[,]" *but* that "[s]uch sentiments are . . . deeply misguided."

145.    The webpage concludes with a statement which reads, "If you are neutral in situations of injustice, you have chosen the side of the oppressor[.]"

146.    In January 2020, the Nichols Middle School Black Lives Matter Committee presented an overview of BLM Week to staff at a mandatory staff meeting.

147.    The purpose of the presentation was to help staff "understand the importance of this event" and to review "resources that are available to teachers for personal growth and development related to the Black Lives Matter movement."

148.    The objective of the staff meeting was to determine how to "get the focus on Black Lives Matter to extend beyond the week of presentation."

149.    Each department at Nichols Middle School was responsible for presenting one Black Lives Matter lesson to students. For example, the mathematics department was instructed to

24

present a lesson on "Diversity and Globalism," the physical education department was instructed to present a lesson on "Intergenerational, Black Families and Black Villages," and the science department was instructed to present a lesson on "Black Women and Unapologetically Black."

150.    For example, during BLM Week in the 2020-2021 school year, Plaintiff was instructed to teach a lesson where she would ask students whether they would participate in a civil rights march like the Children's March of 1963. The students had three options: either they declare that they would march, that they wanted to march but their parents would not allow them to, or that they would not march. Plaintiff was then expected to teach students about what "motivation" means and encourage students to share why they decided to march. Plaintiff was expected to conclude by asking whether the motivated marchers changed anyone else's mind about marching.

151.    During the 2019-2020 school year, Plaintiff was instructed to teach a lesson about intersectionality. According to the lesson plan, Plaintiff was to teach students about the identities that make up an individual, including race, gender, class, sexual orientation, ability, and nationality. Plaintiff also had to teach students that each identity can contribute to or be hurt by systems of oppression.

152.    Both years, District 65, under Defendant Beardsley's guidance, produced the BLM Week curriculum for all Pre-K through eighth grade students.[1]

153.    Some lessons varied by grade, but many relied on the same works.

154.    For example, in 2020 and 2021, all teachers from Pre-K through fifth grade were instructed to read aloud *Not My Idea: A Book about Whiteness (Ordinary Terrible Things)*, by Anastasia Higginbotham.

---

[1] https://perma.cc/V7TD-6SF9; https://perma.cc/YKL8-W75C.

155.    In the introduction to the book, Higginbotham states that she was motivated to write the story after author Toni Morrison said, "White people have a very, very serious problem, and they should start thinking about what they can do about it."

156.    *Not My Idea* teaches, "Racism is a white person's problem and we are all caught up in it."

157.    *Not My Idea* teaches, "Even people you love may behave in ways that show they think they are the good ones."

158.    *Not My Idea* teaches, "In the United States of America, white people have committed outrageous crimes against Black people for four hundred years."

159.    *Not My Idea* teaches, "White supremacy has been lying to kids for centuries."

160.    *Not My Idea* teaches, "Innocence is overrated."

161.    *Not My Idea* teaches, "Whiteness is a bad deal. It always was."

162.    *Not My Idea* includes a depiction of a white man with a devil's tail holding a "Contract Binding You to WHITENESS." Per the terms of the contract, WHITENESS gives: "stolen land, stolen riches, special favors," and in return, WHITENESS gets "to mess endlessly with the lives of your friends, neighbors, loved ones, and all fellow humans of COLOR for the purpose of profit." WHITENESS also gets "your soul."

163.    After reading the book aloud, District 65 instructed Pre-K, Kindergarten, first grade, and second grade teachers to ask their students, "What does it mean to be white but not a part of 'whiteness'?"

164.    After third grade teachers read the book aloud, District 65 instructed them to ask their students, "What is your understanding of whiteness?"

26

165.    After fourth grade teachers read the book aloud, District 65 instructed teachers to show their students a cartoon and ask, "[H]ow does whiteness show up in this political cartoon?"

166.    Before fifth grade teachers read the book aloud, District 65 instructed them to tell students, "It is important to recognize that White people play a big role in the problems of racism today and throughout world history. If this is one of the first times that you are talking about Whiteness, it might feel uncomfortable and that is okay. I want you to notice how you feel while we read this book today. If you feel awkward or uncomfortable, sit in that discomfort so you can build the muscles that you need to talk about racism honestly."

167.    District 65 also instructed fifth grade teachers to repeat out loud to students Toni Morrison's quote from the introduction of *Not My Idea*: "White people have a very, very serious problem and they should start thinking about what they can do about it." Then the teachers were instructed to ask students whether they see truth in the quote.

168.    District 65 also instructed fifth grade teachers to repeat out loud to students, "The author says that grown ups hide scary things from kids because they are scared too. This is called burying the truth . . . It is something many White people do to ignore racism when they feel uncomfortable."

169.    District 65 also instructed fifth grade teachers to repeat out loud to students, "Pretending not to see color is called color blindness. Color blindness helps racism. . . . Many White people use color blindness to ignore the problem of racism."

170.    District 65 also instructed fifth grade teachers to ask students what colorblind messages they have heard. According to District 65, the messages "treat everybody equally" and "love conquers all" are colorblind and therefore are racist.

27

171.     District 65 also instructed fifth grade teachers to ask students, "What does the author mean by 'Whiteness?'" and to expect answers from students like "burying the truth, color blindness, xenophobia, ignoring history, and other aspects[.]"

172.     Through its definition for "internalized racism," District 65 teaches that "there is a system in place that rewards people of color who support white supremacy and power and coerces or punishes those who do not[,]" resources like time and money "are unequally in the hands and under the control of white people," "the standards for what is appropriate or 'normal' that people of color accept are white people's or Eurocentric standards," and "people of color might, for example, believe we are more violent than white people and not consider state-sanctioned political violence or the hidden or privatized violence of white people and the systems they put in place and support."

173.     District 65 defines "cultural racism" as "the idea that behaviors and values associated with white people or 'whiteness' are automatically 'better' or more 'normal' than those associated with other racially defined groups."

174.     In 2020, as part of its BLM Week Black Villages curriculum, District 65 included in a lesson plan for third through fifth grade students, "It [is] important to disrupt the Western nuclear family dynamics as the best/proper way to have a family[.]"

> The **Black Families** and **Black Village** guiding principles encourage safe spaces for all types of families. It is important to disrupt the Western nuclear family dynamics as the best/ proper way to have a family and a return to the "collective village" that takes care of each other.

175.     In 2021, as part of its Black Villages curriculum, District 65 included in a lesson plan for third grade students, "During our lesson on whiteness, we discussed how white culture

shows up in the way that we think about family structures. There is a belief that a 'normal' family consists of a mom, dad, son, daughter, and pet. We've learned that this isn't true."

176.    In 2021, as part of its Black Villages curriculum, District 65 set forth a guiding principle in a lesson plan for fourth grade students that included "Another way whiteness/white supremacy shows up in the United States is in the idea of the nuclear family. In the United States and other countries colonized by European countries, families that consist of a mom and dad and 2-3 children (maybe even a dog) are considered the proper or right way to have a family."

177.    In 2021, as part of its Black Villages curriculum, District 65 instructed fifth grade teachers to conduct a survey among students to determine whether each student is an "individualist" or "collectivist."

178.    District 65 instructed teachers to "Tell students: In many cultures and families, people work together as a collective village that takes care of [each other] . . . In cultures that strongly value the collective village, the success of one person depends on the success of everybody; people are all connected to each other. This idea is called collectivism."

179.    District 65 also included as a teaching point, "The opposite of collectivism is individualism. Individualism celebrates independence and individual achievement."

180.    District 65 also instructed teachers to display African proverbs and American sayings.

181.    The African proverbs included, "If you want to go fast, go alone; but if you want to go far, go together"; "It takes a village to raise a child"; and "I am because we are."

182.    The American sayings included, "Good things come to those who work hard"; "Pull yourself up by your bootstraps"; and "Worry about yourself."

183.    District 65 instructed teachers to explain that the idea of Black Villages and the lesson's guiding principles "have to do with the idea of collectivism because they focus on how important it is for communities (villages, families, generations) to work together for the benefit of everybody, like the messages in these [African] proverbs."

184.    District 65 also instructed teachers to say, "The dominant . . . culture in the United States tends to be more individualistic overall because the country was founded on individualistic ideas. We can see this in some of the [American] sayings."

185.    District 65 also instructed teachers to explain, "The principles of Intergenerational, Black Villages, and Black Families is important to the Black Lives Matter movement because racism is a problem that will take a collective village to resolve."

186.    In 2020, District 65 taught third through fifth grade students that the definition for "racial injustice" means "an act/occurrence motivated by anti-blackness or racism."

187.    District 65 also teaches through its BLM Week lesson plans, "Because of the overt and subliminal messages about Black people being bad, ugly, and inferior to White people, Black people feel pressure to assimilate, or throw away their culture in order to become more like White people in the hopes to be more accepted by society."

188.    District 65 also teaches, "In the same way that the systems and the government are controlled by White people and racism being a result of it, so is it with men controlling systems and government and messages about women being dumb, weak, and inferior being a result."

### Plaintiff's Experience at District 65

189.    Plaintiff has worked as a drama teacher in District 65 continuously for more than twenty years.

30

190.    In addition to her work at Nichols, Plaintiff has also worked as a drama teacher at Dr. Martin Luther King Jr. Literary and Fine Arts School ("King Arts"), Haven Middle School, Kingsley Elementary School, and Lincoln Elementary School, where she is assigned for the 2024-2025 school year.

191.    At all times pertinent to this complaint, Plaintiff was aware of and subjected to segregated affinity groups among staff and students, Courageous Conversation trainings and practices, curriculum centering on whiteness, and District 65 policies and procedures devoted to so-called racial equity.

192.    Plaintiff spoke out against these practices at a drama department meeting in February 2016, when drama teachers were required to read the book *Drama of Color* by Johnny Saldana.

193.    Plaintiff was concerned by statements in the book such as, "I've encountered racism and discrimination from White adolescents and adults," and "teachers should examine if objectives, expectancies, etc., may be Eurocentric or incompatible with the learning styles and everyday realities of children of color[.]"

194.    When Plaintiff expressed these concerns, her colleagues interrupted her, rolled their eyes, and told Plaintiff she did not know what she was talking about.

195.    Plaintiff concluded that if she voiced her concerns further, she would be marginalized and face further humiliation from her colleagues. That was the one and only time Plaintiff spoke out against District 65's materials or policies.

196.    Commissioner Peter Kirsanow of the United States Commission on Civil Rights wrote a letter in his personal capacity to the principal of Nichols Middle School in March 2018, criticizing Nichols' practice of segregating faculty meetings through affinity groups.

31

197.    In a May 2019 email, an executive board member of District 65's teacher's union wrote in response to another colleague, "Not one person checked you on your entitled and condescending email . . . Consequently, I will wield my metaphorical machete at white privilege at every single opportunity." All District 65 staff, including Plaintiff, were copied on the email.

198.    Soon after, Plaintiff filed a complaint with the Department of Education OCR on June 17, 2019.

199.    Plaintiff also notified OCR of Commissioner Peter Kirsanow's letter.

200.    Based on information and belief, in early January 2021, OCR notified District 65 that it had violated, and was violating, Title VI of the Civil Rights Act.

201.    District 65 then had 90 days to reach a resolution with OCR.

202.    Based on information and belief, however, following President Biden's inauguration-day Executive Order on Equity, Exec. Order No. 13,985, 86 Fed. Reg. 7009 (Jan. 25, 2021), OCR has taken no further action against District 65.

203.    Plaintiff is interested in her continuing professional development but was unable to pursue it because of District 65's racial stereotyping and animus, the stigma against her because of her race, the aggressive and racist philosophy being promoted, and the racial segregation present in many events. Plaintiff takes great offense at the existence of racially segregated affinity groups and is unwilling to participate in them, even to her own professional detriment.

204.    Instead, Plaintiff was forced to go elsewhere to seek professional development and enrolled in an Ed.D. program at Northeastern University in Boston, Massachusetts, in 2022.

205.    Unlike many of her colleagues, Plaintiff was unable to pursue her continuing professional education at District 65 because she was white.

206.    For instance, on April 18, 2023, Plaintiff received a weekly bulletin sent to all staff, offering "Educator Grantmaking Opportunities."

207.    That bulletin specified that grants were available to teachers with a "[d]emonstrated commitment and effectiveness in serving students of color."

208.    Plaintiff understood this to mean that the grants would only be available to her if she engaged in District 65's practice of perpetuating racial animus and racial stereotypes.

209.    The bulletin continued by explaining that District 65 is "especially committed to supporting educators of color who may have barriers in obtaining a masters in literacy or reading endorsement certificate."

210.    District 65 constantly provides this kind of preferential treatment based on race.

211.    District 65 also offers summer programs that provide opportunities for professional development for teachers.

212.    But those opportunities, too, are preferentially given based on race.

213.    One of the Summer 2023 opportunities offered was a project to work on revising curriculum to "integrate and infuse the concepts of the equity curricula" throughout the school.

214.    But the advertisement for this professional development opportunity specified that "this work will need a diverse team of early childhood educators . . . ."

215.    Plaintiff understood the request for a "diverse" team to mean what it always means when District 65 uses it: non-white staff will be given preferential treatment and are disproportionately likely to be selected for the opportunity.

216.    White teachers like Plaintiff will not be selected for it, and even if they were, they would have to promote and subject themselves to District 65's racially discriminatory ideology.

217.    The constant racial animus promoted by District 65 discouraged Plaintiff from pursuing professional development opportunities because of her race and prevented Plaintiff from forming bonds with her students and colleagues because of her race.

218.    In addition, Plaintiff has been repeatedly harassed by her students, who frequently hurl race-based insults and accusations at her.

219.    District 65 is both aware of these repeated incidents of harassment and has not prevented them from continuing.

220.    For instance, on or about February 23, 2023, when Plaintiff stood to greet her class that morning, a group of three of her students walked past her aggressively shouting "Black lives matter!" rather than greeting her in kind.

221.    Later that same day, a student disrupted class by jumping up on the theatre stage and yelling at Plaintiff that she is "a terrible person" because "black lives matter."

222.    On or about February 24, 2023, a student informed Plaintiff that "no one likes you," "not even the students like you," "you are a bad person," "you don't like black people," and then called another student a "white monkey."

223.    On February 28, 2023, this tense situation escalated when Plaintiff had a group of eight students walk out of her class.

224.    The eight students alleged to the administration that Plaintiff treated two black students worse on account of their race.

225.    Similar instances of harassment occurred throughout March of 2023.

226.    Plaintiff has not seen any evidence that District 65 ever imposed a punishment or implemented an effective solution to prevent this continuing escalation.

227.    In fact, District 65's actions helped cause the situation.

34

228.    District 65's constant focus on teaching an "equity" curriculum grounded in racial animus and stereotyping white people as inherently privileged and racist caused this injury.

229.    District 65 intentionally created the stigma around Plaintiff's race and perpetuated it, resulting in this harassment.

230.    District 65 continues to treat individuals differently based on their race.

**CLAIMS FOR RELIEF**

**COUNT 1**
**Equal Protection**

231.    Plaintiff fully incorporates the allegations above as if fully set forth herein.

232.    "Classifications based on race carry a danger of stigmatic harm," and can "promote notions of racial inferiority and lead to a politics of racial hostility." *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 493 (1989).

233.    Racial classifications that are motivated by "prejudice or stereotype"—even when narrowly tailored—violate the Equal Protection Clause of the Fourteenth Amendment. *Id.*

234.    Defendants treated Plaintiff differently from her colleagues because of her race when they intentionally segregated staff meetings by race, offered race-based programming, promoted affinity groups, conducted privilege walks, and maintained policies committed to "focusing on race as one of the first visible indicators of identity[.]"

235.    Defendants continue to treat Plaintiff differently because of her race.

236.    Defendants' focus on teaching racial animus biases Plaintiff's colleagues and students against her, creating a stigma against her because of her race.

237.    This stigma injures Plaintiff by making it harder for her to do her job, harming her interactions with her colleagues and students, and making it more difficult for her to earn professional accolades.

238.    This injury is a long-lasting and pervasive harm that prevents Plaintiff from engaging positively in the workplace and limits her ability to advance her career.

239.    Defendants' discriminatory actions toward Plaintiff do not serve a compelling interest, nor are they narrowly tailored.

240.    Defendants' discriminatory actions violate the Equal Protection Clause of the Fourteenth Amendment.

## COUNT 2
### Intentional Discrimination

241.    Plaintiff fully incorporates the allegations above as if fully set forth herein.

242.    Discrimination that violates the Equal Protection Clause also violates Title VI of the Civil Rights Act. *Gratz v. Bollinger*, 539 U.S. 244, 257 n.23 (2003) ("We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.") (citing *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001)).

243.    District 65 receives federal funding for educational and vocational purposes and thus is subject to Title VI of the Civil Rights Act of 1964.

244.    Defendants treated Plaintiff differently from her colleagues because of her race when they intentionally segregated staff meetings by race, offered race-based programming, promoted affinity groups, conducted privilege walks, and maintained policies committed to "focusing on race as one of the first visible indicators of identity[.]"

245.    This differential treatment harmed Plaintiff because she was required to attend a segregated staff meeting and was constantly bombarded with invitations to attend various events she refused to attend because she knew that they would either involve racial segregation or would

36

involve her being taught that she was evil, racist, and harmful to non-white people because she is white.

246.    Defendants continue to treat Plaintiff differently because of her race.

247.    Defendants' disparate treatment of Plaintiff violates Title VI of the Civil Rights Act.

**COUNT 3**
**Hostile Educational Environment**

248.    Plaintiff fully incorporates the allegations above as if fully set forth herein.

249.    Title VI prohibits race discrimination, and it applies in all programs receiving federal funds. *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 917 (7th Cir. 2012).

250.    Title VI provides that no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. § 2000d; *see also* 34 C.F.R. 100.3(a).

251.    The term, "program or activity," includes a local educational agency, system of vocational education or other school system. 42 U.S.C. § 2000d-4a.

252.    District 65 is a local educational agency. *See* 20 U.S.C. § 7801(30)(A).

253.    The term, "program or activity," refers to "*all* the operations of" an educational institution. 34 CFR § 100.13(g) (emphasis added); *see also T.S. v. Heart of Cardon, LLC*, 43 F.4th 737, 746 (7th Cir. 2022) ("Thus, the intended-beneficiary, program-specific condition that Simpson placed on a plaintiff seeking relief for discrimination under the Rehabilitation Act did not survive passage of the CRRA.").

254.    District 65 receives federal funding under Title II and thus is subject to the requirements of Title VI.

37

255. District 65's federal funding under Title II is in the form of grants aimed at improving teacher quality and increasing the number of high-quality teachers.

256. Plaintiff is the intended primary beneficiary of the Title II grants received by District 65, the primary purpose of which is to aid the professional development of teachers.

257. District 65 violated Title VI by permitting a hostile educational environment to exist when it was (1) aware of and (2) deliberately indifferent to (3) discriminatory harassment against Plaintiff based on her race that is (4) so severe, pervasive, and objectively offensive as to deny her the benefits of her education. *See Jaquet v. Green Bay Area Catholic Educ., Inc.*, 996 F.3d 802, 808 (7th Cir. 2021).

258. Defendants abandoned equality entirely and launched a nonstop campaign of stereotyping individuals based on their race.

259. Defendants have subjected Plaintiff to severe, pervasive, and objectively offensive racial harassment by aggressively promoting race-based training, race-obsessed student curriculum, segregated staff meetings and affinity groups, privilege walks, and frequent and repeated affirmation by Defendants about District 65's commitment to making racial distinctions among students and staff.

260. These programs deny Plaintiff educational benefits, specifically, professional development and other programming aimed at furthering her education as a teacher, because the programs District 65 offers are almost exclusively focused on its philosophy that promotes racial animus.

261. Plaintiff is not capable of participating in these programs and furthering her education as a teacher and her professional development because District 65 has provided almost

38

no development opportunities that do not promote its discriminatory views on race and require Plaintiff to perpetuate the hostile environment she faces.

262.    The harassment has deprived and continues to deprive Plaintiff of access to adequate professional development and continuing education.

263.    Defendants know of the harassment and are deliberately indifferent to it because Defendants intentionally created the hostile environment through the acts complained of above.

264.    This discriminatory harassment pervades District 65's activities and is so severe, pervasive, and objectively offensive that it prevents Plaintiff from enjoying federal benefits that would have aided her professional development and furthered her education.

265.    The deliberate indifference of Defendants to the ongoing racially hostile environment violates Title VI of the Civil Rights Act.

266.    District 65 thus created a hostile educational environment, and it is liable under Title VI for doing so because it denied Plaintiff educational benefits of which she is the intended beneficiary.

## **RELIEF REQUESTED**

Plaintiff respectfully requests that this Court:

A.    Enter a declaratory judgment that Defendants' acts, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured by the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act;

B.    Enter an order permanently enjoining Defendants to take all affirmative steps necessary to remedy the effects of the unconstitutional, illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

C.      Retain jurisdiction over this action to assure full compliance with the orders of the Court and with applicable law and require Defendants to file such reports as the Court deems necessary to evaluate compliance;

D.      Enter an award for nominal damages of $1.00;

E.      Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable legal authority; and

F.      Grant Plaintiff such other and further relief as the Court deems appropriate.

Dated: <u>September 20, 2024</u>.

Respectfully submitted,

/s/ Benjamin I. B. Isgur
Kimberly S. Hermann
   Ga. Bar No. 646473
Braden H. Boucek
   Tenn. BPR No. 021399
   Ga. Bar No. 396831
Benjamin I. B. Isgur
   Va. Bar No. 98812
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA 30075
Tel.: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
bisgur@southeasternlegal.org

Whitman H. Brisky
ARDC No. 297151
Judith A. Kott
ARCD No. 6280395
Mauck & Baker, LLC
1 N. LaSalle St., Suite 3150
Chicago, IL 60602
Telephone: (312) 726-1243
wbrisky@mauckbaker.com

jkott@mauckbaker.com

*Attorneys for Plaintiff*

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 20, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail and/or facsimile. Parties may access the filing through the Court's electronic filing system.

<u>/s/ Benjamin I. B. Isgur</u>
Benjamin I. B. Isgur