# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STACY DEEMAR,                                )
                                             )
    Plaintiff,               )
                                             )
    v.                       )    No. 21-CV-03466
                                             )
BOARD OF EDUCATION OF THE                    )    Judge John J. Tharp, Jr.
CITY OF EVANSTON/SKOKIE et al.,              )
                                             )
    Defendants.              )
                                             )

## MEMORANDUM OPINION AND ORDER

Stacy Deemar is a drama teacher in Evanston/Skokie School District 65 ("District 65"). District 65 implemented curriculum and programming targeted at promoting racial equity, including equity training for all its employees, racial affinity groups for students and staff, and staff meetings divided based on race. It also integrated lessons about intersectionality and oppression into its curriculum. Deemar argues that through its equity initiatives, District 65 intentionally discriminated against her because she is white, violating both the Equal Protection Clause and Title VI. She also says that District 65 unlawfully created a hostile educational environment by teaching and promoting "racial animus." The defendants move to dismiss her complaint for lack of subject matter jurisdiction and failure to state a claim. For the reasons explained below, that motion is granted in part and denied in part.

## BACKGROUND

Deemar has been teaching for District 65 since 2002. First Am. Compl. 5 ¶ 17, ECF No. 68.[1] She is white. *Id.* at 5 ¶ 17. In 2015, District 65 expressed its desire to promote equity in its

---

[1] The Court takes all of the facts alleged in the complaint as true for purposes of this motion. *Kilborn v. Amiridis*, 131 F.4th 550, 554 (7th Cir. 2025).

schools, noting achievement gaps associated with race, income, disability status, and language barriers. *Id.* at 8 ¶¶ 34–35. Deemar alleges that District 65's ensuing policies and actions discriminated against white people like her and created a racially hostile educational environment.

Deemar filed suit against District 65 and individual employees of the district. The defendants moved to dismiss the original complaint, which this Court granted. Many of the facts Deemar alleges in her amended complaint are identical to the allegations in her original complaint; the following is a list from the Court's prior order, detailing the race-based actions that District 65 allegedly took:[2]

- **Racial-Equity-Focused Statements, Policies, and Initiatives.** According to Deemar, District 65's public statements and policies reveal a preference for "racial equity" rather than "racial equality."[3] As some examples, she alleges:

  - In 2015, District 65 released a five-year Strategic Plan developed by its Research, Accountability, and Data Department. As part of its Plan, District 65 publicly expressed its desire that by the year 2020, " . . . our schools and classrooms [will] be spaces marked by . . . equity." *Id.* at 8 ¶ 34.

  - In 2017 and 2018, District 65 began its Achievement Reports with a "Racial and Educational Equity Statement" that proclaimed the District's "commitment to equity" and vowed to identify and address barriers such as "institutional racism," which it claimed "create[s] advantages for whites and oppression and disadvantage for people from groups classified as people of color." *Id.* at 8–9 ¶ 38.

- **Race-Conscious Messaging in Employee Training and Professional Learning.** Deemar offers several examples of allegedly problematic assertions that the District "asserts" through various training programs for District 65 teachers. For example:

  - Through [the] Courageous Conversation [training program], District 65 asserts, "White people tend to dominate conversation by setting the tone for how everyone must talk and which words should be used." It uses the terms

---

[2] Citations to the following allegations have been updated to reflect their location in the First Amended Complaint.

[3] According to Deemar, the District explained the distinction as follows: "Equity is about fairness, justice and individuals getting what they need and deserve in order to reach their full potential as opposed to equality, which is about sameness and treating everyone in exactly an identical manner regardless of their differences or unique situations." First Am. Compl. 9 ¶ 40.

"white talk" and "color commentary" to describe how individuals of different races interact. It describes "white talk" as "loud, authoritative . . . [and] controlling," and "color commentary" as "silent respect . . . [and] disconnect." Through Courageous Conversation training, District 65 accuses "White educators" of forcing non-white students and colleagues to "conform to the normalized conditions of White culture." *Id.* at 10–11 ¶¶ 49–50.

- **Racial Affinity Groups for Staff.** Deemar also alleges that "District 65 mandated that all staff undergo Beyond Diversity training by 2019, using Courageous Conversation materials that employ race-based affinity groups." *Id.* at 11 ¶ 55. "For example, in the exercise called Engaging Multiple Racial Points of View, Beyond Diversity facilitators segregate educators into racial affinity groups to read and discuss a poem." *Id.* at 11 ¶ 56.

- **Racial Affinity Groups for Students.** Deemar also alleges that District 65 offered affinity groups for students based on their race and gender. *Id.* at 20–21 ¶¶ 125–35.

- **Privilege Walks for Staff.** During some trainings, District 65 required teachers to rate the applicability of a number of scenarios to their lives on a scale of 0–5, *e.g.*, "Because of my race or color, if I should need to move, I can be pretty sure of renting or purchasing housing in an area which I can afford and in which I would want to live." *Id.* at 17 ¶ 92. Participants are then told to form a line, with the highest scores on the left and the lowest scores on the right. The Courageous Conversation facilitator then reads a series of prompts. For each prompt, individuals to whom it applies are instructed to take a step forward. Near the end of the exercise, the facilitator asks all white people standing in line to step forward. The facilitator concludes, "What you see is White privilege and the color line." *Id.* at 17 ¶¶ 93–95.

- **Privilege Walks for Students.** Deemar alleges that the District also conducted privilege walk activities, to the effect described above, for students. *Id.* at 22–23 ¶¶ 136–39.

- **Professional Learning for Administrators:** *White Fragility.* Deemar alleges, "District 65 administrators read the book *White Fragility* by Robin DiAngelo. For the book discussions, District 65 separated administrators into different affinity groups based on their race. Specifically, District 65 excluded white administrators from the rest of their colleagues by placing them in a separate discussion group." *Id.* at 18 ¶ 99. She then excerpts several quotes from the book, copies of which she also alleges were offered to teachers, including, for example, "[w]hite identity is inherently racist; white people do not exist outside the system of white supremacy," *id.* at 18 ¶ 103, and, "white people raised in Western society are conditioned into a white supremacist worldview because it is the bedrock of our society and its institutions," *id.* at 18 ¶ 104.

- **Student Curriculum/Black Lives Matter Week.** Deemar also alleges that during the 2019–20 and 2020–21 school years, the District held "Black Lives Matter at School Weeks of Action," during which teachers and students worked through lesson plans about racism, which Deemar alleges were themselves racially discriminatory.

3

> According to Deemar, she was instructed to teach a lesson about intersectionality during one of these weeks. *Id.* at 25 ¶ 151. During one of these weeks, teachers were instructed to read aloud a book that teaches things such as: "Racism is a white person's problem and we are all caught up in it," *id.* at 25–26 ¶¶ 154–56, "In the United States of America, white people have committed outrageous crimes against Black people for four hundred years," *id.* at 26 ¶ 158, and "Whiteness is a bad deal. It always was," *id.* at 26 ¶ 161. Deemar also alleges that, following this reading, teachers ask students, "What does it mean to be white but not be a part of 'whiteness'?". *Id.* at 26 ¶ 163.

In its prior Order, this Court noted that Deemar had not alleged that she was herself treated differently based on her race, which proved fatal to her equal protection claim. Mem. Op. & Order 10–11, 19, ECF No. 65. Deemar's amended complaint contains additional allegations about her experience at District 65.

Deemar first adds allegations regarding racially segregated staff meetings. She says that during the 2017–2018 school year, District 65 held staff meetings on Wednesday afternoons, which Deemar consistently attended. First Am. Compl. 12 ¶¶ 59–60. At one of the meetings that Deemar attended, the school principal "directed all white staff to one room and all non-white staff to a different room for that afternoon's meeting." *Id.* at 12 ¶ 63. Deemar further alleges that mandatory segregated staff meetings took place on Thursdays during the same school year, but that she did not attend those meetings because she did not work during those times. *Id.* at 13 ¶¶ 66–69.

Other new allegations involve District 65's professional development programming. During the 2019–2020 school year, District 65 held professional development training for racial affinity groups, including a workshop on self-care for Asian and LatinX staff members and a workshop for Indigenous and Black staff members. *Id.* at 14 ¶ 80. Deemar says she would have attended workshops "had they been available to her, but she was excluded from many of them based on her race." *Id.* at 14–15 ¶ 81. District 65 also offered grants and summer programs aimed at furthering its teachers' professional development. *Id.* at 33 ¶¶ 206, 211. In 2023, District 65

4

advertised an available grant, noting that it was "especially committed to supporting educators of color." *Id.* at 33 ¶ 209. Deemar does not allege that she applied for this grant. Also in 2023, District 65 offered a summer program for teachers to help revise the curriculum, stating that "this work will need a diverse team of early childhood educators." *Id.* at 33 ¶ 214. Deemar says she understood District 65 to mean that non-white staff would be given preference, *id.* at 33 ¶ 215, but again does not allege that she applied for the program. She alleges that "because of District 65's racial stereotyping and animus, the stigma against her because of her race, the aggressive and racist philosophy being promoted, and the racial segregation present in many events," she was unable to pursue professional development opportunities with the district and instead had to enroll in an Ed.D. program at Northeastern University. *Id.* at 32 ¶¶ 203–04.

Finally, Deemar alleges that her students harassed her through "race-based insults and accusations," including calling her a "terrible person" and accusing her of not liking Black people. *Id.* at 34 ¶ 220–24. She asserts that District 65 knew of the alleged harassment and did nothing to stop it. *Id.* at 34 ¶ 219. In fact, Deemar blames District 65's equity messaging for the treatment she faced from her students. *Id.* at 34–35 ¶¶ 227–29.

In response to Deemar's amended complaint, the defendants again filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6), arguing both that Deemar lacks standing to bring this action and that she fails to state a plausible claim for relief.

## DISCUSSION

### I. Standing

The Court must first determine if it has subject-matter jurisdiction to hear this case. Article III of the Constitution requires that a plaintiff have standing to bring her claim in federal court. In other words, Deemar must have a real stake in the outcome of the case for this Court to have jurisdiction over her claims. To meet Article III's standing requirements, Deemar must have

5

suffered an injury-in-fact that is traceable to the defendants' actions and redressable by a favorable decision of this Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Because Deemar's complaint contains allegations about several different types of conduct, and different kinds of conduct are relevant to each of Deemar's claims, the Court analyzes which particular conduct can give rise to Deemar's claim of injury for each claim. *See* Mem. Op. & Order 8.

### a. Equal Protection Clause

The Court first considers whether Deemar has standing to bring her equal protection claim. In its order granting the defendants' first motion to dismiss, this Court found that Deemar did not allege an injury-in-fact because she did not show that the District "treated her differently on the basis of her race." Mem. Op. & Order 10. Deemar subsequently amended her complaint, attempting to address the pleading deficiencies outlined in this Court's prior order.

An injury-in-fact must be both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). For this reason, Deemar must show that she has standing for each remedy she seeks. A harm that has already occurred can support retrospective relief, but Deemar must demonstrate that she is "likely to suffer future injury" of the same sort in order to seek prospective equitable relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Deemar seeks nominal damages, a declaratory judgment, and an injunction. Nominal damages are retrospective, injunctions are prospective, and declaratory judgments can take either form. *See Green v. Mansour*, 474 U.S. 64, 73–74 (1985) (noting that declaratory judgments can be retrospective but may not be used as an end-run around sovereign immunity concerns).

6

### i. Retrospective Relief

Deemar first seeks nominal damages to redress her alleged harm. At the outset, the Court notes that nominal damages can redress a past constitutional injury. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 285 (2021). Nonetheless, the defendants maintain that Deemar's amended complaint still does not allege that she suffered a constitutional injury, for two reasons: first, she did not seek to participate in the racial affinity groups or apply for grants, and second, she did not suffer any harm from participating in the segregated staff meeting. Reply 1–2. The Court considers each in turn.

The defendants say that Deemar's amended complaint suffers the same deficiencies as her first, because it does not "allege she attempted to enroll and was denied participation in the District's professional development programs." Mot. Dismiss Mem. 6. They argue that Deemar merely "assumed" she wouldn't be able to attend, which is insufficient for standing. Reply 1–2. But the plaintiff explicitly alleges that "she was excluded from many [workshops] based on her race, including the 'Courageous Self Care' session exclusive to 'Asian and LatinX' staff." First Am. Compl. 14–15 ¶ 81. The allegation that Deemar herself was "excluded" is sufficient to draw the reasonable inference that she was explicitly told that she was not permitted to attend. Whether or not that is true is a factual question for summary judgment or trial.

Next, the defendants posit that Deemar does not allege she actually suffered any harm from attending the segregated staff meeting. Reply 3 ("Any possible indefinable and unexplained injury or harm resulting from a single meeting is de minimis at best and is insufficient to support standing."). But Deemar does allege that District 65's actions caused "intense stigmatization of white people like her." First Am. Compl. 5 ¶ 14. As this Court explained in its prior order, allegations of stigma do allege a cognizable harm:

> [I]magine if the District forced white teachers to teach in classrooms on the southwest side of the school and allowed non-white teachers to teach anywhere, and assume that there is no tangible benefit to teaching in any particular area of the school. A white teacher could still demonstrate that they suffered a cognizable injury by alleging that there is a harmful stigma associated with being relegated to one side of the building while teachers of other races can teach anywhere. *See, e.g.*, *Freeman v. Pitts*, 503 U.S. 467, 485–86 (1992) (noting that stigmatic injury is the principal wrong of de jure segregation).

Mem. Op. & Order 10. Deemar thus alleges a concrete and particularized injury-in-fact that could be redressed by an award of nominal damages.

There are, however, a number of injuries Deemar alleges for which she does not have standing to sue. For the reasons this Court has already explained, simply being exposed to messaging Deemar does not agree with is not harm cognizable under Article III. *Id.* at 11 ("The school's messaging itself, which Deemar alleges differentiates among races, cannot itself be considered unequal treatment, nor can Deemar's feelings of stigmatic injury stemming from her exposure to those statements furnish her with a basis for Article III standing."). The same goes for the grants and programming for which she did not apply. *See id.* at 18 ("[Deemar] was no more personally subject to these incidents than, for instance, a student who receives a letter inviting them to apply to a university that offered preferential admissions based on race but who otherwise does not intend to apply."). Finally, as noted in this Court's prior order, Deemar has no standing to bring a claim on behalf of any alleged harms done to her students. *Id.* at 19.

#### ii. Prospective Relief

As noted above, Deemar must also show that she has standing to seek prospective relief. To do so, she must allege that she faces a "real and immediate threat" of being subjected to another segregated meeting or denied access to an affinity group workshop. *Lyons*, 461 U.S. at 105. This Court told her as much in its prior Order. Mem. Op. & Order 18 ("[T]o the extent that Deemar seeks prospective relief, she must also plausibly allege her intentions with respect to future

8

segregated meetings."); *see also Morgan v. Fed. Bureau of Prisons*, 129 F.4th 1043, 1048–49 (7th Cir. 2025) (holding that plaintiff did not have standing to seek an injunction against the Bureau of Prisons' dietary policies where he did not allege that he intended to purchase the relevant food item again).

Deemar's amended complaint does not contain allegations sufficient to establish that she currently faces a real and immediate threat. The segregated meeting that Deemar says she attended took place during the 2017–2018 school year, and the racial affinity group workshops were held during the 2019–2020 school year. The amended complaint provides no additional allegations about District 65 treating Deemar differently because of her race since the filing of the original complaint. Deemar does not allege that she intends to try to attend future segregated meetings or workshops. In addition, Deemar was assigned to a new school (Lincoln Elementary School) for the 2024–2025 school year. First Am. Compl. 31 ¶ 190. She makes no allegations about her treatment at that school. This change in circumstances and dearth of accompanying allegations makes it even more uncertain that Deemar faces any future harm. *Cf. Morgan*, 129 F.4th at 1049 (considering the fact that the plaintiff had been moved to a different facility as part of a prospective standing analysis). Deemar therefore does not have standing to seek an injunction on her equal protection claim. She may, however, seek a backward-looking declaratory judgment as a predicate for damages.[4] *Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004) ("When a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive.").

---

[4] This is only true to the extent Deemar is suing the defendants in their personal capacities. A backward-looking declaratory judgment running against the defendant officers in their official capacities would be an impermissible "end run" around the Eleventh Amendment, *Green*, 474 U.S. at 73, because it would only serve as a predicate to a retrospective award of damages, which is unavailable in an official-capacity suit. *Edelman v. Jordan*, 415 U.S. 651, 678 (1974).

### b. Title VI

In the Order granting the defendants' first motion to dismiss, this Court found that Deemar had standing to bring her Title VI claim. Though her original allegations about District 65's actions did not demonstrate that she was treated differently because of her race, the Court noted that each of Deemar's allegations about District 65's treatment of race could "contribute to an overall racially hostile environment that injures her in a cognizable way." Mem. Op. & Order 22. That is at least as true for the amended complaint, given that it adds allegations about racial discrimination aimed at her in particular. Deemar has standing to seek retrospective relief for her Title VI claim. But again, she cannot seek prospective relief, because her complaint is entirely devoid of allegations about her new school.

## II. Failure to State a Claim

Because Deemar has standing to seek at least some forms of relief for both her equal protection and Title VI theories, the Court next considers whether she states a claim under either theory. On a motion to dismiss, the Court accepts the pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *Kilborn v. Amiridis*, 131 F.4th 550, 554 (7th Cir. 2025). The Court does not, however, accept legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Viewed in this light, a complaint must state a facially plausible claim to relief to overcome the motion to dismiss. *Id.*

### a. Equal Protection Clause

Deemar argues that holding a segregated staff meeting and racial affinity group sessions that were unavailable to white people violated the Equal Protection Clause. In other words, she alleges that the defendants' actions were facially discriminatory because they explicitly drew distinctions based on race. Courts apply strict scrutiny to facially discriminatory government

10

actions under the Equal Protection Clause. *United States v. Skrmetti*, 605 U.S. 495, 510 (2025) (noting that "laws that classify on the basis of race, alienage, or national origin trigger strict scrutiny"). Such an action "will pass constitutional muster 'only if [it is] suitably tailored to serve a compelling state interest.'" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).

Defendants maintain that Deemar has not suffered an equal protection violation. They argue that *Brown v. Board of Education*, 347 U.S. 483 (1954), only stands for the proposition that segregation *can* be wrongful, not that it always is. Reply 3–4.[5] This argument is reminiscent of what is known as the "anti-subordination" theory of the Fourteenth Amendment, which essentially posits that racial classifications are problematic only when they harm a socially disadvantaged group. Jack M. Balkin & Reva B. Siegel, *The American Civil Rights Tradition: Anticlassification or Antisubordination?*, 58 U. Miami L. Rev. 9, 9–10 (2003). Another view, though, is one of anticlassification, which posits that the government can never classify based on race. *Id.* at 10. Deemar champions the latter theory of the Equal Protection Clause.

Recent Supreme Court precedent makes clear that at least for Deemar's purposes, the anticlassification reading of *Brown* must win out. Though the defendants argue that they were attempting to "address the longstanding gaps and inequities" between racial groups, Mot. Dismiss Mem. 3, the Supreme Court has instructed that "ameliorating societal discrimination does not constitute a compelling interest that justifies race-based state action." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 226 (2023). The

---

[5] Though defendants argue that Deemar does not have Article III standing for this reason, it is better understood as an argument on the merits. She alleges that she suffered stigmatic harm; that suffices for standing. This argument instead gets at whether Deemar has alleged a violation of the Equal Protection Clause.

segregated meetings and racial affinity groups that Deemar alleges were closed to white people, then, cannot withstand strict scrutiny. Deemar states a claim under the Equal Protection Clause.

### b. Title VI

Title VI outlaws racial discrimination in any "program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Deemar alleges that District 65, which receives federal funding, both intentionally discriminated against her and created a hostile educational environment in violation of Title VI. First. Am. Compl. 36–37. An intentional discrimination claim under Title VI comprises two elements: "(1) that [the plaintiff has] been intentionally discriminated against on the grounds of race; and (2) that defendants are recipients of federal financial assistance." *Beaulieu v. Ashford Univ.*, 529 F. Supp. 3d 834, 850 (N.D. Ill. 2021). A hostile educational environment claim, meanwhile, requires a showing of racial "harassment 'so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Doe v. Galster*, 768 F.3d 611, 614 (7th Cir. 2014) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

The defendants argue that Deemar fails to state a plausible claim for relief under Title VI based on either discrimination or harassment, first because she is not within the zone of interests protected by the statute and second, because her claim concerns District 65's employment practices rather than its educational environment. The Court considers each argument in turn.

### i. Zone of Interests

The defendants first contend that Deemar is not within the zone of interests protected by Title VI. While zone-of-interests arguments are often imprecisely referred to as "prudential standing" arguments, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) ("[P]rudential standing is a misnomer as applied to the zone-of-interests analysis, which

12

asks whether this particular class of persons has a right to sue under this substantive statute." (citation modified)), this is actually a statutory interpretation argument about what Congress intended when it enacted Title VI. While Title VI provides no express private right of action, the Supreme Court has consistently held that there exists an implied right of action for Title VI violations. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002); *see also Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 376 (7th Cir. 2010) ("The Supreme Court recognized that Title VI itself included an implied private right of action for both injunctive relief and damages for violations of the statute itself . . . ."). The question, then, is whether that implied right of action extends to Deemar.

Defendants contend that Deemar, as a teacher, is not the intended beneficiary of educational benefits provided by the federal government and therefore cannot sue under Title VI. The defendants point to Seventh Circuit precedent holding that "the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program" to bring a Title VI claim. *Doe ex rel. Doe v. St. Joseph's Hosp.*, 788 F.2d 411, 418 (7th Cir. 1986) (citation omitted). That is, a Title VI plaintiff would need to be the intended beneficiary of the specific program supported by federal funds, not just involved in a different program at an institution which received federal funding. The Seventh Circuit based its reasoning on Title VI's language and legislative history. *See Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, 1232–35 (7th Cir. 1980) (applying reasoning from Title VI to Rehabilitation Act), *superseded by statute*, Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28, *as recognized in T.S. ex rel. T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737 (7th Cir. 2022).

When the Seventh Circuit decided *St. Joseph's Hospital* and *Simpson*, establishing the intended-beneficiary requirement, Congress had not yet defined what constituted a "program or

13

activity." *See Consol. Rail Corp. v. Darrone*, 465 U.S. 624 (1984). But Congress later passed the Civil Rights Restoration Act of 1987 ("CRRA"), which defined a "program or activity" under Title VI (and the Rehabilitation Act) as "*all* the operations" of an entity which receives federal funding. Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, § 6, 102 Stat. 28 (emphasis added). Based on the CRRA, the Seventh Circuit decided that for purposes of the Rehabilitation Act, Congress had made clear that "the intended-beneficiary, program-specific condition" no longer governs. *Heart of CarDon*, 43 F.4th at 746. But, it later noted, "*Heart of CarDon* was not a Title VI case, and we have not yet addressed whether the Civil Rights Restoration Act eviscerates the 'intended beneficiary' rule we laid out in *St. Joseph's Hospital* for Title VI." *Collins v. Ctrs. for Medicare & Medicaid Servs.*, No. 24-2557, 2025 WL 599630, at *3 (7th Cir. 2025). In *Collins*, the Seventh Circuit left it to the district court, in the first instance, to resolve the question "in a manner consistent with *Heart of CarDon*." *Id.*

There are compelling reasons to think that the CRRA expands the universe of potential Title VI plaintiffs in the same way that it extended the universe of Restoration Act plaintiffs. The similarity between the two statutes spurred the Seventh Circuit to apply the "intended beneficiary" rule to the Restoration Act in the first place, based on its reasoning in the Title VI context. Indeed, the court noted that the Rehabilitation Act "was modeled after, and Congress intended that it be enforced in the same manner as, the antidiscrimination mandate of" Title VI. *Simpson*, 629 F.3d at 1235. If the two statutes are to be enforced in the same manner, then the court's reasoning about the Rehabilitation Act's zone of interests should apply equally to Title VI. What's more, the CRRA added almost exactly the same language to both the Rehabilitation Act and Title VI. *Compare* Pub. L. No. 100-259 § 4 ("For the purposes of this section, the term 'program or activity' means all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a

State or of a local government . . . ."), *with id.* § 6 ("For the purposes of this title, the term 'program or activity' and the term 'program' mean all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . ."). The Court sees no reason why the logic in *Heart of CarDon* would not apply to Title VI, and therefore joins the courts in this circuit that have decided that Title VI plaintiffs no longer need satisfy the "intended beneficiary" rule. *See Collins v. Advoc. Aurora Health Inc.*, No. 24-cv-0490, 2025 WL 3215758, at *3 (W.D. Wis. Nov. 18, 2025); *Patterson v. Sandage*, No. 20-cv-01073, 2023 WL 2582613, at *5 (C.D. Ill. Mar. 20, 2023).

Without the "intended beneficiary" rule, all Deemar need allege is that an educational entity receiving federal funds racially discriminated against her. Because she alleges just that, she falls within Title VI's zone of protected interests.

### ii. Educational or Employment Claim

The defendants next argue that Deemar's claim is actually about the defendants' employment practices, not the educational environment, barring her from bringing it under Title VI. Federal law states that no person can sue under Title VI regarding any employment practice, "except where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3. The defendants argue that, although District 65 receives Title II funding,[6] the primary purpose of that funding is to "support[] the educational needs of students, not provid[e] employment to teachers." Mot. Dismiss. Mem. 11. This Court agrees. By its own terms, Title II funding is intended to:

---

[6] Title II is part of the Elementary and Secondary Education Act ("ESEA"), Pub. L. No. 89-10, § 1001, 79 Stat. 27 (1965). ESEA's statutory purpose "is to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." 20 U.S.C. § 6301 (West).

(1) increase student achievement consistent with the challenging State academic standards;

(2) improve the quality and effectiveness of teachers, principals, and other school leaders;

(3) increase the number of teachers, principals, and other school leaders who are effective in improving student academic achievement in schools; and

(4) provide low-income and minority students greater access to effective teachers, principals, and other school leaders.

20 U.S.C. § 6601. Each of these objectives is centered around improving the learning experience for students, not employing teachers for its own sake. This language cannot establish that Title II funding's primary purpose is employment. Deemar doesn't dispute that; she says that she is only making an educational environment claim, not an employment one. Resp. 8. For these reasons, Deemar can only state a Title VI claim if her allegations involve education and not District 65's employment practices.

What constitutes an "employment practice"? Section 2000d-3 does not say. Nor has the Seventh Circuit interpreted it. Title VII, however, does define "employment practice." Title VII was enacted in conjunction with Title VI as part of the Civil Rights Act of 1964. *Bloomberg v. N.Y.C. Dep't of Educ.*, 119 F.4th 209, 215 (2d Cir. 2024). The typical rules of statutory construction provide that "when Congress uses a term in multiple places within a single statute, the term bears a consistent meaning throughout." *Azar v. Allina Health Servs.*, 587 U.S. 566, 576 (2019); *see Bloomberg*, 119 F.4th at 215. That presumption is even stronger here, where "Congress designed [2000d-3] so that Title VI would not 'impinge' on Title VII," meaning that an employment practice actionable under Title VII should not also be actionable under Title VI. *Id.* at 216.

16

Title VII defines an unlawful employment practice as, in part, "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000 e-2. Applying that definition to Title VI, it is clear that Deemar's claim does regard an employment practice. Recall that Deemar's amended complaint sets forth two different theories under Title VI: one for intentional discrimination and one for a hostile educational environment. For the first, Deemar says that she was treated differently from her non-white colleagues because of the staff meetings, race-based programming, affinity groups, privilege walks, and policies regarding race. First Am. Compl. 367 ¶ 244. She alleges that she "was constantly bombarded with invitations to attend various events she refused to attend because she knew that they would either involve racial segregation or would involve her being taught that she was evil, racist, and harmful to non-white people because she is white." *Id.* at 36–37 ¶ 245. But the meetings, policies, and programming that Deemar refers to were all either a condition or privilege of her employment. To the extent she was required to attend those programs or follow those policies, they were a condition of her employment. And to the extent she wanted to attend them, they were a privilege of her employment.

Regarding Deemar's hostile educational environment claim, she asserts that she lost out on "professional development and other programming aimed at furthering her education as a teacher" provided by District 65. First Am. Compl. 38 ¶ 260. But the professional development and other educational programming that District 65 provides to its teachers is a privilege of her employment with District 65. The programs are not for students or for the general public. District 65 employees have access to those opportunities by way of their status as employees.

Deemar argues that this Court should instead define an "employment practice" by reference to the Department of Education's Title VI regulations. Resp. 9. Those regulations state that

17

employment practices "include[e] recruitment or recruitment advertising, employment, layoff or termination, upgrading, demotion, or transfer, rates of pay or other forms of compensation, and use of facilities." 34 C.F.R. § 100.3(c)(1). But agency regulations are not authoritative, and a court must independently interpret the statute. *Cf. McLaughlin Chiropractic Assoc. v. McKesson Corp.*, 606 U.S. 146, 155 (2025) ("In an enforcement proceeding, a district court must independently determine for itself whether the agency's interpretation of a statute is correct."). And even if this Court adopted the Department of Education's reading, the regulation specifically says "including," indicating that the list is not comprehensive. It therefore provides no reason to exclude staff meetings and professional development workshops from the universe of employment practices.

Because Deemar's Title VI allegations all involve District 65's employment practices, she is statutorily barred from bringing a Title VI claim.

\*       \*       \*

Deemar's amended complaint fares slightly better than her first. It contains factual allegations that, if true, establish that she suffered a past harm. It does not, however, provide sufficient reason to think that she faces imminent harm in the future, so she does not have standing to seek prospective relief. As for the merits, Deemar's amended complaint states an equal protection claim, but not a Title VI claim. Federal law prohibits Title VI claims regarding employment, and Deemar's claim is fundamentally about District 65's employment practices, not its educational environment.

Date: June 23, 2026

John J. Tharp, Jr.
United States District Judge

18